UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> SANGWOO MAH, D.C., SEUNG HYUK CHOI, P.T., HO RHEEM RIM, L.AC., SEUNG YEON SONG, L.AC., JOHN S. CHO, M.D., DANIEL J. YOO, M.D., NORTHERN PHYSICAL THERAPY, CHIROPRACTIC AND ACUPUNCTURE, PLLC, BETHEL INTERVENTIONAL PAIN MANAGEMENT LLC, WESTERN JANEDA ORTHOPEDICS OF NEW JERSEY L.L.C., AND HACKENSACK SURGERY CENTER, L.L.C., <br><br> Defendants. | C.A. No. _____ |

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., allege as follows:

**I.     INTRODUCTION**

1.     This case is about a scheme to defraud Allstate involving the deliberate and systematic exploitation of automobile accident victims and the insurance coverage available to them.

2.     The first aspect of this scheme involves a plan devised by Defendant Sangwoo Mah, D.C. ("Mah") and then carried-out through a series of healthcare providers that operated from a

1

clinic located at 150-01 Northern Boulevard in Flushing, NY (hereinafter referred to as the "Northern Boulevard Clinic").

3.      Overseen by Mah, the Northern Boulevard Clinic housed several healthcare providers who banded together to propel this scheme through Northern Physical Therapy, Chiropractic & Acupuncture, PLLC ("NPTCA"), an enterprise that stole hundreds of thousands of dollars from Allstate through the submission of fraudulent claims for reimbursement of No-Fault benefits under New York law.

4.      In this aspect of the scheme, Mah conspired with Defendants Seung Hyuk Choi, P.T., ("Choi"), Seung Yeon Song, L.Ac. ("Song"), and Ho Rheem Rim, L.Ac. ("Rim") (hereinafter collectively referred to as the "Sham Members") to organize and then operate NPTCA in New York.

5.      NPTCA was purposely formed as a professional limited liability company ("PLLC"), and NPTCA has, at all relevant times, been managed, operated and controlled in violation of New York law.

6.      Led by Mah, NPTCA was caused to seek and collect No-Fault benefit payments from Allstate even though NPTCA was not lawfully eligible to receive such payments.

7.      To create the illusion of compliance with New York law, Mah recruited Choi, Song, and Rim to act as sham members of the PLLC, while Mah enjoyed all of the rights and privileges as NPTCA's actual owner, including transacting business with NPTCA for his own personal gain, and reaping nearly all of the profits generated from the delivery of acupuncture, physical therapy, and chiropractic services to NPTCA's patients.

8.      Even though NPTCA's publicly-filed corporate records list Song, Rim, and Choi as licensee-members of the company, such representations are false because no one other than Mah ever had the right to operate, manage, and control NPTCA.

9.      As detailed herein, Mah purposely structured NPTCA such that Song, Rim, and Choi were restricted from exercising any meaningful control over the company, and were divested of their right to realize the proceeds and profits generated through the provision of acupuncture and physical therapy services to patients of NPTCA.

10.      Mah also installed himself as the managing member of NPTCA, a position which entitled Mah to control the operation and management of NPTCA without any input from the Sham Members.

11.      Because NPTCA was structured and managed in this manner, it was unlawfully operated and controlled by Mah and was thus never lawfully eligible to seek or collect No-Fault benefit payments from Allstate.

12.      The second aspect of this scheme involves fraudulent tests and treatments provided to patients of the Northern Boulevard Clinic by Mah and the Sham Members acting through NPTCA.

13.      As detailed herein, acting through NPTCA, Mah and the Sham Members unlawfully provided and then billed for tests and treatments that were (a) medically unnecessary, (b) fraudulently reported, (c) part of a pre-determined protocol of treatment, and (d) provided for the sole purpose of maximizing the profits of the provider rather than improving the condition of the patient.

14.    Because the tests and treatments provided by Mah and the Sham Members were medically unnecessary, fraudulently reported, and not lawfully rendered, the No-Fault benefit claims submitted by NPTCA for these tests and treatments are not compensable.

15.    The third aspect of this scheme involves Mah's unwarranted referrals of NPTCA patients to other healthcare providers such as Defendant John S. Cho, M.D. ("Cho") and Defendant Daniel J. Yoo, M.D. ("Yoo") for additional tests and services, which themselves were medically unnecessary, fraudulently charged, and not lawfully rendered.

16.    The referrals of NPTCA patients to these other providers were intended to fabricate false justifications for continued therapeutic treatments—justifications that Mah and the Sham Members exploited by providing further tests and treatments to the NPTCA patients.

17.    These referrals also gave the other healthcare providers, such as Cho and Yoo, the opportunity to conduct evaluations of the NPTCA patients—evaluations that were intended to generate recommendations for additional services, such as MRI studies, pain management services, injections, and surgeries.

18.    Throughout the course of this scheme, the defendants utilized this patient referral arrangement as a means to steer as many patients as possible into choosing to undergo a battery of injections and surgeries that were invasive, uncomfortable, unneeded, unwarranted, and potentially harmful.

19.    Acting through Defendant Bethel Interventional Pain Management LLC ("Bethel Interventional"), Cho accepted NPTCA patient referrals, evaluated the NPTCA patients, ordered and interpreted MRI studies, recommended pain management services, and then administered those pain management services to the NPTCA patients.

4

20.     Acting through Defendant Western Janeda Orthopedics of New Jersey L.L.C. ("Western Janeda"), Yoo also accepted NPTCA patient referrals, conducted orthopedic evaluations of the NPTCA patients, recommended surgical procedures, and then performed those surgical procedures upon the NPTCA patients.

21.     Consistent with the means and motives of this scheme, Cho subjected the patients that he treated under Bethel Interventional to an array of evaluations and pain management services that were (a) medically unnecessary, (b) fraudulently reported, (c) falsely billed, (d) part of a pre-determined protocol of treatment, and (e) provided for the sole purpose of maximizing the profits of the provider rather than improving the condition of the patient.

22.     Likewise, Yoo also subjected the patients that he treated under Western Janeda to a panoply of surgeries and experimental injections that were (a) medically unnecessary, (b) fraudulently reported, (c) falsely billed, (d) part of a pre-determined protocol of treatment, and (e) provided for the sole purpose of maximizing the profits of the provider rather than improving the condition of the patient.

23.     Because the services provided to NPTCA patients by Cho and Yoo were (a) not medically necessary, (b) fraudulently reported, and (c) falsely charged, the No-Fault benefit claims submitted by Bethel Interventional and Western Janeda for these services are not compensable.

24.     Additionally, because Mah and the Sham Members provided further tests and treatments to NPTCA patients based on the recommendations generated from Cho's and Yoo's fraudulent evaluations, the No-Fault benefit claims submitted by NPTCA for these services are not compensable.

25.     The fourth aspect of this scheme involved Cho's and Yoo's provision of and billing for evaluations and services to patients in New York through Bethel Interventional and Western Janeda even though these entities were not lawfully authorized to operate in New York.

26.     Because Bethel Interventional and Western Janeda were not authorized to operate in New York, the evaluations and services provided to patients by Cho and Yoo through these entities were not lawfully rendered.

27.     Accordingly, because these evaluations and services provided to New York patients were not lawfully rendered, the No-Fault benefit claims submitted by Bethel Interventional and Western Janeda in connection with these New York patients are not compensable.

28.     A fifth aspect of this scheme involves fraudulent surgeries performed upon patients of Western Janeda.

29.     As detailed herein, Yoo recommended an array of surgeries and other services when evaluating patients of Western Janeda.

30.     When the Western Janeda patients accepted Yoo's recommendations for surgery, Yoo self-referred all of the patients to Defendant Hackensack Surgery Center, L.L.C. ("Hackensack Surgery") for the procedures.

31.     Hackensack Surgery is an ambulatory care facility located in New Jersey and owned, in part, by Yoo.

32.     In this part of the scheme, Yoo subjected patients of Western Janeda to an array of surgeries and injections performed at Hackensack Surgery in New Jersey that were (a) medically unnecessary, (b) falsely reported, (c) fraudulently billed, and (d) performed as the direct result of a patient referral made in violation of New Jersey law.

33.     Because the surgeries and injections were medically unnecessary and fraudulently billed, the No-Fault benefit claims submitted by Western Janeda and Hackensack Surgery for these procedures are not compensable.

34.     As detailed herein, Yoo's self-referrals of Western Janeda patients to Hackensack Surgery for surgeries and injections were unlawful because Yoo's dual ownership of Western Janeda and Hackensack Surgery was not lawfully disclosed to patients at or prior to the time that the referrals were made.

35.     Because the surgeries and injections were the product of unlawful self-referrals between entities owned by Yoo, the services were not lawfully rendered, and thus the No- Fault benefit claims submitted by Western Janeda and Hackensack Surgery for these procedures are not compensable.

36.     The sixth and final aspect of this scheme involved the deliberate inflation of charges submitted to Allstate by Bethel Interventional, Western Janeda, and Hackensack Surgery.

37.     The amounts charged for the surgeries and injections provided by Yoo through Western Janeda and Hackensack Surgery and the pain management services provided by Cho through Bethel Interventional are governed by law regardless of whether the services are provided in New York or New Jersey.

38.     Despite knowing these fee restrictions, Bethel Interventional, Western Janeda, and Hackensack Surgery intentionally submitted grossly excessive charges for the services provided by Cho and Yoo.

39.     Bethel Interventional, Western Janeda, and Hackensack Surgery were also caused to submit charges for services that were unbundled and/or for services that were never provided at all.

40.     As a direct and proximate result of the defendants' unlawful conduct during the course of this entire scheme, Allstate was wrongfully induced to make "No-Fault" insurance payments totaling over $2,217,000.00 in connection with reimbursement demands made by NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery.

41.     Through this action, Allstate seeks to recover all monies wrongfully paid to NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery.

42.     Allstate's claim for compensatory damages includes: (a) payments made by Allstate to NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery in reliance upon the defendants' false representations that NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery were eligible to receive reimbursement under New York's No-Fault laws; (b) payments made by Allstate to NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery in reliance upon the false medical documentation submitted, or caused to be submitted, by the defendants; (c) treble damages; (d) interest; (e) costs; and (f) attorney's fees.

43.     In addition to compensatory damages, Allstate also seeks a declaration that it has no legal obligation to make any payments on any and all previously denied and/or currently unpaid claims submitted by (or on behalf of) NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery because the tests and treatments purportedly provided to Allstate-covered patients were rendered in direct violation of one or more licensing requirement necessary to provide such tests and treatments, thus rendering NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery completely ineligible to seek No-Fault reimbursement under prevailing New York laws and regulations.

44.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken purposely, knowingly, and intentionally.

45.     Each defendant named herein conspired with at least one other defendant to accomplish and to further the objectives of their scheme to defraud.

46.     The defendants purposely designed and executed this scheme with the express aim of eliciting payment of automobile insurance contract proceeds from Allstate to NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery for the benefit of each and all of the defendants named herein.

47.     In each claim detailed throughout this Complaint and in the accompanying Exhibits, an Allstate automobile insurance contract was the platform upon which the defendants perpetrated their scheme to defraud.

48.     The defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

49.     Allstate estimates that the defendants, in furtherance of this scheme, purposely and knowingly submitted hundreds of bills for tests and services purportedly rendered to persons eligible for insurance coverage under Allstate insurance policies.

50.     By this Complaint, and as detailed in each count set out below, Allstate asserts claims against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; (c) unjust enrichment; and (d) declaratory relief.

## II.    THE PARTIES

### A.    PLAINTIFFS

51.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

52. Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company each have their principal place of business in Northbrook, Illinois.

53. At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company were each authorized to conduct business in New York.

**B.    DEFENDANTS**

**1.    Sangwoo Mah, D.C.**

54. Mah resides in and is a citizen of the State of New York.

55. At all relevant times, Mah has been licensed to provide chiropractic services in the State of New York.

56. However, Mah has never been licensed or otherwise authorized to provide acupuncture services in the State of New York or elsewhere.

57. Likewise, Mah has never been licensed or otherwise authorized to provide physical therapy services in the State of New York or elsewhere.

58. During the relevant period, Mah was the managing member of NPTCA and was vested with near-exclusive authority over the operation, management, and control of NPTCA, including the right to receive nearly all of the profit realized through the delivery of acupuncture and physical therapy services to the company's patients.

59. As detailed herein, Mah participated in the operation and management of NPTCA, and also conducted the affairs of NPTCA through a pattern of mail fraud racketeering activity.

60.     Mah furthered the objectives of this scheme (i.e., stealing money from Allstate) by (a) fraudulently forming NPTCA as a PLLC under New York law, (b) dominating the operation, management, and control of NPTCA, (c) facilitating unneeded (and sometimes unlawful) patient referrals for diagnostic tests and other healthcare services, (d) providing unnecessary healthcare services, (e) administering unnecessary diagnostic tests, and (f) demanding and collecting payment for these unnecessary tests and services.

61.     As detailed herein, Mah also exerted unlawful control over Bethel Interventional in connection with Cho's purported provision of physician services to patients at the Northern Boulevard Clinic.

62.     Because he directly participated in the operation and management of the NPTCA and Bethel Interventional enterprises, Mah is thus responsible for the fraudulent and non-compensable tests and services rendered to patients of those entities at issue in this Complaint.

### 2.     Seung Hyuk Choi, P.T.

63.     Choi resides in and is a citizen of the State of New York.

64.     At all relevant times, Choi has been licensed to practice physical therapy in the State of New York.

65.     Choi participated in this scheme by serving as a sham member of NPTCA.

66.     As detailed herein, Choi ceded all material control over NPTCA to Mah, and also relinquished to Mah the right to collect the majority of the proceeds and profits generated from the delivery of physical therapy services to patients of NPTCA.

67.     Even though he did not actually control NPTCA, Choi still participated in the operation of NPTCA as a sham member and as a provider of physical therapy services, and is thus

responsible for the fraudulent and non-compensable tests and services provided to patients of NPTCA at issue in this Complaint.

### 3. Seung Yeon Song, L.Ac.

68. Song resides in and is a citizen of the State of New Jersey.

69. At all relevant times, Song has been licensed to practice acupuncture in the State of New York.

70. Song participated in this scheme by serving as a sham member of NPTCA.

71. In or around October 2016, Song was induced to sell her NPTCA membership units to Rim for a nominal fee.

72. During her time as a sham member of NPTCA, Song ceded all material control over NPTCA to Mah, and also relinquished to Mah the right to collect the majority of the proceeds and profits generated from the delivery of acupuncture services to patients of NPTCA.

73. Even though she did not actually control NPTCA, Song still participated in the operation of NPTCA as a sham member and as a provider of acupuncture services, and is thus responsible for the fraudulent and non-compensable tests and services provided to patients of NPTCA at issue in this Complaint.

### 4. Ho Rheem Rim, L.Ac.

74. Rim resides in and is a citizen of the State of New York.

75. At all relevant times, Rim has been licensed to practice acupuncture in the State of New York.

76. Since at least October 2016, Rim has participated in this scheme by serving as a sham member of NPTCA.

77.     Rim was recruited and then induced to purchase Song's NPTCA membership units for a nominal fee.

78.     Despite purchasing membership units in NPTCA, Rim ceded all material control over NPTCA to Mah, and also relinquished to Mah the right to collect the majority of the proceeds and profits generated from the delivery of acupuncture services to patients of NPTCA.

79.     Even though he did not actually control NPTCA, Rim still participated in the operation of NPTCA as a sham member and as a provider of acupuncture services, and is thus responsible for the fraudulent and non-compensable tests and services provided to patients of NPTCA at issue in this Complaint.

### 5.     John S. Cho, M.D.

80.     Cho resides in and is a citizen of the State of New Jersey.

81.     At all relevant times, Cho has been licensed to practice medicine in the State of New York.

82.     At all relevant times, Cho was the sole officer, director, and shareholder of Bethel Interventional.

83.     Cho participated in this scheme by evaluating patients of Bethel Interventional in the State of New York and then recommending that those patients undergo pain management procedures.   In many cases, when patients of Bethel Interventional accepted Cho's recommendations for pain management, those procedures were performed by Cho at an ambulatory care facility in the State of New Jersey.

84.     Cho also participated in this scheme by causing Bethel Interventional to operate in the State of New York even though Bethel Interventional was not legally authorized to do so.

13

85.     Cho further participated in this scheme and furthered its objectives (i.e., stealing money from Allstate) by causing Bethel Interventional to seek No-Fault benefit reimbursement from Allstate for such evaluations and services even though Bethel Interventional was not lawfully eligible to seek or collect No-Fault benefit payments under New York law.

86.     Cho also participated in this scheme by conspiring with Mah, Yoo, and others to facilitate recommendations for—and the subsequent provision of—tests and services by NPTCA and others, and to facilitate unnecessary and/or unlawful patient referrals between and among Bethel Interventional, NPTCA, and Western Janeda.

87.     At all relevant times, Cho participated, directly and indirectly, in the operation and conduct of the Bethel Interventional enterprise, and is thus responsible for the fraudulent and non-compensable tests and services provided to Bethel Interventional patients at issue in this Complaint.

### 6.      Daniel J. Yoo, M.D.

88.     Yoo resides in and is a citizen of the State of New Jersey.

89.     At all relevant times, Yoo has been licensed to practice medicine in the State of New York.

90.     At all relevant times, Yoo was the sole officer, director, and shareholder of Western Janeda.

91.     At all relevant times, Yoo was also a partial owner of Hackensack Surgery.

92.     Yoo participated in this scheme by evaluating patients of Western Janeda in the State of New York and then recommending that those patients undergo surgical procedures.  In virtually every case, when patients of Western Janeda accepted Yoo's recommendations for

surgery, those procedures were performed by Yoo at Hackensack Surgery, which is located in the State of New Jersey.

93.     Yoo also participated in this scheme by causing Western Janeda to operate in the State of New York even though Western Janeda was not legally authorized to do so.

94.     Yoo also participated in this scheme and furthered its objectives (i.e., stealing money from Allstate) by causing Western Janeda to seek No-Fault benefit reimbursement from Allstate for such evaluations and services even though Western Janeda was not lawfully eligible to seek or collect No-Fault benefit payments under New York law.

95.     Yoo further participated in this scheme by unlawfully referring Western Janeda patients to Hackensack Surgery for fraudulent surgeries, and by causing Hackensack Surgery to provide facility services in connection with the fraudulent surgeries performed by Yoo.

96.     Yoo also participated in this scheme and furthered its objectives (i.e., stealing money from Allstate) by causing Hackensack Surgery to seek No-Fault reimbursement from Allstate in connection with facility fees arising from the fraudulent surgeries performed by Yoo.

97.     Yoo also participated in this scheme by conspiring with Mah and others to facilitate the recommendations for and then the subsequent provision of unnecessary and unwarranted tests and services by NPTCA and others.

98.     At all relevant times, Yoo participated, directly and indirectly, in the operation and conduct of Western Janeda and Hackensack Surgery, and is thus responsible for the fraudulent and non-compensable evaluations and surgical procedures performed upon the patients of Western Janeda and Hackensack Surgery at issue in this Complaint.

### 7. Northern Physical Therapy, Chiropractic, and Acupuncture, PLLC

99.     NPTCA is organized under New York law as a professional limited liability company.

100.    NPTCA maintains its principal place of business at 150-01 Northern Boulevard, 1st Floor in Flushing, New York.

101.    NPTCA was formed to provide physical therapy, chiropractic and acupuncture services to patients.

102.    According to records on file with the New York Department of State, Mah, Choi and Song were the founding members of NPTCA.

103.    In or around October 2016, Song was induced to sell her NPTCA membership units to Rim for a nominal fee.

104.    At all relevant times, Mah, Choi, Song and/or Rim provided, or directed the provision of, diagnostic tests and healthcare services to patients of NPTCA.

105.    When patients sought tests and services from NPTCA, they were caused to enter into assignment of benefits agreements with NPTCA, thus giving NPTCA the right to seek No-Fault payments directly from insurers.

106.    As an assignee of its patients' benefits, NPTCA sought and collected No-Fault benefit payments directly from insurers, including Allstate.

107.    As detailed herein, the defendants purposely sought No-Fault benefit payments from Allstate knowing that NPTCA was not lawfully eligible to seek or collect such payments.

### 8. Bethel Interventional Pain Management LLC

108.    Bethel Interventional is organized under New Jersey law as a limited liability company.

16

109.    Cho is the sole member and/or manager of Bethel Interventional.

110.    Bethel Interventional maintains its principal place of business at 385 Sylvan Avenue, Suite 23 in Englewood Cliffs, New Jersey.

111.    Bethel Interventional was formed to provide professional physician services to patients.

112.    When conducting business and providing healthcare services in New York, Bethel Interventional is subject to New York law, including those governing the practice of medicine and the operation of limited liability companies that provide professional services.

113.    During the relevant period, Cho provided healthcare services to patients in New York while acting as the sole member of Bethel Interventional.

114.    When Cho provided healthcare services to Bethel Interventional patients in New York, the patients were caused to enter into assignment of benefits agreements with Bethel Interventional, thus giving Bethel Interventional the right to seek payments directly from insurers pursuant to New York's No-Fault laws.

115.    As an assignee of its patients' benefits, Bethel Interventional sought and collected No-Fault benefit payments directly from insurers, including Allstate.

116.    Bethel Interventional has never been authorized to operate in New York as a foreign limited liability company.

117.    Additionally, as alleged herein, Cho subjected patients of Bethel Interventional to a battery of evaluations and pain management services, including those that were (a) medically unnecessary, (b) fraudulently reported, (c) falsely charged, and (d) not lawfully rendered.

118.    Accordingly, as alleged herein, Cho (and/or persons working under Cho's direction) purposely caused Bethel Interventional to seek No-Fault benefit payments from Allstate knowing that Bethel Interventional was not lawfully eligible to seek or collect such payments.

### 9.    Western Janeda Orthopedics of New Jersey L.L.C.

119.    Western Janeda is organized under New Jersey law as a limited liability company.

120.    Yoo is the sole member and/or manager of Western Janeda.

121.    Western Janeda maintains its principal place of business at 1055 Palisades Avenue in Fort Lee, New Jersey.

122.    Western Janeda was formed to provide professional physician services to patients.

123.    When conducting business and providing healthcare services in New York, Western Janeda is subject to New York law, including those laws and regulations governing the practice of medicine and the operation of limited liability companies that provide professional services.

124.    During the relevant period, Yoo provided healthcare services to patients in New York while acting as the sole member of Western Janeda.

125.    When Yoo provided healthcare services to Western Janeda patients in New York, the patients were caused to enter into assignment of benefits agreements with Western Janeda, thus giving Western Janeda the right to seek payments directly from insurers pursuant to New York's No-Fault laws.

126.    As an assignee of its patients' benefits, Western Janeda sought and collected No-Fault benefit payments directly from insurers, including Allstate.

127.    Western Janeda has never been authorized to operate in New York as a foreign limited liability company.

128.     Additionally, as alleged herein, Yoo subjected patients of Western Janeda to a battery of evaluations and surgical procedures that were (a) medically unnecessary, (b) fraudulently reported, (c) falsely charged, and (d) provided pursuant to unlawful self-referrals.

129.     Accordingly, as alleged herein, Yoo (and/or persons working under Yoo's direction) purposely caused Western Janeda to seek No-Fault benefit payments from Allstate knowing that Western Janeda was not lawfully eligible to seek or collect such payments.

**10.     Hackensack Surgery Center, L.L.C.**

130.     Hackensack Surgery is organized under New Jersey law as a limited liability company.

131.     Hackensack Surgery maintains a principal place of business at 19 Kotte Place in Hackensack, New Jersey.

132.     Hackensack Surgery purported to be a properly licensed ambulatory care facility under New Jersey law.

133.     At all relevant times, Yoo was a partial owner of Hackensack Surgery.

134.     When patients of Western Janeda accepted Yoo's recommendations for surgery, Yoo referred those patients to Hackensack Surgery for surgery.

135.     As alleged herein, Yoo and Hackensack Surgery routinely failed to disclose Yoo's ownership interest in Hackensack Surgery when Western Janeda patients were referred for surgery.

136.     Even in those instances when Yoo's ownership interest in Hackensack Surgery was purportedly disclosed, all such disclosures were invalid because Yoo's ownership interest in Hackensack Surgery was never disclosed to Western Janeda patients at or prior to the time the referrals were made.

137.     Hackensack Surgery purported to provide facility services in connection with the fraudulent surgeries performed by Yoo upon patients of Western Janeda.

138.     As alleged herein, Hackensack Surgery provided facility services that were (a) medically unnecessary, (b) falsely charged, and (c) provided as the result of unlawful referrals.

139.     Accordingly, as alleged herein, Yoo (and/or persons working under Yoo's direction) purposely caused Hackensack Surgery to seek No-Fault benefit payments from Allstate knowing that Hackensack Surgery was not lawfully eligible to seek or collect such payments.

## III.    <u>JURISDICTION AND VENUE</u>

140.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

141.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

142.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

143.     For example, Mah, the Sham Members, Cho, and Yoo (a) unlawfully operated NPTCA, Bethel Interventional, and Western Janeda from facilities located in Flushing, New York, (b) provided healthcare services to New York-based patients, and (c) sought payment for those services under New York's No-Fault laws.

144.     Additionally, Yoo purposely referred patients of Western Janeda to Hackensack Surgery for surgical procedures wherein (a) Hackensack Surgery provided surgical facility services to New York-based patients, and (b) sought payment for those services under New York's No-Fault laws.

145.    The defendants have also engaged in purposeful activities in New York by causing NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery to initiate arbitration proceedings in New York against Allstate for the purpose of seeking reimbursement under New York's No-Fault laws.

146.    Accordingly, the defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

147.    As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

## IV.    APPLICABLE LAW

### A.    NEW YORK

#### 1.    New York No-Fault Laws and Regulations

148.    Allstate underwrites motor vehicle insurance in the State of New York.

149.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary professional healthcare services.

150.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. INS. LAW § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively the "No-Fault laws"), motor vehicle insurers are required to provide coverage to persons involved in motor vehicle accidents, regardless of fault.  These benefits are known as "No-Fault benefits."

151.    New York law mandates that No-Fault benefit coverage in the amount of $50,000.00 be available to each eligible claimant.

152.    Each eligible insured person (i.e., "claimant") may use such No-Fault benefits as a source of compensation for any "basic economic loss" incurred as the result of a motor vehicle accident.

153.    Under New York's No-Fault laws, "basic economic loss" is defined to include "all necessary expenses" for an array of professional healthcare services, including the evaluations, treatments, injections, and surgical procedures purportedly provided by the defendants.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

154.    A claimant may assign their No-Fault benefits to third parties, such as professional healthcare service providers.

155.    Pursuant to a duly executed assignment of benefits, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered, using the claim form required by the New York State Department of Insurance (known by its title "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly known as an "NF-3").

156.    Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

157.    The NF-3 and CMS-1500 forms are important documents in the insurance industry. These certify that the provider's request for payment is not materially false, misleading, or fraudulent.  11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

158.    Pursuant to N.Y. Ins. Law § 403(d), each NF-3 and CMS-1500 form carry the same warning by substance: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent act, which is a crime."

159.    It is a material misrepresentation to submit NF-3 and CMS-1500 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

160.    To regulate and control the fees charged by healthcare providers, the New York Workers' Compensation Board has established a schedule of fees (i.e., "NY Fee Schedule") to be used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate No-Fault benefit claims.

161.    Under New York's No-Fault laws, healthcare providers are prohibited from submitting charges that exceed the amounts set forth in the NY Fee Schedule.

162.    Additionally, under New York law, a provider of healthcare services is not eligible for No-Fault reimbursement if the provider fails to meet **_any_** applicable New York state or local licensing requirement necessary to perform such service in New York, **_or_** if the provider fails to meet **_any_** licensing requirement necessary to perform the service in any other state in which the service is performed.  11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

163.     Accordingly, if a professional healthcare service provider fails to meet *__any__* applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect No-Fault benefits under New York's No-Fault laws.

164.     As alleged herein, the defendants failed to meet several laws and regulations when providing healthcare services to claimants during the course of this scheme; therefore, the defendants are not—and never were—eligible to seek or collect No-Fault benefits from Allstate.

## 2.    New York Laws Applicable to Professional Healthcare Service Providers

165.     New York's Education Law, Business Corporation Law, and Limited Liability Company Law apply to professional healthcare providers, such as individual licensees and professional service entities.

166.     Providers must adhere to the applicable provisions of these laws when providing healthcare services in New York in order to be lawfully entitled to seek or collect No-Fault benefits under New York's No-Fault laws.

167.     Under New York's Education Law, providers are prohibited from providing physician services, physical therapy services, chiropractic services, or acupuncture services in New York unless they are properly licensed.

168.     New York law also requires that foreign medical professional entities operating in New York (a) apply for authority to do business in New York, and (b) obtain a certificate of authority from the New York Department of Education.

169.     Accordingly, foreign medical professional entities that operate in New York without obtaining the requisite certificate of authority and authorization are not eligible to seek or collect No-Fault benefits under New York's No-Fault laws.

170.    New York's Limited Liability Company Law allows the formation of a professional limited liability company—or "PLLC"—for the purpose of providing professional services, but a PLLC may only render professional services through individuals authorized by law to render such professional services.

171.    While a PLLC may be formed by one or more professionals, New York law allows the joining of professionals in a PLLC only if each such professional is authorized by law to render a professional service for which the PLLC is formed to provide.

172.    New York law restricts membership in a PLLC only to those professionals authorized by law to practice in New York the profession(s) that such PLLC is authorized to practice.

173.    A PLLC is prohibited from rendering a professional service except through individuals authorized by law to render such professional service.  *See* N.Y. LTD. LIAB. CO. LAW § 1204(a).

174.    Likewise, a PLLC shall not engage in any profession or professions other than those set forth in its articles of organization.  A PLLC may only engage in a profession or professions as to which one or more of its members is authorized by law to render professional services in this state.  *See* N.Y. LTD. LIAB. CO. LAW § 1206.

175.    Further, a member of a PLLC may only sell or assign their PLLC membership interest to another professional eligible to become a member of such PLLC.  Any sale of transfer in violation of these restrictions shall be void.   *See* N.Y. LTD. LIAB. CO. LAW § 1211 (a)(c).

176.    These provisions of New York law exist to ensure that professional service entities provide services only through qualified professionals, and that such professional service entities are controlled only by qualified members.

177.    These are not mere technical requirements; rather, each of these provisions is meant to (a) protect the health and safety of patients, and (b) ensure the ethical and competent practice of the healthcare professions.

178.    As alleged herein, the defendants violated one or more of these provisions when providing professional healthcare services to patients during the course of this scheme, thus rendering the defendants ineligible to seek or collect No-Fault benefits from Allstate.

**B.    NEW JERSEY**

179.    The defendants' scheme also implicates New Jersey law because some of the services were provided by the defendants in New Jersey.

180.    New Jersey has a system similar to New York in which motor vehicle accident victims can obtain compensation for their injuries.  *See* N.J.S.A. 39:6B-1 to 3; N.J.S.A. 39:6A-1 *et seq.* (hereinafter "New Jersey No-Fault laws").

181.    New Jersey's No-Fault laws allow claimants to assign their rights to healthcare providers in exchange for services.

182.    With a duly executed assignment, a healthcare provider may submit claims directly to an insurer to obtain reimbursement for medically necessary services.

183.    Healthcare providers are not entitled to seek or collect No-Fault benefits under New Jersey law if they fail to comply with all applicable statutory and regulatory requirements governing healthcare practice.

184.    The services themselves must also be rendered in compliance with all applicable laws to be eligible for coverage under New Jersey's No-Fault laws.

185.    Ambulatory care facilities are regulated under New Jersey law.

186.    Among other things, New Jersey law requires that ambulatory care facilities obtain proper licensure and disclose their ownership, and the failure to meet these requirements will render an offending facility ineligible for No-Fault reimbursement.

187.    Patient referrals made by physicians are also governed by New Jersey law.

188.    Under N.J.S.A. 45:9-22.5 (i.e., the "New Jersey Codey Law"), physicians are generally prohibited from referring a patient to healthcare provider in which the physician (or an immediate family member) has a significant beneficial interest.

189.    However, physicians may refer patients to an ambulatory care facility in which the physician holds a significant financial interest as long as certain conditions are met.

190.    Indeed, these restrictions on patient self-referrals do not apply if the following conditions are met: (a) the referring physician personally performs the procedure; (b) the referring physician's remuneration as owner of the ambulatory care facility is directly proportional to the physician's ownership interest and not the volume of patients referred to the facility; (c) all clinically-related decisions at an ambulatory care facility owned in part by non-physicians are made bv physicians and are in the best interest of the patient; and (d) the referring physician's significant beneficial interest in the ambulatory care facility is disclosed to the patient, in writing, at or prior to the time that the referral is made.

191.    Accordingly, if written disclosure of the referring physician's ownership interest in the in the ambulatory care facility is not provided to the patient at (or before) the time that the referral is made, then the referral violates the New Jersey Codey Law and is thus unlawful.

192.    Additionally, as in New York, New Jersey has established a fee schedule (i.e., "NJ Fee Schedule") to govern the charges submitted by healthcare providers under New Jersey's No-Fault laws.

27

193.    Under New Jersey law, healthcare providers are prohibited from submitting charges that exceed the amounts set forth in the NJ Fee Schedule.

194.    As alleged herein, the defendants violated one or more provision of applicable New Jersey law when providing professional healthcare services to patients during the course of this scheme.

195.    Accordingly, the defendants were not lawfully eligible to seek or collect No-Fault benefits from Allstate in connection with healthcare services provided to claimants in the State of New Jersey.

## V.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.    GENERAL OVERVIEW OF DEFENDANTS' SCHEME TO DEFRAUD

196.    New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of professional healthcare services, and is also designed to require prompt payment of patient claims.

197.    As a result, the submission of facially valid bills by healthcare service providers for patient services will often result in prompt payment from a No-Fault insurer.

198.    For professional healthcare services provided inside of New York, healthcare providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet **_any_** New York state or local licensing requirement necessary to perform such services in New York.

199.    For professional healthcare services provided outside of New York, healthcare providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet **_any_** state or local licensing requirement necessary to provide the services where they are performed.

200.     Thus, a healthcare provider is only eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 for professional healthcare services provided in New Jersey if the provider meets all applicable New Jersey licensing requirements.

201.     Throughout the course of this scheme, the defendants have taken advantage of Allstate by demanding and collecting No-Fault benefit payments in connection with (a) tests and services that were not medically unnecessary, (b) tests and services that were excessive, (c) tests and services that were rendered pursuant to a pre-determined protocol designed to enrich the provider, (d) tests and services that were not provided in the manner represented in the bills submitted to Allstate, and (e) tests and services that were furnished pursuant to an unwarranted and/or unlawful referral.

202.     Overall, the defendants devised and then carried out a purposely planned—yet highly templated and generic—treatment regimen that was characterized by overlapping, redundant, excessive, and completely unnecessary services.

203.     As alleged herein, because the defendants caused NPTCA, Bethel Interventional, and Western Janeda to be operated in violation of New York law throughout the relevant period, NPTCA, Bethel Interventional, and Western Janeda are not—and never were—eligible to seek or collect No-Fault benefits from Allstate under New York's No-Fault laws.

204.     As also alleged herein, because Western Janeda and Hackensack Surgery violated New Jersey law when providing healthcare services to claimants in New Jersey, both Western Janeda and Hackensack Surgery are not—and never were—eligible to seek or collect No-Fault benefits from Allstate in connection with such services under New York's No-Fault laws.

205.     To extract No-Fault benefit payments from Allstate, the defendants knowingly and purposely extracted No-Fault benefit payments from Allstate by (a) misrepresenting the conditions

and diagnoses of their patients, (b) providing unnecessary tests and treatments based on these misrepresented conditions and diagnoses, and (c) misrepresented the nature and extent of certain tests and treatments.

206.   The defendants also extracted No-Fault benefits from Allstate even though they had no legal right to do so because they were (a) operating professional healthcare service entities in violation of New York law, and (b) engaging in unlawful patient referral practice

207.   The defendants knew (or should have known) that this conduct was improper, yet they persisted in submitting No-Fault benefit claims to Allstate seeking payment in connection with claimants who were treated by the defendants (or those persons working under their direction or control) in the manner described above.

208.   The defendants' heightened the degree of their already unlawful conduct by submitting charges for their services that were grossly excessive.

**B.      NPTCA AND THE NORTHERN BOULEVARD CLINIC**

**1.      Unlawful Control of NPTCA**

209.   Throughout the course of this scheme, the defendants have exploited the New York No-Fault system by operating NPTCA in violation of one or more applicable New York State licensing requirements, and by submitting false and fraudulent treatment records and claims demanding payment pursuant to New York's No-Fault laws.

210.   Mah's association with the Northern Boulevard Clinic pre-dates the formation of NPTCA and the inception of this scheme.

211.   Prior to 2015, Mah began to lay the groundwork for the creation of the NPTCA enterprise by recruiting Choi and Song for their participation as healthcare providers at the Northern Boulevard Clinic.

212.     Mah structured the operation of the Northern Boulevard Clinic such that chiropractic, physical therapy, and acupuncture services were provided by, or under the direction of, Mah, Choi, and Song through separate entities.[1]

213.     During this time, Mah held the lease for the Northern Boulevard Clinic in his own name, with Choi, Song, and their entities serving as Mah's sub-lessees.

214.     As a chiropractor, Mah was unable to lawfully engage in or profit from the delivery of physical therapy or acupuncture services, and any conduct suggesting that Mah controlled or profited from these providers would inhibit the defendants' ability to carry-out this scheme.

215.     As a result, prior to the formation of NPTCA, the defendants took purposeful steps to conceal their connections to Mah and to hide the control exerted by Mah over the Northern Boulevard Clinic and the providers that operated there.

216.     For example, Mah and his co-defendants used the Northern Boulevard Clinic's physical location to their advantage in concealing their connections.

217.     Located at the intersection of Northern Boulevard and 150th Street in Flushing, NY, the building housing the Northern Boulevard Clinic has an entrance on each street, which provides the Northern Boulevard Clinic with two distinct street addresses.

218.     The main entrance to the Northern Boulevard Clinic is located on Northern Boulevard and it bears the address 150-01 Northern Boulevard, Flushing, NY.

219.     The second entrance to the Northern Boulevard Clinic is located around the corner on 150th Street and it bears the address 35-25 150th Street, Flushing, NY.

---

[1] Prior to the formation of NPTCA, Mah provided chiropractic services through an entity named Sangwoo Mah, D.C., P.C., while Choi and Song provided services through entities named Choi Physical Therapy, P.C. and Yeon Acupuncture, P.C., respectively.

220.    Prior to the formation of NPTCA, Mah's bills for chiropractic services bore a service address of 150-01 Northern Boulevard address.

221.    Meanwhile, the bills submitted by Choi and Song for physical therapy and acupuncture services represented that the services were provided at the 35-25 150th Street address.

222.    The defendants purposely crafted their bills and records in this manner to create the false impression that the chiropractic, physical therapy, and acupuncture services were provided by distinctly different providers at distinctly different locations.

223.    Despite what their bills represented, Mah, Choi, Song and their entities operated under the same roof and were subject to Mah's control.

224.    In or around early 2015, as a means to perpetuate this scheme and to further conceal his control over the profits from the provision of physical therapy and acupuncture services at the Northern Boulevard Clinic, Mah conspired with Choi and Song to form NPTCA as a professional limited liability company ("PLLC") under New York law.

225.    As a PLLC, NPTCA could offer services in chiropractic, physical therapy, and acupuncture, so long as the company appointed a member who was licensed in each particular professional discipline.

226.    To allow NPTCA to pass muster as a PLLC under New York law, Mah conscripted Choi as NPTCA's physical therapy member and Song as NPTCA's acupuncture member and then had them both serve as Sham Members.

227.    With Choi and Song in place as Sham Members, the defendants could bill for and then profit from the provision of chiropractic, physical therapy, and acupuncture services under one single entity.

228.     With Mah in place as NPTCA's managing member, the management of NPTCA could be structured such that day-to-day control over NPTCA and its finances was vested in Mah, and the operation of NPTCA could be orchestrated such that virtually all of the company's professional fees and profits flowed to Mah.

229.     From the date of its formation, Mah and the Sham Members have purposely and materially misrepresented NPTCA's eligibility to seek and collect No-Fault benefit payments.

230.     Despite the content of NPTCA's operating agreement and publicly-filed documents, Choi, Song, and Rim were never anything more than Mah's employees.

231.     Although listed as "members" of NPTCA, the Sham Members' membership interests were illusory because they gave Choi, Song, and Rim no meaningful control over the company or its proceeds or profits.

232.     The Sham Members were only granted these membership interests by Mah because New York law required that Choi, Song, and Rim hold the title of "member" in the PLLC because Mah was not licensed to practice physical therapy or acupuncture.

233.     Because a member's control over NPTCA was determined by their rights to receive distributions and profits and because Mah purposely structured NPTCA's operating agreement such that he was entitled to the lion's share of the company's chiropractic, physical therapy, and acupuncture proceeds and profits, the balance of power within NPTCA's membership ranks was tilted decidedly in favor of Mah.

234.     Despite being "members," the Sham Providers were in fact prohibited from making any decisions that involved the company's financial affairs, or the management of NPTCA's day-to-day operations.

235.    Despite being "members," the Sham Members had no input or control over fundamental business decisions such as the location of the practice or the negotiation of any of NPTCA's leases.

236.    For example, Mah already held a lease at the Northern Boulevard Clinic prior to the formation of NPTCA, and the company's operating agreement was structured such that the Sham Members were directed to pay "all rent and additional rent that is and becomes payable" directly to Mah.

237.    Mah also controlled each Sham Member's equipment lease obligations whereas Mah already owned the physical therapy and acupuncture equipment prior to the formation of NPTCA, and then structured the company's operating agreement such that the Sham Members were obligated to lease the equipment directly from Mah.

238.    NPTCA's operating agreement was drafted without any input from the Sham Members, and only existed for the purpose of making the company appear to Allstate and to the public to be a properly organized PLLC, when in fact, all management and control of the company vested solely in Mah.

239.    At all relevant times, Mah exerted complete control over all aspects of the operation, management, and finances of NPTCA by appointing himself as the company's managing member, thus vesting in Mah the near-absolute right to make all decisions related to the operation of NPTCA.

240.    For example, Mah possessed complete authority to do the following without any input from the other "members" of NPTCA:

- Change the company's name at any time and for any reason;

- Change the company's principal business address at any time and for any reason, with notice to the Sham Members only required *after* any changes had been made;

- Open and control the company's banking accounts;

- Make all meaningful accounting decisions for the company, such as hiring accountants and determining the accounting method to be used in keeping the company's books;

- Make all meaningful legal decisions for the company, such as retaining counsel and initiating legal action; and

- Take any actions necessary or appropriate to effectuate management and control of the company.

241.    Mah also had unquestioned authority and control over the weight and value of NPTCA's membership interests, and the distribution of profits and free cash realized through the provision of chiropractic, physical therapy, and acupuncture services to patients of NPTCA.

242.    For example, Mah structured the company's operating agreement such that the Sham Members were required to bear nearly all the responsibility for making payments toward the company's expenses—payments of which Mah was the beneficiary, including:

- An annual salary of $200,000.00 payable to Mah for serving as NPTCA's managing member;

- Monthly payments of $3,335.00 payable to Mah for equipment that Mah owned and leased to NPTCA;

- Monthly payments of $2,800.00 (plus interest) payable to Mah for repayments on a loan that Mah personally took for "build-out" costs incurred by him prior to the formation of NPTCA; and

- Monthly rent and "additional rent" payments payable to Mah to cover lease payments that Mah was personally obligated to make as the named leaseholder for the Northern Boulevard Clinic.

243.    Additionally, as a means to maximize his profits from and cement his control over NPTCA, Mah purposely structured the company's operating agreement such that he was granted

unilateral authority to decide how the PLLC's membership units would be distributed among himself and the Sham Members.

244.     When forming NPTCA, Mah made sure that he secured a majority interest in the company by causing 60% of the outstanding membership units to be allocated to himself.

245.     By holding a majority interest in the company and then subjugating the Sham Members to minority interests of 20% each, Mah was able to act unilaterally in making decisions that financially enriched only him, such as deciding and determining the timing and amount of NPTCA's distributions of profit and free cash.

246.     For example, NPTCA's operating agreement was structured such that distributions could only be made upon the decision of the managing member or upon a vote of 70% of the membership.

247.     As NPTCA's majority interest holder, the operating agreement gave Mah the power to prevent the other Sham Members from having any control over the distribution of the company's profits or free cash because, without Mah's support, the Sham Members could never amass the 70% aggregate interest required to make decisions relative to distributions.

248.     To cement his control over the company, Mah purposely structured NPTCA's operating agreement such that membership interests were based upon each member's share of company profits.

249.     Mah then crafted the terms of the operating agreement such that Mah was guaranteed the largest share of the company's profits.

250.     Accordingly, Mah had complete control of NPTCA, and this complete control allowed Mah to unlawfully share in the proceeds and profits derived from the delivery of physical therapy and acupuncture services to NPTCA's patients.

251.    For example, Choi, as the physical therapy member, was entitled to only a small share of NPTCA's physical therapy revenue even though a substantial portion of NPTCA's revenue was derived from the delivery of physical therapy services.

252.    In calculating the amount of Choi's membership distribution, the total amount of NPTCA's physical therapy collections were first reduced by 50% of the company's total liabilities—liabilities which, in reality, were debts owed and payable to Mah.

253.    Then, once reduced by half of the company's liabilities, Choi's share of NPTCA's physical therapy revenue was determined by multiplying the remaining figure by 20%.

254.    As a result of these deductions (which were made to Mah's benefit), Choi, as the company's sole licensed physical therapy member, was only entitled to receive less than 20% of the revenue generated from the delivery of physical therapy services.

255.    Meanwhile, Mah was entitled to reap a substantial majority of NPTCA's physical therapy revenues.

256.    First, Mah was entitled to receive approximately 50% of the company's gross physical therapy revenue by virtue of the deductions taken to cover payments made toward company liabilities—payments that, in reality, went straight to Mah.

257.    Then, because of the way that Mah structured each member's distribution rights under the operating agreement, 80% of the company's post-expense physical therapy revenue went to the company's pool of "distributable free cash," from which Mah was entitled to receive almost two-thirds (2/3) of the monies distributed from the pool.

258.    As a result, greater than 60% of NPTCA's physical therapy revenue went to Mah, while less than 20% of the physical therapy revenue went to Choi.

259.    The terms of NPTCA's operating agreement treated the distribution of the company's acupuncture collections in a similar manner, with Mah receiving greater than 50% of NPTCA's acupuncture revenue.

260.    As demonstrated above, at all relevant times, Mah and the Sham Members have taken advantage of New York's No-Fault system by operating NPTCA in violation of one or more applicable New York state licensing requirement governing the provision of professional chiropractic, physical therapy, and acupuncture services.

261.    Mah and the Sham Members, at all times relevant, knew that (a) the delivery of physical therapy services through NPTCA was controlled by a non-physical therapist (i.e., Mah), (b) the delivery of acupuncture services through NPTCA was controlled by a non-acupuncturist therapist (i.e., Mah), and (c) the Sham Members were caused to unlawfully split professional physical therapy and acupuncture fees and profits with a person not authorized to receive same (i.e., Mah).

262.    The control exerted by Mah over NPTCA and the Sham Members compromised patient care, as the provision of healthcare services to NPTCA patients was subject to Mah's pecuniary interests rather than the individualized needs of the patients.

263.    Because NPTCA was unlawfully operated and controlled by Mah and was also used as a conduit to unlawfully split professional fees with Mah, NPTCA was operated in violation of New York law, thus rendering NPTCA completely ineligible for No-Fault reimbursement under Insurance Law § 5102(a)(1).

## 2.    <u>Fraudulent Healthcare Services</u>

264.    As detailed above, Mah structured NPTCA—and the operation of the Northern Boulevard Clinic at large—to ensure that patients received as much treatment as possible.

265.    In addition to unlawfully controlling NPTCA and reaping fees he was not entitled to, Mah devised and implemented a pre-determined protocol, which was designed to ensure that patients of the Northern Boulevard Clinic always received a full battery of chiropractic, physical therapy, acupuncture, and other services regardless of actual clinical need.

266.    Nearly every patient that walked through the doors of NPTCA received the same exact treatment.

267.    Every incoming NPTCA patient began their treatment with a chiropractic exam by Mah.

268.    Virtually every NPTCA patient examined by Mah was then referred within NPTCA for acupuncture treatment and also to an "independent" physician for further evaluation.

269.    Per Mah's protocol, the acupuncture services were delivered by (or under the direction of) Song and, later, Rim, as the acupuncture "member" of NPTCA.

270.    The referral to an "independent" physician was needed as a means to obtain prescriptions for physical therapy.

271.    This aspect of the scheme was personally profitable to Mah because under the NPTCA operating agreement, Mah was entitled to receive a significant portion of the fees and profits collected for acupuncture services.

272.    This aspect of the scheme was also personally profitable to Mah because the referral to an "independent" physician—typically Cho—always resulted in a prescription for physical therapy services, which allowed NPTCA to provide and bill for physical therapy services, and provided yet another profit center for Mah because the NPTCA operating agreement gave Mah the largest share of the company's physical therapy fees and profits.

273.    The physician referral was also beneficial to Mah and to NPTCA because the physician—virtually always Cho and/or Yoo—routinely recommended and provided false justification for prolonged chiropractic, physical therapy, and acupuncture services, which are always provided by NPTCA.

### a.      *Fraudulent Physical Therapy Services*

274.    The defendants' scheme involved routine referrals for, and subsequent aggressive delivery of, physical therapy services through NPTCA.

275.    The physical therapy services were a cornerstone of the defendants' scheme because the need for a physical therapy referral justified the need for Mah's referral of NPTCA patients to an "independent" physician at the Northern Boulevard Clinic, typically Cho.

276.    Justifying and then delivering a prolonged course of physical therapy services was also financially significant and important to NPTCA and to Mah because the terms of the NPTCA operating agreement granted Mah the largest share of the revenue and profits that were generated and realized through the delivery of physical therapy services to patients of NPTCA.

277.    Overall, the physical therapy services allegedly provided to NPTCA patients by Choi (or those NPTCA employees working under his direction or control) were not performed based on any need or want of the patient; rather, the delivery of these services was motivated by the defendants' desire to justify the delivery of excessive and medically unnecessary treatment, and then maximize their profit by billing Allstate for these unnecessary and unwarranted services.

278.    For a physical therapist to render treatment, a referral must be provided by a licensed physician, dentist, podiatrist, nurse practitioner or licensed midwife who must be acting within the lawful scope of their own respective practice and in accordance with their own diagnosis for the patient.

40

279.    Pursuant to NPTCA's pre-determined treatment protocol, virtually all patients are first seen by Mah, who then refers the patient to Cho for a physician evaluation.

280.    Once Cho makes the referral for physical therapy, the patients are then seen by Choi for the delivery of physical therapy services.

281.    In many instances, Cho's physical therapy referral and Choi's commencement of physical therapy services happen on the same day.

282.    In certain cases, in a rush to commence treatment (and to start billing Allstate), physical therapy services were initiated even though the patient had not yet received a referral from a licensed physician.

283.    For example, Cho would not see the NPTCA patient until a week (or more) after the physical therapy had begun and would then make a physical therapy referral even though Choi had already started delivering such services.

284.    In other cases, Cho would issue an initial report that would recommend that the patient "continue" physical therapy even though a referral had not yet been given.

285.    In some instances, physical therapy was provided pursuant to a referral from Cho, but the referral was not accompanied by an actual report.

286.    Without a documented diagnosis to support the physical therapy referral, the physical therapy services were never authorized and thus any subsequent provision of physical therapy was not lawfully rendered.

287.    Such conduct demonstrates how the defendants placed their own financial interests ahead of their patients' interests and medical needs.

41

288.    The defendants were so eager to start, recommend, and then cement false foundations for the delivery of prolonged and unnecessary services that they failed to follow even the most basic of standards and accepted practices.

289.    The services listed in Exhibit 1 (i.e., physical therapy services billed by NPTCA under CPT codes 97010, 97014, 97110, and 97150) demonstrate the pattern of Choi's gross overutilization of physical therapy in connection with NPTCA patients.

290.    Accordingly, the physical therapy services administered to NPTCA patients were excessive and unjustified, and each charge submitted to Allstate by NPTCA for these services is not compensable under New York's No-Fault Laws, including, but not limited to, the services listed in Exhibit 1.

291.    To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with any physical therapy services provided to NPTCA patients, Allstate is entitled to recover all payments made to NPTCA in connection with any such services, including, but not limited to, the services listed in Exhibit 1.

292.    Additionally, to the extent that any of NPTCA's charges submitted in connection with physical therapy services remain unpaid (including, but not limited to, the services listed in Exhibit 1), Allstate is under no obligation to make any payments in connection with those transactions because those services were excessive, not warranted, and therefore not compensable under New York's No-Fault Law.

### b.    *Fraudulent Chiropractic Services*

293.    Part of the defendants' scheme involved the provision of and billing for a highly templated and generic regimen of chiropractic care that was accompanied by a barrage of

overlapping and redundant diagnostic tests, the results of which were typically disregarded and ignored.

294.    These chiropractic services and related diagnostic tests were administered and billed for by, or under the direction of, Mah through NTPCA.

295.    The unnecessary tests and services provided by Mah included (a) initial patient examinations, (b) follow-up patient examinations, and (c) several different electrodiagnostic tests.

296.    These tests and services were not provided based on any need or want of the patient.

297.    Instead, the tests and services were administered as a means to (a) maximize NPTCA's (and Mah's) profits through the submission of billing to Allstate and (b) justify the provision of additional, excessive, and medically unnecessary treatment, all of which was purposely provided as part of the defendants' pre-determined treatment protocol and unlawful referral arrangement.

### c.    *Fraudulent Electrodiagnostic Testing*

298.    A central part of the defendants' scheme was to fraudulently provide and bill for unnecessary and excessive electrodiagnostic ("EDX") testing.

299.    EDX testing involves multiple studies performed by a healthcare provider, such as (a) electromyography studies ("EMGs") and (b) nerve conduction studies ("NCSs").

300.    EDX testing is generally used in the clinical evaluation of patients with disorders of the peripheral and/or central nervous system because the testing can help a practitioner evaluate symptoms, generate a proper diagnosis, and monitor patient response to treatments.

301.    EDX testing should not be administered uniformly across a provider's patient population.

302. Because proper EDX testing should involve the use of a dynamic (i.e., patient-specific) approach, the nature and scope of the testing should change and evolve as the testing is administered to a patient.

303. Here, the EDX testing provided by Mah (or those NPTCA employees acting under Mah's direction and control) stands as a clear example of the pre-determined nature of the defendants' sham treatment protocol in which the same litany of services was provided regardless of the patients' age, gender, or prior medical history.

304. For example, the use of EMGs was so excessive that virtually every NPTCA patient was subjected to (and thus subsequently billed for) this testing on all four limbs, which is exceedingly rare and uncommon.

305. In addition to being excessive, the EDX testing administered by Mah yielded incorrect diagnoses, thus underscoring the truly thoughtless manner in which these services were prescribed and administered.

306. Overall, not only was Mah's barrage of testing redundant and unnecessary, but it also posed a serious risk of harm to patients because (a) patients were most often needlessly subjected to invasive tests and possible infection, (b) the tests yielded incorrect or inaccurate findings and diagnoses, and (c) Mah often disregarded or ignored the results of the tests meaning that NPTCA patients did not receive proper care.

i.  <u>Fraudulent Nerve Conduction Studies</u>

307. In a legitimate clinical setting, NCSs are administered to measure nerve conduction by stimulating the nerves with a small electrical current.

308. NCSs involve both F-Wave ("F-Wave") and H-Reflex ("H-Reflex") studies.

309.    The amount of electricity subsequently transmitted by the nerve is measured by this stimulation that, in turn, creates the nerve response platform, which is displayed on a screen.  The screen displays the latency, amplitude, area, and duration of the nerve response through a graphic display of the waveforms for each nerve.

310.    NCSs typically confirm whether or not the nerves are functioning properly.

311.    NCSs should be applied in a dynamic rather than protocol manner; in other words, the format and application of these studies should vary from patient to patient and should also be based on the patient's symptoms, findings and suspect diagnosis.

312.    Here, Mah administered NCSs without regard to his patient's symptoms, findings or suspect diagnoses; rather, he applied an excessive number of NCSs in the majority of cases not including H-Reflex or F-Wave studies.

313.    According to the American Medical Association ("AMA"), the utilization of dynamic decision-making in electrodiagnostic testing is a prerequisite to properly use and bill for electrodiagnostic CPT coding.

314.    Dynamic decision making regarding each individual test is required by the provider to properly administer EDX testing such as NCSs.

315.    Here, Mah failed to tailor his EDX testing to each individual patient and instead followed a protocol approach to the utilization of NCSs, which resulted in both the over-utilization of NCS and the administration of the same studies to most of NPTCA's patients.

316.    Mah administered NCSs to NPTCA patients as part of a pre-determined protocol that was intentionally employed to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and services, and (c) produce profits for NPTCA and for Mah.

317.    As a direct result of Mah's protocol approach to NCSs—including (a) his overutilization of the studies, (b) misinterpretation of the results, and (c) misrepresentation of the diagnoses—the charges submitted to Allstate by NPTCA for NCSs were excessive and not compensable under New York No-Fault Law.

318.    The studies listed in Exhibit 2 (i.e., the nerve conduction studies billed by NPTCA under CPT codes 95900, 95903, and 95904) demonstrate Mah's intentional and grossly irresponsible pattern and practice of misusing NCSs in connection with NPTCA patients.

319.    Because the NCSs administered to NPTCA patients were excessive and unwarranted, each charge submitted to Allstate by NPTCA for these studies is not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibit 2.

320.    To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with any NCSs administered to NPTCA patients, Allstate is entitled to recover all payments made to NPTCA in connection with any such NCSs, including, but not limited to, the studies listed in Exhibit 2.

321.    Additionally, to the extent that any of NPTCA's charges submitted in connection with NCSs remain unpaid (including, but not limited to, the studies listed in Exhibit 2), Allstate is under no obligation to make any payments in connection with those transactions because those studies were excessive, not warranted, and therefore not compensable under New York's No-Fault Laws.

ii.    <u>Fraudulent EMG Studies</u>

322.    EMGs measure electrical activity in specific muscles, and are often performed in conjunction with NCSs.

323.    EMGs involve the insertion of a needle into various muscles, and the studies can be performed on any muscle accessible to an EMG needle.  If the muscles are found to be functioning normally, then an inference is created that the connection between the motor nerve and the spinal cord is normal.

324.    An abnormal result from an EMG study indicates, among other possibilities, the presence of problems with the nerve root near the spinal cord, or with the peripheral nerve near the muscle.

325.    Similar to NCSs, the utilization of EMGs should vary from patient-to-patient; otherwise, the testing provider risks reaching an incorrect diagnosis if the same muscles are being tested in the same number and sequence across the patient population.

326.    As such, EMGs should be utilized with a dynamic rather than protocol approach.

327.    Because each patient should be evaluated based upon their individual needs, EMGs should be limited and reserved for when specific outcomes are being investigated, such as when a single limb's muscles are being reviewed for radiculopathy.

328.    Furthermore, the muscles selected EMGs should present the least amount of pain possible for the patient.  As such, the testing provider should know how to test each muscle, and know how to best limit the amount of pain for his patient.

329.    When a pre-determined and protocol-based approach to diagnostic tests and studies is used, much like the one employed by Mah when testing NPTCA patients, the testing is inaccurate and excessive.

330.    Testing in this manner is not just excessive and medically unnecessary, but it can also harm the patient.

331.    Regardless of these limitations, Mah utilized a protocol approach when administering EMGs to NPTCA patients, and he never tailored the EMGs to the specific, individualized needs of the patient.

332.    Indeed, virtually all of the EMGs administered to NPTCA patients by Mah involved the same set of muscles, including the following:

- Upper limbs: deltoids, biceps, triceps, flexor carpi radialis, abductor pollicus brevis, abductor digiti minimi, and first dorsal interosseous muscles; and
- Lower limbs: vastus medialis, medial gastrocnemius, peroneus long, and anterior tibial muscles.

333.    In the extremely unlikely event that every NPTCA patient treated by Mah actually required an EMG study, the odds that each patient's condition would warrant the same study of the same exact muscles every time is virtually impossible.

334.    Mah subjected NPTCA patients to needless and unwarranted (and sometimes painful) EMGs as part of a pre-determined protocol that was intentionally employed to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and services, and (c) produce profits for NPTCA and for Mah.

335.    As a direct result of Mah's protocol approach to EMGs—including (a) his overutilization of these studies, (b) misinterpretation of the results, and (c) misrepresentation of the diagnoses—the charges submitted to Allstate for EMGs were excessive and not compensable under New York No-Fault Law.

336.    The studies listed in Exhibit 2 (i.e., the electromyography studies billed by NPTCA under CPT codes 95861 and 95864) demonstrate Mah's intentional and grossly irresponsible pattern and practice of misusing EMGs in connection with NPTCA patients.

337.    Because the EMGs administered to NPTCA patients were excessive and unwarranted, each charge submitted to Allstate by NPTCA for these studies is not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibit 2.

338.    To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with any EMGs administered to NPTCA patients, Allstate is entitled to recover all payments made to NPTCA in connection with any such EMGs, including, but not limited to, the studies listed in Exhibit 2.

339.    Additionally, to the extent that any of NPTCA's charges submitted in connection with EMGs remain unpaid (including, but not limited to, the studies listed in Exhibit 2), Allstate is under no obligation to make any payments in connection with those transactions because those studies were excessive, not warranted, and therefore not compensable under New York's No-Fault Laws.

iii.    Fraudulent F-Wave Studies

340.    F-Wave studies involve motor nerve conduction, and the studies have limited use with identifying and diagnosing radiculopathy.

341.    F-Wave studies are performed by stimulating motor nerves through supramaximal stimulus, which creates a reaction in the nerve and produces muscle responses, the second of which is referred to as the F-Wave.

342.    In an F-Wave study, measurements are obtained by attaching electrodes to patient's skin and then recording reactions using an EMG machine.

343.    To obtain a reading that is of medical significance, each F-Wave study must involve, at a minimum, ten (10) separate instances of nerve stimulation on **each** motor nerve, i.e., the patient is subjected to ten (10) electric shocks.

344.     F-Wave studies are generally not useful in diagnosing radiculopathy.

345.     First, F-Wave studies generally return abnormal results that are not helpful.

346.     Second, the method of measuring reactions during F-Wave studies is uncomfortable for patients.

347.     Overall, the F-Wave studies administered by Mah (or those NPTCA employees working under his direction and control) were not medically necessary because nearly every patient was subjected to these studies regardless of their age, gender, symptoms or diagnoses.

348.     Mah subjected NPTCA patients to needless and unwarranted F-Wave studies as part of a pre-determined protocol that was intentionally employed to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and services, and (c) produce profits for NPTCA and for Mah.

349.     Because the F-Wave studies were neither warranted nor medically necessary, they are not compensable under New York No-Fault Law.

350.     As a direct result of Mah's protocol approach to F-Wave studies—including (a) his overutilization of these studies, (b) misinterpretation of the results, and (c) misrepresentation of the diagnoses—the charges submitted to Allstate for F-Wave studies were excessive and not compensable under New York No-Fault Law.

351.     The studies listed in Exhibit 2 (i.e., the F-Wave studies billed by NPTCA under CPT code 95903) demonstrate Mah's intentional and grossly irresponsible pattern and practice of misusing F-Wave studies in connection with NPTCA patients.

352.     Because the F-Wave studies administered to NPTCA patients were excessive and unwarranted, each charge submitted to Allstate by NPTCA for these studies is not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibit 2.

353.     To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with any F-Wave studies administered to NPTCA patients, Allstate is entitled to recover all payments made to NPTCA in connection with any such F-Wave studies, including, but not limited to, the studies listed in Exhibit 2.

354.     Additionally, to the extent that any of NPTCA's charges submitted in connection with F-Wave studies remain unpaid (including, but not limited to, the studies listed in Exhibit 2), Allstate is under no obligation to make any payments in connection with those transactions because those studies were excessive, not warranted, and therefore not compensable under New York's No-Fault Laws.

iv.     <u>Fraudulent H-Reflex Tests</u>

355.     Submaximal stimulation of select mixed nerves cause an H-Reflex to occur.

356.     While this can occur in multiple mixed nerves, H-Reflex testing is best practiced clinically through stimulation of the tibial nerve and at the S-1 level.

357.     The H-Reflex at the S-1 level is also useful for finding evidence of radiculopathy in that region.

358.     H-Reflex testing is only rarely practiced on additional mixed nerves and even then it is mainly for research purposes.

359.     The use of H-Reflex testing in the tibial nerve is not medically necessary for lower limb EDX studies despite its practicality, as EMG and NCS are more than adequate in diagnosing radiculopathy in the lower limbs.

360.     Upper limb H-Reflex testing in the median nerve is not a common clinical practice; indeed, it borders on experimental and is below the standard of care.

361.    As such, H-Reflex testing dictates that a dynamic approach, rather than a set protocol, is needed for its diagnosis and utilization.

362.    Mah utilized H-Reflex testing on both the upper limbs and lower limbs when treating virtually every NPTCA patient.

363.    Mah also never made any attempt to consider the needs or symptoms of his patients in using H-Reflex testing.

364.    The provision of H-Reflex testing in this manner provides further evidence that Mah simply followed a pre-determined protocol of treatment that blatantly ignored the age, gender, prior medical history, and the individualized needs of his patients.

365.    Moreover, Mah also misrepresented the H-Reflex findings in order to support his conclusions, despite some cases involving the actual absence of H-Reflexes.

366.    Mah subjected NPTCA patients to needless and unwarranted (and sometimes painful) H-Reflex tests as part of a pre-determined protocol that was intentionally employed to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and services, and (c) produce profits for NPTCA and for Mah.

367.    In this case, the H-Reflex testing administered to NPTCA patients by Mah (or those NPTCA employees working under his direction and control) was excessive and not medically necessary, and the results were materially misrepresented.

368.    As a direct result of Mah's protocol approach to H-Reflex tests—including (a) his overutilization of these studies, (b) misinterpretation of the results, and (c) misrepresentation of the diagnoses—the charges submitted to Allstate for H-Reflex tests were excessive and not compensable under New York No-Fault Law.

369.    The services listed in Exhibit 2 (i.e., the H-Reflex tests billed by NPTCA under CPT codes 95934 and 95936) demonstrate Mah's intentional and grossly irresponsible pattern and practice of misusing H-Reflex tests in connection with NPTCA patients.

370.    Because the H-Reflex tests administered to NPTCA patients were excessive and unwarranted, each charge submitted to Allstate by NPTCA for these studies is not compensable under New York No-Fault Law, including, but not limited to those listed in Exhibit 2.

371.    To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with any H-Reflex tests administered to NPTCA patients, Allstate is entitled to recover all payments made to NPTCA in connection with any such H-Reflex tests, including, but not limited to, the studies listed in Exhibit 2.

372.    Additionally, to the extent that any of NPTCA's charges submitted in connection with H-Reflex tests remain unpaid (including, but not limited to, the studies listed in Exhibit 2), Allstate is under no obligation to make any payments in connection with those transactions because those tests were excessive, not warranted, and therefore not compensable under New York's No-Fault Laws.

v.    Fraudulent Billing for EMG Studies

373.    EMGs are conducted to measure electrical activity in specific muscles, and are often done in conjunction with NCSs.

374.    Similar to NCSs, the utilization of EMGs should vary from patient-to-patient; otherwise, the testing provider risks an incorrect diagnosis when the same muscles are being treated for each patient regardless of the situation.

375.    Similarly, it is medically unnecessary to perform EMGs on all four extremities of every patient.  Performing an EMG on four extremities for each patient is a misrepresentation of the patient's individual needs.

376.    The need to perform EMGs on all four extremities of a patient is rarely necessary and should almost never be performed.  It is not considered appropriate testing and is typically used to increase costs.

377.    Mah performed EMGs on all four extremities of NPTCA patients without any indication of need.

378.    In providing these four extremity EMGs, Mah materially misrepresented the patient's actual needs, symptoms and diagnoses.

379.    Because the four extremity EMGs were grossly excessive and not medically necessary, NPTCA's charges for these studies are not compensable under New York's No-Fault Laws.

380.    In addition to being grossly excessive and not medically necessary, the charges for these EMGs were false and fraudulent because they were purposely "unbundled" as a means to artificially inflate the charges submitted to Allstate.

381.    Unbundling refers to the practice of submitting multiple charges under a certain CPT code when a singular, more appropriate CPT code is available.

382.    Providers like Mah and NPTCA engage in unbundling as means to artificially increase the amount of their bills.

383.    Four-extremity EMGs must be billed as a single charge under CPT code 95864.

384.    EMGs can only be charged under CPT code 95861 if the study is limited only to two of the patient's extremities.

385.     Providers like Mah and NPTCA are prohibited from administering EMGs to all four of a patient's extremities, and then splitting the bill into two separate charges under CPT code 95861 as if two separate two-extremity EMGs had been conducted for the testing across two separate charges for EMG testing of two extremities.

386.     Despite this prohibition, every time Mah administered four-extremity EMGs to NPTCA patients, NPTCA billed Allstate for the studies by submitting two separate charges under CPT code 95861 rather than one singular charge under CPT code 95864.

387.     Billing for EMGs in this manner was false and fraudulent because the prices were artificially inflated and because the charges themselves materially misrepresented the nature of the services that were actually rendered.

388.     Because the charges for EMGs were false and fraudulent, each charge submitted to Allstate by NPTCA for these studies is not compensable under New York No-Fault Law, including, but not limited to, the EMGs billed by NPTCA under CPT code 95861 that are listed in Exhibit 2.

389.     To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with these EMGs administered to NPTCA patients, Allstate is entitled to recover all payments made to NPTCA in connection with any such EMGs, including, but not limited to, the EMGs billed by NPTCA under CPT code 95861 that are listed in Exhibit 2.

390.     Additionally, to the extent that any of NPTCA's charges submitted in connection with EMGs remain unpaid (including, but not limited to, the EMGs billed by NPTCA under CPT code 95861), Allstate is under no obligation to make any payments in connection with those

transactions because the charges for those studies were misrepresented, false, and therefore not compensable under New York's No-Fault Laws.

### vi.   Fraudulent Billing for F-Wave Studies

391.   To obtain medically significant findings, each F-Wave study must consist of a bare minimum of ten (10) separate instances of electrical stimulation on _**each**_ motor nerve, i.e., the patient is subjected to ten (10) separate electric shocks.

392.   To submit a valid charge for F-Wave studies under CPT code 95903, the study must record a minimum of ten (10) F-Waves.

393.   The failure to conduct the minimum number of stimulations will return study findings that are neither medically significant nor usable for diagnostic purposes.

394.   Mah always failed to reach these minimum standards when subjecting NPTCA patients to F-Wave studies.

395.   By submitting bills for F-Wave studies under CPT code 95903, Mah and NPTCA represented to Allstate that the studies were performed properly.

396.   By failing to conduct the minimum number of stimulations, Mah failed to properly perform the F-Wave studies.

397.   Accordingly, every time Mah and NPTCA submitted a charge to Allstate for F-Wave studies under CPT code 95903, they materially misrepresented the nature and compensability of the tests.

398.   Because the charges for the F-Wave studies administered to NPTCA patients were false and fraudulent, each charge submitted to Allstate by NPTCA for these studies is not compensable under New York No-Fault Law, including, but not limited to, the F-Wave studies billed by NPTCA under CPT code 95903 that are listed in Exhibit 2.

399.     To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with any F-Wave studies administered to NPTCA patients, Allstate is entitled to recover all payments made to NPTCA in connection with any such F-Wave studies, including, but not limited to, the F-Wave studies billed by NPTCA under CPT code 95903 that are listed in Exhibit 2.

400.     Additionally, to the extent that any of NPTCA's charges submitted in connection with F-Wave studies remain unpaid (including, but not limited to, the F-Wave studies billed by NPTCA under CPT code 95903), Allstate is under no obligation to make any payments in connection with those transactions because the charges for those studies were misrepresented, false, and therefore not compensable under New York's No-Fault Laws.

### d.     *Fraudulent Range of Motion Testing*

401.     Range of motion ("ROM") testing is utilized to measure spinal ROM in three planes of motion: sagittal, frontal or coronal and transverse or axial.

402.     Spinal ROM consists of all three segments of the spine: cervical, thoracic and lumbar.

403.     If a spinal region is found to have two or more impaired motions, then ratings for each ROM impairment are added.

404.     In spinal ROM administered by Mah, he failed to measure lumbar rotation in lumbar motion tests for each patient it was administered to and thus failed to measure ROM in all three planes of motion.

405.     As a result, the ROM administered by Mah is incomplete and has limited clinical relevance.  This incomplete testing results in an inability to determine the extent of the injury.

406.     Even if the spinal ROM testing were complete, having already measured all three planes of motion, the computerized ROM was not medically necessary.

407.     Indeed, Mah administered computerized ROM when a manual determination of a patient's ROM in the initial evaluation was already sufficient.

408.     The charges submitted by NPTCA for ROM testing were false and fraudulent and, therefore, not compensable because Mah improperly and purposely unbundled the charges for these services as a means to artificially inflate the charges submitted to Allstate.

409.     The ROM tests provided by Mah and billed for by NPTCA require a separate written and signed report, and are intended to be billed under CPT code 95851.

410.     In this case, NPTCA repeatedly billed Allstate for ROM tests under CPT code 95851 even though Mah never provided a separate written and signed report.

411.     Accordingly, the defendants billed Allstate for services that were not rendered as represented.

412.     Because the charges for the ROM tests administered to NPTCA patients were false and fraudulent, each charge submitted to Allstate by NPTCA for these tests is not compensable under New York No-Fault Law, including, but not limited to, the ROM tests billed by NPTCA under CPT code 95851 that are listed in Exhibit 3.

413.     To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with any ROM tests administered to NPTCA patients, Allstate is entitled to recover all payments made to NPTCA in connection with any such ROM testing, including, but not limited to, the ROM tests billed by NPTCA under CPT code 95851 that are listed in Exhibit 3.

414.    Additionally, to the extent that any of NPTCA's charges submitted in connection with ROM tests remain unpaid (including, but not limited to, the tests listed in the ROM tests billed by NPTCA under CPT code 95851 that are listed in Exhibit 3), Allstate is under no obligation to make any payments in connection with those transactions because the charges for those tests were misrepresented and false, and, therefore, not compensable under New York's No-Fault Laws.

415.    Manual muscle testing ("MMT") is generally utilized to measure a patient's muscle strength by applying opposing, resistant forces against the body of the patient, who is attempting to move against this force.

416.    MMT must identify the specific grades of the specific muscles being tested instead of muscle groups.

417.    In a normal, legitimate clinical setting, MMT is utilized only on a case-by-case basis.

418.    Here, Mah administered computerized muscle testing even when a manual determination of a patient's muscle strength was sufficient.

419.    As part of Mah's justification for this, the computerized muscle testing report stated that the testing was medically necessary because it was objective computerized testing and establishes a baseline level to work with.

420.    There is no such thing as "objective" computerized muscle testing because the patient's cooperation is required to determine their level of maximum strength, regardless of whether it was done manually or computerized.

421.    A baseline level can be established in the initial or follow-up examination, thus negating the "medical necessity" of this testing.

422.     Mah also performed computerized muscle testing that was incomplete and only indicated a limited number of muscle groups being tested

423.     By limiting itself to only a small sampling of muscle groups, the computerized muscle testing creates a situation where one cannot have a complete idea of the patient's strength and thus it presents incomplete data, which is clinically flawed.

424.     Furthermore, the MMT results are invalid due to the fact that the reported knee extension strength would be insufficient to support a patient standing up from a chair, with or without use of the hands.

425.     In order for a patient to be effectively given MMT, they would need to be able to rise from a chair and support themselves, with or without hands to assist.

426.     A combined force of 67.5 pounds for the left knee added to the right knee is required to stand from a chair without the use of hands.  A combined force of 50.3 pounds for the left knee added to the right knee is required to stand from a chair with the use of hands.

427.     In patients treated by Mah, the knee extension force varied from as low as approximately 4 pounds to less than 26 pounds of force.  If a patient has this level of knee extension force, then they would be incapable of standing either with or without assistance from the hands.

428.     Despite this, Mah routinely listed the patient's gait as "normal" when the patients were, based upon Mah's analysis and MMT, incapable of standing.

429.     NPTCA's charges for MMT were also false and fraudulent because Mah artificially inflated the invoices submitted to Allstate.

430.     Charges under CPT code 95831 for MMT on extremities other than the hand or trunk are meant to be billed as one single charge.

431.    Charges under CPT code 95831 for MMT on extremities other than the hand or trunk also require a separate written and signed report.

432.    Charges under CPT code 95832 for MMT on the hand are meant to billed as one single charge.

433.    Charges under CPT code 95832 for MMT on the hand also require a separate written and signed report.

434.    If performed using a computer, muscle testing is meant to be billed as a single charge under CPT code 97750.

435.    Charges under CPT code 97750 also require a separate written and signed report.

436.    Here, NPTCA's billing for MMT is false and fraudulent because multiple charges under the same CPT code were submitted even though the testing was conducted in the same session.

437.    NPTCA's charges for MMT are also false and fraudulent because Mah performed muscle testing using a computer, but billed for the tests as if they had been performed manually (i.e., without the aid of a computer).

438.    In doing so, Mah and NPTCA intentionally inflated the amounts charged to Allstate for these muscle tests.

439.    In charging for muscle testing in this manner, Mah and NPTCA also billed Allstate for services that were not rendered as represented.

440.    Moreover, even if NPTCA's charges for "manual" muscle testing under CPT code 95831 and 95832 were proper (although they never were), NPTCA's charges under these codes constitute billing for services not rendered as represented because Mah never provided a separate written and signed report for any of the tests.

61

441.    Because the muscle testing was unnecessary and because the associated charges for this testing was false and fraudulent, the charges submitted to Allstate by NPTCA for muscle testing (i.e., the charges billed by NPTCA under CPT codes 97750, 95831, and 95832) are not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibit 3.

442.    To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with any muscle testing provided to NPTCA patients, Allstate is entitled to recover all payments made to NPTCA in connection with any such testing, including, but not limited to, the charges billed by NPTCA under CPT codes 97750, 95831, and 95832 that are listed in Exhibit 3.

443.    Additionally, to the extent that any of NPTCA's charges submitted in connection with muscle testing remain unpaid (including, but not limited to, the billed by NPTCA under CPT codes 97750, 95831, and 95832 that are listed in Exhibit 3), Allstate is under no obligation to make any payments in connection with those transactions because the services were unnecessary and unwarranted, and because the charges for those tests were misrepresented, false, and therefore not compensable under New York's No-Fault Laws.

### e.    *Fraudulent Computerized Radiographic Mensuration Analysis*

444.    Computerized Radiographic Mensuration Analysis ("CRMA") measures the distance between bones in the spine.

445.    CRMA should only be performed when a patient has reached their maximum medical improvement ("MMI").

446.    All CRMAs performed by Mah were done during active treatment and before the patients had reached MMI.

447.    When CRMA is performed prior to patients reaching MMI, the impairment reports are invalid and cannot be used to determine a patient's impairment level, thus rendering them clinically useless.

448.    The AMA requires that patients reach their MMI before undergoing CRMA.

449.    As such, the impairment reports developed by Mah were invalid and the billing submitted for CPT code 76499 was for services not rendered.

450.    Even if CRMA were being performed properly at the patients' MMI, the impairment reports were not developed using accurate data.

451.    Impairment reports cannot rely solely upon imaging results.

452.    An evaluation of impairment should include an accurate medical history and a complete description of the patient's current symptoms as they relate to daily activities.

453.    Mah relied upon only the imaging results to determine the impairment rating of patients and to subsequently draft the impairment reports.

454.    In fact, the impairment reports drafted by Mah state that imaging tests alone are insufficient to determine impairment.

455.    At no time did Mah review the symptoms of his patients for the specific purpose of determining their individual impairment ratings.

456.    Indeed, despite Mah's failure to review his patient's symptoms in drafting impairment reports, Mah somehow included a boilerplate statement on each report that predicts future issues for each patient.

457.    These boilerplate statements are identical in form and nature.

458.    An impairment report cannot determine future status about current impairment, especially when the current impairment is determined by imaging alone.

459.    Furthermore, the impairment reports did not provide any medical justification, instead relying upon further boilerplate statements in an attempt to show that they were in fact medically necessary (although they were not).

460.    In addition to providing unwarranted CRMA, Mah and NPTCA also submitted fraudulent charges for these services.

461.    CRMA is billed under CPT code 76499.

462.    CPT code modifier 22 is for "Increased Procedural Services" and is applied when the work required to perform a service is substantially greater than typically required.  This additional work must be supported by documentation.

463.    For each instance of CRMA being billed under CPT code 76499, Mah always used the modifier 22 when billing for CRMA without providing any documentation to support this additional work.

464.    In fact, the reports generated by Mah contain only boilerplate text and machine-generated images, meaning that Mah had virtually no actual involvement with the procedure other than signing the report.

465.    Overall, it is clear Mah did not perform any of the additional work that was necessary to justify the use of the modifier 22 when billing for CRMA.

466.    Because the CRMA itself was unnecessary and because the associated charges for this testing were false and fraudulent, the charges submitted to Allstate by NPTCA for CRMA under CPT codes 76499 and 76499-22 are not compensable under New York No-Fault Law, including, but not limited to, those listed in Exhibit 4.

467.    To the extent that Allstate paid NPTCA in reliance on the documents created and submitted to Allstate by NPTCA in connection with any CRMA provided to NPTCA patients,

Allstate is entitled to recover all payments made to NPTCA in connection with these services, including, but not limited to, the charges billed by NPTCA under CPT codes 76499 and 76499-22 that are listed in Exhibit 4.

468.     Additionally, to the extent that any of NPTCA's charges submitted in connection with CRMA remain unpaid (including, but not limited to, the charges billed by NPTCA under CPT codes 76499 and 76499-22 that are listed in Exhibit 4), Allstate is under no obligation to make any payments in connection with those transactions because the services were unnecessary and unwarranted, and because the charges for those services were misrepresented, false, and therefore not compensable under New York's No-Fault Laws.

### B.     BETHEL INTERVENTIONAL

#### 1.     Unlawful and Unauthorized Operation of Bethel Interventional in New York

469.     Bethel Interventional is a limited liability company organized under New Jersey law.

470.     At all relevant times, Bethel Interventional maintained offices in both New Jersey and New York.

471.     At all relevant times, Cho and Bethel Interventional have engaged in systematic and regular activity in New York such that they can be considered as conducting business in the State of New York.

472.     Despite conducting regular business in New York, Bethel Interventional has never been incorporated in New York, nor has it ever applied for a Certificate of Authority to operate in New York as a foreign limited liability company.

473.     Bethel Interventional has also never been registered with the Office of the Professions in New York.

474.    By failing to obtain authority to operate a limited liability company performing professional medical services in New York, Bethel Interventional was, at all relevant times, operated in violation of New York law.

475.    Because it was operated in violation of New York law, Bethel Interventional was, at all relevant times, not lawfully eligible to seek or receive No-Fault benefit payments from Allstate.

476.    Cho also conspired with Mah to operate Bethel Interventional in violation of New York law.

477.    Mah's control over NPTCA and the Northern Boulevard Clinic facilitated Cho's operation of Bethel Interventional in New York.

478.    As a foreign corporation, Bethel Interventional needed to obtain a physical address within New York before it could provide healthcare services to patients and then seek payment for those services under New York's No-Fault laws.

479.    As the named leaseholder for the Northern Boulevard Clinic, Mah was able to bring other healthcare providers into the Clinic have them operate alongside NPTCA.

480.    In the course of operating the Northern Boulevard Clinic, Mah, through NPTCA, entered into a lease agreement with Cho and Bethel Interventional for the use of clinical office space ("NPTCA-Bethel Lease Agreement" or "the Lease").

481.    NPTCA-Bethel Lease Agreement was beneficial to Cho because the lease provided Bethel Interventional with the physical office space that Cho needed in order to treat New York-based patients.

482.    The NPTCA-Bethel Lease Agreement was beneficial to NPTCA because its ability to provide and seek payment for the provision of physical therapy services depended upon referrals

from physicians, and the Lease facilitated the continued referrals of NPTCA patients to Bethel Interventional—referrals that nearly always resulted in Cho referring the patient back to NPTCA for further physical therapy treatment.

483.    The NPTCA-Bethel Lease Agreement was beneficial to Mah personally because, as the named leaseholder for the Northern Boulevard Clinic, Mah was the direct beneficiary of the lease payments made by Bethel Interventional.

484.    Mah also enriched himself through the NPTCA-Bethel Lease Agreement because (a) Mah already covered his personal leaseholder obligations for the Northern Boulevard Clinic using the expenses allocated to and paid by NPTCA, (b) the leasing expenses charged to NPTCA were not off-set by the additional lease payments made by Cho and Bethel Interventional thus allowing Mah to profit from their lease payments, and (c) Mah received the largest share of NPTCA's physical therapy collections—collections that were driven by services provided as the direct result of Cho's physician referrals.

485.    The NPTCA-Bethel Lease Agreement also gave Mah control over Cho's provision of physician services to patients of the Northern Boulevard Clinic.

486.    For example, the Lease prohibited Cho from entering the Northern Boulevard Clinic without Mah's prior consent, and the Lease also required Cho to give Mah at least one week's notice before entering the Clinic to evaluate and treat patients.

487.    Mah was able to use the Lease to effectively control the day-to-day activities of Cho and Bethel Interventional at the Northern Boulevard Clinic.

488.    Indeed, by controlling Cho's access to the Northern Boulevard Clinic, Mah was able to dictate the treatment of Bethel Interventional patients, even though New York law prohibits chiropractors from dictating when and where a physician provides medical services.

489. In furtherance of this scheme, Mah—who is not a physician—used his position of power over NPTCA and the Northern Boulevard Clinic to (a) control Cho's provision of physician services, (b) participate in the operation, management, and control of the Bethel Interventional enterprise, (c) facilitate Cho's referral of patients back to NPTCA for additional physical therapy services, and (d) obtain personal financial enrichment through the collection of lease payments from Bethel Interventional and through NPTCA's collection of physical therapy payments as the company's majority stakeholder.

490. Based on Cho's and Mah's misconduct, Bethel Interventional was operated in violation of New York law throughout the course of this scheme.

491. Because it was operated in violation of New York law, Bethel Interventional was never lawfully eligible to seek or receive No-Fault benefit payments from Allstate.

## 2. Fraudulent Healthcare Services Provided by Cho to Patients of Bethel Interventional

492. The routine referral of NPTCA patients to Cho and Bethel Interventional was a cornerstone of the defendants' scheme to defraud.

493. The referral of NPTCA patients to Cho and Bethel Interventional served several purposes, including (a) generating physical therapy referrals, (b) providing an opportunity for Cho to provide an aggressive regimen of interventional pain management, (c) justifying further chiropractic, physical therapy, and acupuncture treatment at NPTCA, and (d) supplying an additional avenue to extract No-Fault benefit payments from Allstate.

494. The services provided by Cho through Bethel Interventional were excessive, unwarranted, and not medically necessary in virtually every instance.

495.    As part of this scheme, patients were referred to Cho and Bethel Interventional for pain management services that they simply did not need, especially where the vast majority of these patients had no objective documented deficits to warrant the delivery of these services.

496.    The majority of NPTCA patients referred to Cho and Bethel Interventional received injections that were excessive and medically unnecessary.

497.    These injections included, but were not limited to, trigger point injections, epidural steroid injections, facet injections, and percutaneous disc decompression.

498.    The injections were performed frequently and without medical justification; in fact, the injections were often repeated numerous times without any documented objective benefit or functional improvement.

499.    In almost all cases, patients were subjected to the same battery of injections regardless of their presenting complaints or diagnoses.

500.    Additionally, the patients were subjected to a series of injections even though the injections, from an objective standpoint, did little to improve the patients' condition.

501.    Despite the lack of objective evidence showing effectiveness of the injections or improvement in the patients' condition following the injections, Cho kept providing additional injections.

502.    In certain cases, the injections were recklessly and irresponsibly administered in close succession, thus placing the patients at serious risk of bodily harm.

503.    Accordingly, in addition to being provided unlawfully and without authorization under New York law, the physician services administered by Cho to the patients listed in Exhibit 5 were excessive, unnecessary, and often dangerous, and thus the charges submitted by Bethel

Interventional in connection with these services are not compensable under New York's No-Fault laws.

504.    To the extent that Allstate paid Bethel Interventional in reliance on the documents created and submitted in connection with the claims listed in Exhibit 5, Allstate is entitled to recover all payments made to Bethel Interventional in connection with these services.

505.    Moreover, to the extent that any of the charges submitted by Cho and Bethel Interventional in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 5), Allstate is under no obligation to make any payments to Cho and Bethel Interventional in connection with those transactions because the services are not compensable under New York's No-Fault Laws.

### 3.    Fraudulent Charges for Services Purportedly Provided to Bethel Interventional Patients

#### i.    Unlawfully Excessive Charges

506.    During the relevant period, when New York-based patients received qualifying healthcare services outside of New York, those services were eligible for reimbursement at the "prevailing fee" in the provider's geographic location.

507.    A significant portion of the services provided by Cho to patients of Bethel Interventional involved injections, many of which were performed by Cho at an ambulatory care facility in New Jersey.

508.    Because New Jersey has a statutory medical fee schedule, the injections provided by Cho to patients of Bethel Interventional in New Jersey were eligible for reimbursement at the rates set forth under the New Jersey ambulatory surgical center fee schedule.

509.     Throughout the course of this scheme, Cho deliberately referred patients of Bethel Interventional to a New Jersey ambulatory care facility to purposely exploit the difference in reimbursement rates between the New York and New Jersey fee schedules.

510.     In many cases, Cho and Bethel Interventional doubled or tripled the amount of No-Fault reimbursement that they could collect for injections by administering them in New Jersey instead of New York.

511.     For example, in the case of Bethel Interventional patient J.C. (claim no. 0414274712), Cho's referral to the New Jersey ambulatory care center for facet joint injections at multiple levels of J.C.'s cervical/thoracic spine yielded reimbursable charges under the New Jersey physicians' fee schedule totaling $1,349.58, assuming that the procedure was medically necessary and properly charged (which it was not—Bethel Interventional submitted charges totaling $16,000.00 for this unwarranted procedure).

512.     Had J.C.'s facet joint injections been performed in New York, the same procedure would have yielded reimbursable charges under the New York fee schedule totaling only $423.74, assuming that the procedure was medically necessary and properly performed (which it was not).

513.     As another example, Cho's referral of Bethel Interventional patient E.J. (claim no. 0379603433) to the New Jersey ambulatory care facility for an epidural steroid injection yielded reimbursable charges under the New Jersey physicians' fee schedule totaling $1,061.75, assuming that the procedure was medically necessary and properly charged (which it was not—Bethel Interventional submitted charges totaling $6,500.00 for this unwarranted procedure).

514.     Had E.J.'s epidural steroid injection been performed in New York, the same procedure would have yielded reimbursable charges under the New York fee schedule totaling

only $490.20, assuming that the procedure was medically necessary and properly charged (which it was not).

515.    Accordingly, given the substantial volume of patients referred to Cho and Bethel Interventional by Mah (through NPTCA) for evaluations and pain management consultations, there were clear—and significant—financial incentives to convince Bethel Interventional patients to accept Cho's (unwarranted) recommendations for injections, and then induce those patients to follow Cho's referral to the New Jersey ambulatory care facility for the (unnecessary) procedures.

516.    Despite the existence of the NJ Fee Schedule, however, Cho and Bethel Interventional always submitted fraudulent and unlawfully excessive charges to Allstate in connection with every injection administered by Cho to a Bethel Interventional patient in New Jersey.

517.    Indeed, the charges submitted to Allstate in connection with injections purportedly administered by Cho to Bethel Interventional patients in New Jersey were grossly and unlawfully inflated, including the following:

| Procedure | Procedure Code | Amount Charged by Bethel Interventional | Maximum Amount Allowed under NJ Fee Schedule | Amount Fraudulently Charged by Bethel Interventional |
|---|---|---|---|---|
| Facet joint injection; cervical or thoracic region | 62310 | $3,000.00 | $1,021.73 | **$1,978.27** |
| Facet joint injection; lumbar or sacral region | 62311 | $3,000.00 | $879.37 | **$2,120.63** |
| Epidural steroid injection; lumbar or sacral region | 64483 | $3,000.00 | $611.76 | **$2,388.24** |
| Bilateral epidural steroid injection; lumbar or sacral region | 64483-50 | $6,000.00 | $917.64 | **$5,082.36** |
| Transforaminal epidural block; cervical or thoracic region, one or more level(s) | 64490<br>64491<br>64492 | $3,000.00<br>$3,000.00<br>$2,000.00 | $494.93<br>$241.80<br>$244.49 | **$2,505.07**<br>**$2,758.20**<br>**$1,755.51** |
| Bilateral transforaminal epidural block; cervical or thoracic region, one or more level(s) | 64490-50<br>64491-50<br>64492-50 | $6,000.00<br>$6,000.00<br>$4,000.00 | $742.39<br>$362.70<br>$244.49 | **$5,257.61**<br>**$5,637.30**<br>**$3,755.51** |
| Bilateral transforaminal epidural block; lumbar or sacral region, one or more level(s) | 64493-50<br>64494-50<br>64495-50 | $6,000.00<br>$4,000.00<br>$4,000.00 | $663.78<br>$328.28<br>$222.43 | **$5,336.22**<br>**$3,671.72**<br>**$3,777.57** |
| Epidurography | 72275-26 | $2,000.00 | $182.38 | **$1817.62** |
| Fluoroscopic guidance | 77003-26 | $1,500.00 | $106.12 | **$1,393.88** |

518.   Accordingly, all of the charges submitted to Allstate by Bethel Interventional in connection with these services are unlawfully excessive and fraudulent, and thus are not compensable under New York's No-Fault laws.

519.   Accordingly, to the extent that Allstate paid Bethel Interventional in reliance on the documents created and submitted in connection with the services listed in Exhibit 5, Allstate is entitled to recover all payments made to Bethel Interventional in connection with these services.

520.   Moreover, to the extent that any of the charges submitted by Bethel Interventional in connection with these services remain unpaid (including, but not limited to, the claims identified

in the chart annexed at Exhibit 5, Allstate is under no obligation to make any payments to Bethel Interventional in connection with those transactions because the underlying services and charges are not compensable under New York's No-Fault Laws.

ii.     Fraudulent Unbundling of Charges

521.    Bethel Interventional submitted charges to Allstate for these services using Current Procedural Terminology ("CPT") codes.

522.    CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of medical charges by insurance carriers and other private and governmental health care payors.

523.    "Unbundling" of CPT codes is another example of a fraudulent and abusive billing tactic.

524.    Unbundling occurs when multiple CPT codes are billed for the component parts of a procedure when there is a single code available that includes the complete procedure.

525.    With respect to most of the injections administered by Cho to Bethel Interventional patients, Cho and Bethel Interventional wrongfully unbundled the charges associated with the procedures in an attempt to obtain payments that exceeded the amounts permissible under the Fee Schedules.

526.    For example, in connection with the epidural steroid injections, Cho and Bethel Interventional always submitted additional charges of $2,000.00 for an epidurography under CPT code 72275-26 and $1,500.00 for fluoroscopic guidance under CPT code 77003-26.

527.    Even if the epidural steroid injections were clinically necessary, properly charged, and compensable (which they were not), the charges for these services were deliberately unbundled as a means to extract additional payment from Allstate because fluoroscopic guidance

provided as part of a contemporaneous epidurography is an inclusive component of the epidurography, and thus the fluoroscopic guidance cannot be charged separately.

528.    Because Bethel Interventional's charges relating to the epidural steroid injections purportedly provided to Allstate claimants were fraudulently unbundled and purposely misrepresented, the charges submitted to Allstate in connection with these services are not compensable under New York's No-Fault laws.

529.    To the extent that Allstate paid Bethel Interventional in reliance on the documents created and submitted in connection with the services as listed in Exhibit 5, Allstate is entitled to recover all payments made to Bethel Interventional in connection with these services.

530.    Moreover, to the extent that any of the charges submitted by Bethel Interventional in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 5), Allstate is under no obligation to make any payments to Bethel Interventional in connection with those transactions because the underlying services and charges are not compensable under New York's No-Fault Laws.

C.    WESTERN JANEDA AND HACKENSACK SURGERY CENTER

1.    Unlawful and Unauthorized Operation of Western Janeda in New York

531.    Western Janeda is a limited liability company organized under New Jersey law.

532.    At all relevant times, Western Janeda maintained offices in both New Jersey and New York.

533.    At all relevant times, Yoo and Western Janeda have engaged in systematic and regular activity in New York such that they can be considered as conducting business in the State of New York.

534.     Despite conducting regular business in New York, Western Janeda has never been incorporated in New York, nor has it ever applied for a Certificate of Authority to operate in New York as a foreign limited liability company.

535.     Western Janeda has also never been registered with the Office of the Professions in New York.

536.     By failing to obtain authority to operate as a limited liability company performing professional medical services in New York, Bethel Interventional was, at all relevant times, operated in violation of New York law.

537.     Because it was operated in violation of New York law, Western Janeda was, at all relevant times, not lawfully eligible to seek or receive No-Fault benefit payments from Allstate.

### 2.     Fraudulent Healthcare Services Provided by Yoo to Patients of Western Janeda

538.     Western Janeda was incorporated in New Jersey, but during the course of this scheme, Yoo operated Western Janeda from a clinic in Flushing, NY (154-08 Northern Boulevard, Flushing, NY), which was located right down the street from NPTCA and the Northern Boulevard Clinic.

539.     The decision to operate Western Janeda at this location was likely purposeful given the clinic's close proximity to several other No-Fault clinics, including the Northern Boulevard Clinic.

540.     For example, the short distance between Western Janeda and the Northern Boulevard Clinic facilitated easy patient referrals from NPTCA and/or Bethel Interventional to Western Janeda.

541.     The path between the Northern Boulevard Clinic and Western Janeda was followed by several claimants during the course of this scheme.

542.    At the outset of treatment, patients of the Northern Boulevard Clinic are seen by Mah and subjected to a barrage of unnecessary services and diagnostic tests, including a battery of EDX tests and MRI studies.

543.    Concurrent with their NPTCA treatment, Mah typically refers patients of the Northern Boulevard Clinic to an outside physician—usually Cho or, when Cho is not available, another "independent" physician operating at the Northern Boulevard Clinic—for further evaluation, for pain management services, and for the purpose of obtaining the critically-important (for Mah and NPTCA, at least) physical therapy referral for the patient.

544.    After being seen by Cho (or another "independent" physician at the Northern Boulevard Clinic), patients are returned to NPTCA for an array of chiropractic, acupuncture, and physical therapy services.

545.    As a result of seeing Cho, patients are also typically referred to Yoo and Western Janeda for additional—and unnecessary—evaluations and services.

546.    During the relevant period, Yoo's treatment of patients through Western Janeda followed a remarkably similar pattern.

547.    Yoo typically evaluates patients shortly after their accident and very early in their treatment, often before the patients' injuries have a chance to resolve on their own or respond to conservative care.

548.    In many cases, Yoo generates his findings and recommendation based on MRI studies, the results of which are misrepresented and/or fabricated.

549.    For example, in certain instances, the MRI studies relied upon by Yoo purport to diagnose acute conditions in areas of the patients' bodies that were not injured in the subject accidents.

550.    In other instances, the MRI studies relied upon by Yoo purposely misrepresent the patients' injuries and conditions as acutely traumatic when they are actually age-appropriate, degenerative (i.e., not accident-related) conditions.

551.    Accordingly, Yoo often recommends treatment and/or provides treatment in connection with injuries that do not actually exist, or, if they do exist, are not related to the patients' accidents.

552.    Based on these rushed and fabricated findings, the majority of patients seen by Yoo are hurried into surgeries that they do not need—surgeries that were always performed at Hackensack Surgery pursuant to Yoo's self-referrals.

553.    For example, Western Janeda patients were regularly pressured into electing surgery, with one Allstate claimant characterizing Yoo's surgical recommendations as "forced advising."

554.    The records created by Yoo contain remarkably similar reports and findings for virtually all of the patients treated by him through Western Janeda

555.    Very few, if any, of the patients treated by Yoo through Western Janeda actually required surgery.

556.    However, even in the rare instance where surgery may have been required, none of the patients needed surgery on the aggressive timetable set by Yoo.

557.    Moreover, none of the patients treated by Yoo through Western Janeda needed the full panoply of procedures purportedly provided by Yoo.

558.    The unnecessary and unwarranted procedures provided by Yoo included the performance of arthroscopic surgeries, often accompanied by the provision of platelet-rich plasma ("PRP") injections at or around the surgical sites.

559.    The PRP injections, which are experimental in nature, were completely unwarranted and were administered simply to further inflate Yoo's and Western Janeda's already excessive charges.

560.    Indeed, Yoo and Western Janeda regularly charged Allstate exorbitant sums—sometimes in upwards of $70,000.00 per procedure—in connection with each patient who was subjected to these relatively routine, yet wholly unwarranted, surgical procedures.

561.    As a partial owner of Hackensack Surgery, Yoo reaped additional financial benefits from the unwarranted surgeries as all of the surgeries were performed at Hackensack Surgery pursuant to Yoo's self-referrals.

562.    Yoo and Western Janeda then compounded their already excessive charges by assessing an additional charge of $7,500.00 each time a PRP injection was administered.

563.    Even if the PRP injections were warranted (which they never were in any case), Yoo's and Western Janeda's charges were grossly excessive because the services should have cost only a few hundred dollars.

564.    Overall, the services purportedly provided by Yoo through Western Janeda were not ordered and performed based on the patients' actual medical needs.

565.    Rather, Yoo's and Western Janeda's services were provided only as a means to maximize the defendants' revenues and profits, and to further the overall objectives of the defendants' scheme (i.e., providing and then billing Allstate for as much treatment as possible) by giving the other providers (e.g., Mah, NPTCA, Cho, Bethel Interventional, etc.) a false justification to provide additional unwarranted services.

566.    Accordingly, in addition to being provided unlawfully and without authorization under New York law, the services administered by Yoo (and those persons assisting Yoo in

providing the services) to the patients listed in Exhibit 6 were excessive, unnecessary, and often dangerous, and thus the charges submitted by Western Janeda in connection with these services are not compensable under New York's No-Fault laws.

567. To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the claims listed in Exhibit 6, Allstate is entitled to recover all payments made to Western Janeda in connection with these services.

568. Moreover, to the extent that any of the charges submitted by Yoo and Western Janeda in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 6), Allstate is under no obligation to make any payments to Yoo and Western Janeda in connection with those transactions because the underlying services are not compensable under New York's No-Fault Laws.

### 3. Unlawful Referrals of Western Janeda Patients to Hackensack Surgery

569. As part of the scheme to exploit New York's No-Fault laws, Yoo routinely evaluated patients through Western Janeda, and then recommended that those patients undergo surgical procedures.

570. When the Western Janeda patients were convinced to undergo surgery, Yoo self-referred those patients to Hackensack Surgery.

571. As alleged herein, even assuming that there was a clinical basis for the surgeries (although there was not), Yoo's self-referrals of Western Janeda patients to Hackensack Surgery were unlawful.

572. As an owner of Western Janeda and Hackensack Surgery, Yoo's ownership interest in Hackensack Surgery was required to be disclosed to Western Janeda patients at or before the time the referral was made.

573.    In violation of New Jersey law, Yoo's ownership interest in Hackensack Surgery was never disclosed to Western Janeda patients at or before the time that the referral was made.

574.    In fact, in several cases, claimants were unable to (a) identify the name of their surgeon, (b) identify the name and location of the surgery center, and (c) explain why they were required to travel from New York to New Jersey for surgery.

575.    Indeed, the vast majority of Western Janeda's patients hailed from New York, thus there was no valid reason why the patients had to travel to New Jersey for surgery, especially when there were several other ambulatory care facilities located closer to their homes.

576.    Even in those limited cases where Yoo's ownership interest was disclosed to Western Janeda patients, the disclosure was not given until the day of the surgery, long after Yoo's surgery referrals were made and long after the patients could elect to have the surgery elsewhere (if at all).

577.    Indeed, the manner in which Yoo's ownership interest was disclosed to Western Janeda patients rendered the disclosures utterly useless.

578.    There are several sound policy reasons underlying the disclosure requirement that are aimed at protecting patients, including informing patients that their physician has a self-interest in the surgery and providing patients with an opportunity to seek treatment at a facility of their own choice.

579.    However, by providing patients with disclosures on the same day as the surgery (if at all), Yoo, Western Janeda, and Hackensack Surgery deprived patients of the chance to meaningfully consider several crucial factors, including (a) whether the surgeries were needed, (b) whether Yoo's surgery recommendations and referrals to Hackensack Surgery were financially motivated, and (c) whether another provider should or could be consulted about the surgery.

580.    Those few patients provided with the disclosure on the day of surgery were also deprived of the opportunity to seek a different provider, one that charged less than Western Janeda and Hackensack Surgery.

581.    As alleged herein, the surgeries performed by Yoo through Western Janeda at Hackensack Surgery were charged at exorbitant rates.

582.    Notably, however, the few disclosures actually provided by Hackensack Surgery contained a clause informing patients that they were responsible for charges not covered by their insurance carrier.

583.    As detailed below, Hackensack Surgery submitted charges to Allstate that exceeded the amounts allowed under the prevailing Fee Schedules, thus guaranteeing that patients would be left to assume responsibility for the costs not covered by Allstate because Hackensack Surgery knew (or should have known) that Allstate would pay only those amounts allowed under the Fee Schedules (if at all).

584.    Overall, Yoo's referrals of Western Janeda patients to Hackensack Surgery for surgeries were unnecessary and were made in violation of New Jersey law.

585.    Accordingly, the charges submitted by Hackensack Surgery in connection with these services, including, but not limited to, those identified in Exhibit 7, are not compensable under New York's No-Fault laws.

586.    To the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted in connection with the services as listed in Exhibit 7, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services.

587.    Moreover, to the extent that any of the charges submitted by Hackensack Surgery in connection with these services remain unpaid (including, but not limited to, the services

identified in the chart annexed at Exhibit 7), Allstate is under no obligation to make any payments to Hackensack Surgery in connection with those transactions because the underlying services are not compensable under New York's No-Fault Laws.

4.      **Fraudulent Charges for Healthcare Services Purportedly Provided to Patients of Western Janeda and Hackensack Surgery**

a.      *Western Janeda*

588.      Throughout the course of this scheme, Yoo (and, in many cases, an unqualified assistant surgeon), acting through Western Janeda, purportedly provided a variety of arthroscopic surgeries and PRP injections to Allstate claimants.

589.      Yoo caused Western Janeda's patients to undergo these procedures at Hackensack Surgery, which was located in New Jersey.

590.      In addition to the procedures themselves being clinically unnecessary, Western Janeda's charges for these procedures were grossly and unlawfully excessive.

591.      As explained below, Yoo and Western Janeda engaged in multiple fraudulent billing practices during the course of this scheme with respect to surgical procedures performed upon Allstate claimants, including (a) submitting unlawfully excessive charges, (b) fraudulently "unbundling" charges, (c) deliberately misrepresenting the services actually provided, and (d) billing for services not actually rendered as represented.

i.      Unlawfully Excessive Charges

592.      During the relevant period, when New York-based patients received qualifying healthcare services outside of New York, those services were eligible for reimbursement at the "prevailing fee" in the provider's geographic location.

593.    Because all of Western Janeda's patients' surgical procedures were performed in New Jersey and because New Jersey has a statutory medical fee schedule, all of the surgical procedures were eligible for reimbursement at the rates set forth under the NJ Fee Schedule.

594.    Throughout the course of this scheme, Yoo deliberately self-referred patients of Western Janeda to a New Jersey ambulatory care facility (one that Yoo partially owned) to purposely exploit the difference in reimbursement rates between the New York and New Jersey fee schedules.

595.    Indeed, for the vast majority of the surgeries performed in furtherance of this scheme, by performing the surgeries in New Jersey instead of New York, Yoo and Western Janeda nearly doubled the amount of No-Fault reimbursement that they could collect for each procedure.

596.    For example, in the case of Western Janeda patient K.J. (claim no. 0278461125), Yoo's self-referral of K.J. to Hackensack Surgery for arthroscopic shoulder surgery yielded reimbursable charges under the NJ Fee Schedule totaling $5,365.77, assuming that the procedure was medically necessary and lawfully performed (which it was not).

597.    Had K.J.'s arthroscopic shoulder surgery been performed in New York, the same procedure would have yielded reimbursable charges under the New York fee schedule totaling only $2,329.34, assuming that the procedure was medically necessary and lawfully performed (which it was not).

598.    As another example, Yoo's self-referral of Western Janeda patient B.L. (claim no. 0451467732) to Hackensack Surgery for arthroscopic knee surgery yielded reimbursable charges under the NJ Fee Schedule totaling $5,661.15, assuming that the procedure was medically necessary and lawfully performed (which it was not).

599.   Had B.L.'s arthroscopic knee surgery been performed in New York, the same procedure would have yielded reimbursable charges under the New York fee schedule totaling only $2,833.23, assuming that the procedure was medically necessary and lawfully performed (which it was not)

600.   Accordingly, given the massive volume of patients referred to Yoo and Western Janeda for orthopedic surgery consultations and evaluations (including those patients referred by Mah and Cho through NPTCA and Bethel Interventional, respectively), there were clear—and significant—financial incentives to convince Western Janeda patients to accept Yoo's (unwarranted) recommendations for surgery, and then induce those patients to follow Yoo's (unlawful) self-referral to Hackensack Surgery for the (unnecessary) procedures.

601.   Despite the existence of the NJ Fee Schedule, however, Yoo and Western Janeda always submitted fraudulent and unlawfully excessive charges to Allstate in connection with every surgical procedure performed upon a Western Janeda patient.

602.   Indeed, every charge submitted to Allstate in connection with shoulder surgeries purportedly performed by Yoo upon Western Janeda patients was grossly and unlawfully inflated, including the following:

| Procedure | Procedure Code | Amount Charged by Western Janeda | Maximum Amount Allowed under NJ Fee Schedule | Amount Fraudulently Charged by Western Janeda |
|---|---|---|---|---|
| Arthroscopy, shoulder, diagnostic, with or without synovial biopsy | 29805 | $5,750.00 | $2,575.75 | **$3,174.25** |
| Arthroscopy, shoulder, surgical; subacromial decompression | 29826 | $7,000.00 | $3,650.34 | **$3,349.66** |
| Arthroscopy, shoulder, surgical; debridement, extensive | 29823-51 | $8,500.00 | $3,430.85 | **$5,069.15** |
| Arthroscopy, shoulder, surgical; synovectomy, partial | 29820 | $6,000.00 | $2,953.64 | **$3,046.36** |
| Platelet-rich plasma injection | 0232T | $7,500.00 | $63.95 | **$7,436.05** |
| | **TOTALS:** | **$34,750.00** | **$12,674.53** | **$22,075.47** |

603. Likewise, every charge submitted to Allstate in connection with knee surgeries purportedly performed by Yoo upon Western Janeda patients was grossly and unlawfully inflated, including the following:

| Procedure | Procedure Code | Amount Charged by Western Janeda | Maximum Amount Allowed under NJ Fee Schedule | Amount Fraudulently Charged by Western Janeda |
|---|---|---|---|---|
| Arthroscopy, knee, diagnostic | 29870 | $3,500.00 | $2,543.44 | **$956.56** |
| Arthroscopy, knee, surgical; with meniscectomy | 29881 | $6,000.00 | $3,531.15 | **$2,468.85** |
| Arthroscopy, knee, surgical; debridement/chondroplasty | 29877 | $4,575.00 | $3,398.38 | **$1,176.62** |
| Arthroscopy, knee, surgical; synovectomy, limited | 29875 | $4,260.00 | $2,712.06 | **$1,547.94** |
| Platelet-rich plasma injection | 0232T | $7,500.00 | $63.95 | **$7,436.05** |
| | **TOTALS:** | **$25,835.00** | **$12,248.98** | **$13,586.02** |

604.     Overall, Yoo and Western Janeda routinely submitted multiple charges for each arthroscopic surgical procedure, including multiple charges ranging from $3,500.00 to $10,000.00 under CPT codes 29805, 29820, 29822, 29823, 29826, 29827, 29870, 29875, 29877, 29880, and 29881.

605.     Because Western Janeda's charges for these services violated New Jersey law, all of the charges submitted to Allstate in connection with these services are false, fraudulent, and are not compensable under New York's No-Fault laws.

606.     Accordingly, to the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services as listed in Exhibit 6, Allstate is entitled to recover all payments made to Western Janeda in connection with these services.

607.     Moreover, to the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 6), Allstate is under no obligation to make any payments to Western Janeda in connection with those transactions because both the underlying services and charges are not compensable under New York's No-Fault Laws.

        ii.      <u>Fraudulent Unbundling of Charges and Reporting of Separate Procedures</u>

608.     Western Janeda submitted charges to Allstate for these services using Current Procedural Terminology ("CPT") codes.

609.     CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of medical charges by insurance carriers and other private and governmental health care payors.

610.     Reimbursement for medical services is directly proportionate to the level of the CPT code billed (i.e., the higher the level of CPT code billed, the greater the amount of reimbursement).

611.     "Unbundling" of CPT codes is another example of a fraudulent and abusive billing tactic.

612.     Unbundling occurs when multiple CPT codes are billed for the component parts of a procedure when there is a single code available that includes the complete procedure.

613.     In virtually every case, Yoo and Western Janeda wrongfully unbundled the charges associated with the surgical procedures performed upon Allstate claimants in an attempt to obtain payments far in excess of the amounts permissible under the Fee Schedules.

614.     For example, in connection with the PRP injections, Yoo and Western Janeda always submitted an additional charge of at least $7,500.00 under CPT code 0232T.

615.     Even if the PRP injections were clinically necessary and compensable (which they were not), the charges for these services were deliberately unbundled as a means to extract additional payment from Allstate because a PRP injection performed as part of a contemporaneous surgical procedure is an inclusive component of the surgical procedure, and is not to be separately charged.

616.     Violating the rules concerning a "separate procedure" is yet another example of a fraudulent and abusive billing tactic utilized by the defendants during this scheme.

617.     When billing under CPT codes, a provider may include the notation "separate procedure" if the procedure is the only one performed, or if the procedure is unrelated to or distinct from other procedures performed during the same operative sessions.

618.    Notably, a "separate procedure" should not be reported when the procedure is performed along with another procedure in an anatomically related region through the same skin incision or surgical approach.

619.    If, and only if, a "separate procedure" charge is appropriate to support the reporting of a designated separate procedure along with another related code, then a modifier must be included to indicate that the separate procedure was performed as a distinct service and is unrelated to the major service (and is therefore separately payable).

620.    In this case, Yoo and Western Janeda intentionally misrepresented the charges for certain services as "separate procedures" despite knowing that such billed-for services were included as part of another services and thus were not separately chargeable.

621.    For example, Yoo and Western Janeda routinely billed for arthroscopic shoulder surgeries using CPT codes 29805, 29826, 29823, 29822, 29820, and 0232T.

622.    The bills submitted by Yoo and Western Janeda for these services represented that diagnostic arthroscopy (billed under CPT code 29805) was provided as a "separate procedure" during the surgery.

623.    However, Yoo's and Western Janeda's representations concerning the diagnostic arthroscopy charges are false and not compensable because diagnostic arthroscopy (billed under CPT code 29805) is included as part of the arthroscopic surgery that was also billed under CPT code 29826, and thus providers are prohibited from charging for diagnostic arthroscopy as a separate service.

624.    With respect to virtually every arthroscopic shoulder surgery, Yoo and Western Janeda submitted to Allstate a charge of $5,750.00 for diagnostic arthroscopy under CPT code

29805 based upon the misrepresentation that the service was eligible for reimbursement as a separate procedure when the Yoo and Western Janeda knew that it was not.

625.     Yoo and Western Janeda advanced additional material misrepresentations with respect to other charges submitted in connection with surgeries purportedly performed upon Allstate claimants, including, but not limited to, charges for PRP injections under CPT code 0232T.

626.     Because Western Janeda's charges for the surgical services purportedly provided to Allstate claimants were fraudulently unbundled and purposely misrepresented, the charges submitted to Allstate in connection with these services were false, fraudulent, and not compensable under New York's No-Fault laws.

627.     To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services as listed in Exhibit 6, Allstate is entitled to recover all payments made to Western Janeda in connection with these services.

628.     Moreover, to the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 6), Allstate is under no obligation to make any payments to Western Janeda in connection with those transactions because both the underlying services and charges are not compensable under New York's No-Fault Laws.

iii.     <u>Billing for Services Not Actually Rendered as Represented</u>

629.     Billing a service at a higher level CPT code when a lower level services was actually performed—for the purpose of inflating the value of the billed-for services—is an example of a fraudulent billing practice utilized by the defendants, and any such charges are not compensable.

630.    Likewise, utilizing a CPT code whose description materially misrepresents the nature and extent of the service actually provided is yet another example of fraudulent billing practice employed by the defendants during the course of this scheme, and any such charges are not compensable

631.    In furtherance of their scheme to defraud Allstate, Yoo and Western Janeda deliberately and improperly modified several of the charges submitted in connection with the surgical services purportedly provided to Allstate claimants.

632.    A provider may modify a charge submitted under a CPT code by adding a 2-digit suffix to the 5-digit CPT code.

633.    Providers utilize these modifiers to indicate that a particular service has been altered by some specific circumstance, such that a higher level of reimbursement is warranted.

634.    The modifier "59" is used to identify procedures or services performed on the same day that are not normally reported together, but are appropriate under the circumstances.

635.    For example, the "59" modifier may represent a different session or patient encounter, different procedure or surgery, different surgical site, or separate injury not ordinarily encountered or performed on the same day by the same physician.

636.    Modifier "59" should only be used to identify clearly independent services, and the modifier should never be used in connection with services provided to the same organ or anatomic region.

637.    For example, a provider is prohibited from applying the "59" modifier to charges relating to the arthroscopic treatment of structures in adjoining areas of the same shoulder.

638.    Despite this prohibition, Yoo and Western Janeda routinely billed CPT codes 29805 and 0232T with the "59" modifier.

639.   By using the "59" modifier in connection with these charges, Yoo and Western Janeda billed for services not actually rendered as represented because no different or separate procedures, surgical sites, or anatomical structures were involved in these procedures.

640.   Yoo and Western Janeda purposely applied these false modifiers to the charges submitted to Allstate to wrongfully collect payment for services that were not actually rendered.

641.   Because Yoo and Western Janeda intentionally applied false modifiers to their charges and, in doing so, billed for services that were not actually rendered as represented, the charges submitted to Allstate in connection with these services were false, fraudulent, and not compensable under New York's No-Fault laws.

642.   To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services as listed in Exhibit 6, Allstate is entitled to recover all payments made to Western Janeda in connection with these services.

643.   Moreover, to the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 6), Allstate is under no obligation to make any payments to Western Janeda in connection with those transactions because both the underlying services and charges are not compensable under New York's No-Fault Laws.

**b.    *Hackensack Surgery***

i.    <u>Charges Based on Unlawful Self-Referrals</u>

644.   As detailed above, the surgeries and PRP injections provided to Western Janeda patients by Yoo (and, in many cases, an unqualified assistant surgeon) were performed at Hackensack Surgery in New Jersey pursuant to Yoo's self-referrals.

645.    In their own right, the surgeries and PRP injections were medically unnecessary because the patients did not need them, and therefore these services were not compensable under New York's No-Fault laws.

646.    The surgeries and PRP injections performed upon Western Janeda patients by Yoo at Hackensack Surgery were also not compensable under New York's No-Fault law because they were provided in violation of New Jersey law prohibiting physician self-referrals.

647.    Among other reasons, Yoo's self-referrals of Western Janeda patients to Hackensack Surgery were unlawful because Yoo's significant beneficial interest in Hackensack Surgery was not disclosed to Allstate claimants in writing at or before the time that the referrals were made.

648.    Upon the conclusion of the surgeries and PRP injections, Hackensack Surgery submitted bills to Allstate seeking payment for facility fees relating to the treatment of the Western Janeda patients.

649.    None of the charges submitted by Hackensack Surgery for these facility fees are compensable because Yoo, Western Janeda, and Hackensack Surgery were engaged in unlawful self-referrals.

650.    Despite knowing that the facility fees were the product of unlawful self-referrals, Yoo and Hackensack Surgery deliberately submitted bills to Allstate seeking payment for these services—bills which falsely represented that Hackensack Surgery was entitled to payment under New York's No-Fault laws when, in fact, it was not.

651.    Because Yoo's referrals of Western Janeda patients to Hackensack Surgery for surgeries were unnecessary and were made in violation of New Jersey law, the charges submitted

by Hackensack Surgery in connection with these services are not compensable under New York's No-Fault laws.

652.     Accordingly, to the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted in connection with the services as listed in Exhibit 7, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services.

653.     Moreover, to the extent that any of the charges submitted by Hackensack Surgery in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 7), Allstate is under no obligation to make any payments to Hackensack Surgery in connection with those transactions because the underlying services are not compensable under New York's No-Fault Laws.

ii.     Unlawfully Excessive Charges

654.     When Yoo performed surgeries upon Western Janeda patients at Hackensack Surgery in New Jersey, Hackensack Surgery purportedly provided surgical facility services in connection with Yoo's procedures.

655.     Like Western Janeda, Hackensack Surgery submitted grossly and unlawfully excessive charges in connection with the surgeries purportedly performed by Yoo upon Western Janeda patients.

656.     Because the surgeries were performed in New Jersey, Hackensack Surgery's facility fees were reimbursable in accordance with New Jersey's Fee Schedule.

657.     Despite the existence of the NJ Fee Schedule, however, Hackensack Surgery always submitted fraudulent and unlawfully excessive charges to Allstate in connection with every surgical procedure performed upon a Western Janeda patient.

658.     Indeed, every charge submitted by Hackensack Surgery to Allstate in connection with shoulder surgeries purportedly performed by Yoo upon Western Janeda patients was grossly and unlawfully inflated, including the following:

| Procedure | Procedure Code | Amount Charged by Hackensack Surgery | Maximum Amount Allowed under NJ Fee Schedule | Amount Fraudulently Charged by Hackensack Surgery |
|---|---|---|---|---|
| Arthroscopy, shoulder, surgical; | 29827 | $21,219.00 | $6,462.39 | **$14,756.61** |
| Arthroscopy, shoulder, surgical; subacromial decompression | 29826 | $7,110.00 | $6,462.39 | **$647.61** |
| Arthroscopy, shoulder, surgical; debridement, extensive | 29823 | $21,219.00 | $6,462.39 | **$14,756.61** |
| Arthroscopy, shoulder, surgical; | 29822 | $11,037.00 | $3,997.71 | **$7,039.29** |
| Arthroscopy, shoulder, surgical; synovectomy, partial | 29820 | $21,200.00 | $6,462.39 | **$14,737.61** |
| Platelet-rich plasma injection | 0232T | $3,000.00 | $89.55 | **$2,910.45** |

659.     Likewise, every charge submitted by Hackensack Surgery to Allstate in connection with knee surgeries purportedly performed by Yoo upon Western Janeda patients was grossly and unlawfully inflated, including the following:

| Procedure | Procedure Code | Amount Charged by Hackensack Surgery | Maximum Amount Allowed under NJ Fee Schedule | Amount Fraudulently Charged by Hackensack Surgery |
|---|---|---|---|---|
| Arthroscopy, knee, diagnostic | 29870 | $11,037.50 | $3,997.51 | **$7,039.99** |
| Arthroscopy, knee, surgical | 29880 | $11,037.50 | $3,997.51 | **$7,039.99** |
| Arthroscopy, knee, surgical; with meniscectomy | 29881 | $11,037.50 | $3,997.51 | **$7,039.99** |
| Arthroscopy, knee, surgical; debridement/chondroplasty | 29877 | $11,037.50 | $3,997.51 | **$7,039.99** |
| Arthroscopy, knee, surgical; synovectomy, limited | 29875 | $5,518.50 | $3,997.51 | **$1,520.99** |

660.     Because Hackensack Surgery's charges for these services violated New Jersey law, all of the charges submitted to Allstate in connection with these services are false, fraudulent, and are not compensable under New York's No-Fault laws.

661.     Accordingly, to the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted in connection with the services as listed in Exhibit 7, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services.

662.     Moreover, to the extent that any of the charges submitted by Hackensack Surgery in connection with these services remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 7), Allstate is under no obligation to make any payments to Hackensack Surgery in connection with those transactions because both the underlying services and charges are not compensable under New York's No-Fault Laws.

     **5.**    **Specific Examples of Fraudulent Surgeries and PRP Injections Performed by Yoo upon Western Janeda Patients at Hackensack Surgery**

        **a.**    *Patient P.C. (claim no. 0295361166)*

663.     P.C. was supposedly involved in a motor vehicle accident that resulted in injuries.

664.    Following the alleged accident, P.C. was seen at the emergency room for complaints of dizziness, but the emergency room visit produced no reported complaints or abnormal exam findings for either shoulder or either knee.

665.    Thereafter, P.C. underwent an aggressive regimen of tests and treatments, including multiple MRI studies of the brain, cervical spine, lumbar spine, right shoulder, and both knees.

666.    The MRI of P.C.'s right knee showed findings consistent with arthritis, and the study overall did not reflect any clear posttraumatic abnormalities.

667.    The MRI of P.C.'s right shoulder also showed findings consistent with arthritis, and, like the right knee MRI, the study did not reflect any clear posttraumatic abnormalities.

668.    P.C. then underwent an orthopedic evaluation with Yoo at Western Janeda.

669.    Yoo's evaluation of P.C.'s knee and shoulder injuries found that P.C. had sustained a flexion and extension mechanism of injury during the subject accident, which is an atypical injury mechanism for the shoulder.

670.    Yoo recommended that P.C. undergo multiple surgical procedures, including PRP injections.

671.    Less than a week after the orthopedic evaluation, Yoo performed arthroscopic surgery on P.C.'s right shoulder, during which labral tears were noted, but no repairs were performed.

672.    Yoo also administered a PRP injection to P.C.'s left shoulder during the surgical encounter.

673.    Consistent with the means and motives of this scheme, P.C.'s surgery was performed in New Jersey at Hackensack Surgery.

674.    Importantly, Yoo's ownership interest in Hackensack Surgery was not disclosed to P.C. in writing at or before the time that the surgery referral was made.

675.    Instead, according to documents submitted by the defendants, written disclosure of Yoo's significant beneficial interest in Hackensack Surgery was not provided to P.C. until he was taken to Hackensack Surgery on the day of the procedure.

676.    The written disclosure was likely withheld until the day of surgery on purpose to deprive P.C. of any meaningful opportunity to (a) find another provider of his choosing, or (b) consider whether Yoo's surgery recommendations were made to suit Yoo's personal financial interests instead of P.C.'s own medical needs.

677.    Overall, these services were unwarranted and unnecessary because even if P.C.'s shoulder was injured in the manner represented by Yoo, any such injuries were not accident-related.

678.    Moreover, even if P.C.'s shoulder injury was accident-related (it was not), the immediate surgery and PRP injection were neither necessary nor warranted.

679.    Western Janeda charged Allstate over $70,000.00 in connection with the surgery, PRP injection, and evaluations purportedly performed by Yoo upon P.C.

680.    Hackensack Surgery submitted facility fee charges to Allstate totaling $35,243.50 in connection with the surgery and PRP injection performed upon P.C.—facility fees that were generated as a direct result of Yoo's unlawful self-referral of P.C. to Hackensack Surgery.

681.    Because the surgery and PRP injection were both completely unnecessary and unwarranted, Western Janeda's and Hackensack Surgery's charges for the services purportedly provided by Yoo to P.C. are false and fraudulent, and thus are not compensable under New York's No-Fault Laws.

682.    To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services purportedly provided to P.C., Allstate is entitled to recover all payments made to Western Janeda in connection with these services, including, but not limited, to the payments listed in Exhibit 6.

683.    To the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Western Janeda's charges are not compensable under New York's No-Fault laws.

684.    In addition to the services being completely unnecessary and unwarranted, because the surgery and PRP injection were performed by Yoo in New Jersey at Hackensack Surgery as the direct result of a patient referral made in violation of New Jersey law, Hackensack Surgery's charges for the facility fees generated in connection with P.C.'s surgery and PRP injection are not compensable under New York's No-Fault laws.

685.    To the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted by Hackensack Surgery to support the charges for facility services provided in connection with P.C.'s surgery and PRP injection, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

686.    To the extent that any of the charges submitted by Hackensack Surgery in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Hackensack Surgery's charges are not compensable under New York's No-Fault laws.

### b. *Patient E.J. (claim no. 0379603433)*

687.    At the accident scene, E.J. reported that her lower back hurt, but denied pain in any other areas.

688.    Later, at the emergency room, E.J. complained of right wrist pain and lower back pain, but, notably, did not make any complaints about pain in either shoulder.

689.    Just two (2) days later, on August 7, 2015, E.J. began receiving chiropractic, physical therapy and acupuncture treatment from Mah and the Sham Members at NPTCA.

690.    Mah swiftly ordered a battery of treatments and diagnostic tests, including EDX tests and MRI studies to several areas of E.J.'s body, including the shoulders.

691.    Following the MRI studies, Mah found purported injuries to E.J.'s shoulder, and referred the patient to Cho for further care.

692.    On August 18, 2015, less than two (2) weeks after the accident, Cho evaluated E.J., found non-specific lower back pain, and recommended an epidural steroid injection.

693.    Thereafter, E.J. was subjected to additional MRI studies and steroid injections, including an MRI study of the right shoulder, which noted degenerative findings and a purported labral tear even though there were no acute findings suggestive of a recent instability episode.

694.    E.J. was then evaluated by a physician at the Northern Boulevard Clinic on September 10, 2015, and was referred to Yoo "to rule out the need for surgical treatment" for the right shoulder (which was not even injured as the result of the subject accident).

695.    E.J., however, did not agree to the surgical evaluation and, instead, requested further therapy and an injection for the right shoulder.

696.    Afterwards, E.J. was cycled through additional treatments, MRI studies, and steroid injections to several areas of the body.

100

697. E.J. was eventually referred to Yoo for an evaluation on September 26, 2015.

698. Yoo reported that E.J. sustained a "flexion-extension mechanism of injury" during the subject accident, which is an atypical injury mechanism for the shoulder.

699. After examining the patient and reviewing the MRI study, Yoo diagnosed impingement and an anterior labral tear in E.J.'s right shoulder, and recommended surgery and a PRP injection.

700. Consistent with the means and motives of this scheme, Yoo self-referred to E.J. to Hackensack Surgery for the surgical procedures.

701. Importantly, upon information and belief, Yoo's ownership interest in Hackensack Surgery was not disclosed to E.J. in writing at or before the time that the surgery referral was made.

702. Yoo also ordered an MRI study of E.J.'s left shoulder to rule out a rotator cuff tear or labral tear.

703. E.J. underwent an MRI study of the left shoulder on September 28, 2015, and a purported labrum tear even though there were no acute findings suggestive of a recent instability episode.

704. On September 30, 2015, less than two (2) months after the accident, Yoo performed surgery on E.J.'s right shoulder in New Jersey at Hackensack Surgery, and also administered a PRP injection to E.J.'s shoulder during the encounter.

705. Then, on October 31, 2015, during a post-operative follow-up visit, Yoo documented pain in E.J.'s left shoulder, and agreed to pursue left shoulder surgery with multiple potential procedures, including a PRP injection.

706. On November 9, 2015, Yoo performed arthroscopic surgery on E.J.'s left shoulder, in which labral tears were noted, but no repairs were performed.

707. Yoo also administered a PRP injection to E.J.'s left shoulder during the surgical encounter.

708. Thereafter, during postoperative visits, Yoo administered additional steroid injections to both shoulders because E.J. was "making frustrating slow recovery" following the surgeries to the left and right shoulders.

709. Overall, Yoo recommended and then administered a barrage of unnecessary and unwarranted MRI studies, surgeries, and injections to E.J.'s shoulders.

710. These services were unwarranted and unnecessary because even if E.J.'s shoulders were injured in the manner represented by Yoo and the other defendants, any such injuries were not accident-related.

711. Moreover, even if E.J.'s shoulder injuries were accident-related (they were not), the immediate surgeries and PRP injections were neither necessary nor warranted.

712. Western Janeda charged Allstate over $70,000.00 in connection with the shoulder surgeries, PRP injections, and evaluations purportedly administered to E.J.

713. Hackensack Surgery submitted facility fee charges to Allstate totaling $64,487.00 in connection with the surgeries and PRP injections performed upon E.J.—facility fees that were generated as a direct result of Yoo's unlawful self-referral of E.J. to Hackensack Surgery.

714. Because the shoulder surgeries and PRP injections were completely unnecessary and unwarranted, Western Janeda's and Hackensack Surgery's charges for the services purportedly provided by Yoo to E.J. are false and fraudulent, and thus are not compensable under New York's No-Fault Laws.

715. To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services purportedly provided to E.J., Allstate is entitled to

recover all payments made to Western Janeda in connection with these services, including, but not limited, to the payments listed in Exhibit 6.

716.    To the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Western Janeda's charges are not compensable under New York's No-Fault laws.

717.    In addition to the services being completely unnecessary and unwarranted, because the shoulder surgeries and PRP injections were performed by Yoo in New Jersey at Hackensack Surgery as the direct result of a patient referral made in violation of New Jersey law, Hackensack Surgery's charges for the facility fees generated in connection with E.J.'s surgeries are not compensable under New York's No-Fault laws.

718.    To the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted by Hackensack Surgery to support the charges for facility services provided in connection with E.J.'s surgeries, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

719.    To the extent that any of the charges submitted by Hackensack Surgery in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Hackensack Surgery's charges are not compensable under New York's No-Fault laws.

### c.    *Patient K.K. (claim no. 0394451199)*

720.    K.K. was supposedly involved in a motor vehicle accident on December 4, 2015.

721.    At the accident scene, K.K. reported neck pain radiating into the back.  K.K. also reported pre-existing neck pain for which K.K. was receiving physical therapy prior to the alleged accident.

722.    K.K. was taken to the emergency room, where an examination specifically noted "good shoulder movement" and a "normal upper extremity exam."

723.    K.K. was diagnosed with neck and back pain, and was released.

724.    Three (3) days later, on December 7, 2015, K.K. began treating with Mah and NPTCA at the Northern Boulevard Clinic.

725.    Mah's initial examination noted that K.K. had "almost unbearable" pain in several areas, including the neck, mid back, lower back, and left shoulder.

726.    Mah noted, but discounted, K.K.'s prior neck and back injuries (for which K.K. was already receiving treatment at the time of the alleged accident), and recommended chiropractic, physical therapy, and acupuncture care, along with referrals to other physicians.

727.    Mah referred K.K. to Cho who examined K.K. the following day (December 8, 2015—just four (4) days after the alleged accident).

728.    Cho noted neck, back, and shoulder pain, and then referred K.K. for MRI studies and for physical therapy.

729.    K.K. returned to NPTCA for physical therapy and other services, and also underwent several MRI studies.

730.    K.K. returned to Cho on January 8, 2016 for evaluation, and Cho noted pain that did not correlate with the findings of K.K.'s prior MRI studies.

731.    Cho also ordered an epidural steroid injection to K.K.'s cervical area, which was administered the following day.

732.    Then, on January 14, 2016, K.K. underwent an MRI study of the left shoulder, which had been ordered by Cho.

733.    The MRI of K.K.'s left shoulder noted degenerative findings, but no evidence of tears or any posttraumatic findings.

734.    Thereafter, K.K. continued treatment with NPTCA, underwent several more MRI studies, and returned to Cho for additional evaluations and injections.

735.    Cho then referred K.K. to Yoo for an orthopedic evaluation, which was conducted on March 10, 2016.

736.    Like several other patients described in this Complaint, Yoo reported that K.K. sustained a "flexion-extension mechanism of injury" during the alleged accident, which is an atypical injury mechanism for the shoulder.

737.    Yoo diagnosed left shoulder impingement, and then administered a steroid injection.

738.    K.K. then returned to Yoo the following week on March 17, 2016 for a reevaluation, and Yoo recommended left shoulder surgery and a PRP injection.

739.    Consistent with the means and motives of this scheme, Yoo self-referred to K.K. to Hackensack Surgery for the surgical procedures.

740.    Importantly, upon information and belief, Yoo's ownership interest in Hackensack Surgery was not disclosed to K.K. in writing at or before the time that the surgery referral was made.

741.    On March 25, 2016, Yoo performed arthroscopic surgery on K.K.'s left shoulder in New Jersey at Hackensack Surgery, during which labral tears were noted, but no repairs were performed.

742.    Yoo also administered a PRP injection to K.K.'s left shoulder during the surgical encounter.

743.    Following surgery, K.K. continued treatment with NPTCA and returned to Yoo and Cho for additional injections and for evaluations, which noted continuing shoulder pain.

744.    Throughout the course of treatment, Yoo and his other co-defendants recommended and then administered a barrage of unnecessary and unwarranted treatments, MRI studies, surgeries, and injections to K.K.'s left shoulder and other parts of the body.

745.    These services were unwarranted and unnecessary because even if K.K.'s left shoulder was injured in the manner represented by Yoo and the other defendants, any such injury was not accident-related.

746.    Moreover, even if K.K.'s left shoulder injury was accident-related (it was not), the immediate surgery and PRP injection were neither necessary nor warranted.

747.    Western Janeda charged Allstate over $70,000.00 in connection with the surgery, PRP injection, and evaluations purportedly performed by Yoo upon K.K.

748.    Hackensack Surgery submitted facility fee charges to Allstate totaling $16,562.00 in connection with the surgeries and PRP injections performed upon K.K.—facility fees that were generated as a direct result of Yoo's unlawful self-referral of K.K. to Hackensack Surgery

749.    Because the shoulder surgery and PRP injection were both completely unnecessary and unwarranted, Western Janeda's and Hackensack Surgery's charges for the services purportedly provided by Yoo to K.K. are false and fraudulent, and thus are not compensable under New York's No-Fault Laws.

750.    To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services purportedly provided to K.K., Allstate is entitled to

recover all payments made to Western Janeda in connection with these services, including, but not limited to, the payments listed in Exhibit 6.

751.    To the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Western Janeda's charges are not compensable under New York's No-Fault laws.

752.    In addition to the services being completely unnecessary and unwarranted, because the surgery and PRP injection were performed by Yoo in New Jersey at Hackensack Surgery as the direct result of a patient referral made in violation of New Jersey law, Hackensack Surgery's charges for the facility fees generated in connection with K.K.'s surgery and PRP injections are not compensable under New York's No-Fault laws.

753.    To the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted by Hackensack Surgery to support the charges for facility services provided in connection with K.K.'s surgery and PRP injections, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

754.    To the extent that any of the charges submitted by Hackensack Surgery in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Hackensack Surgery's charges are not compensable under New York's No-Fault laws.

### d.    *Patient P.L. (claim no. 0358443166)*

755.    P.L. was supposedly involved in a motor vehicle accident on February 17, 2015.

756.    P.L. did not seek emergency care at the scene of the alleged accident or any time thereafter.

757.    Only two (2) days following the alleged accident, P.L. began treatment at the Northern Boulevard Clinic on February 19, 2015.

758.    During the first visit to the Northern Boulevard Clinic, P.L. was evaluated by Mah and was then referred to another "independent" physician operating from the Northern Boulevard Clinic.

759.    Mah evaluated P.L. and diagnosed neck and back injuries, along with a left rotator cuff tear even though the tests of P.L.'s left shoulder did not indicate any weakness in the shoulder.

760.    Mah then recommended that P.L. undergo a battery of services and diagnostic tests.

761.    Mah also forecasted the need for multiple MRI studies and EDX tests if (or, really, when) P.L.'s condition did not improve.

762.    Mah then referred P.L. to a physician at the Northern Boulevard Clinic who oddly noted that there was "no surgery completed or recommended for [P.L.'s] injuries so far."

763.    The Northern Boulevard Clinic physician diagnosed P.L. with neck, back, and left shoulder pain, and then referred P.L. back to NPTCA for physical therapy and chiropractic treatment.

764.    Predictably, P.L. purportedly showed no improvement, thus prompting Mah and the other defendants to subject P.L. to an extensive treatment protocol, which included treatments with all NPTCA providers along with MRI studies, evaluations, and injections from other providers.

765.    On March 26, 2015, P.L. was evaluated by a physician at the Northern Boulevard Clinic, and was given an order for an MRI study of the left shoulder.

766.     Notably, the MRI study of P.L.'s left shoulder showed no findings of labral instability, no evidence of rotator cuff tear, and no posttraumatic findings.

767.     Nevertheless, P.L. was referred to Yoo by the Northern Boulevard Clinic physician for an orthopedic evaluation.

768.     On April 25, 2015, Yoo examined P.L. and noted that P.L. sustained a flexion and extension mechanism of injury during the alleged accident, which is an atypical injury mechanism for the shoulder.

769.     After the examination, Yoo discussed his recommendation for surgery with P.L. and noted that P.L. was "extremely apprehensive about proceeding with surgery."

770.     However, just four (4) days later, on April 29, 2015, P.L. returned to Yoo after thinking "long and hard about various treatment options for the left shoulder," and opted to follow Yoo's earlier recommendation for surgery and a PRP injection.

771.     Before there was any time in which to reconsider, P.L. was rushed to surgery with Yoo.

772.     Consistent with the means and motives of this scheme, Yoo self-referred to P.L. to Hackensack Surgery for the surgical procedures.

773.     Importantly, upon information and belief, Yoo's ownership interest in Hackensack Surgery was not disclosed to P.J. in writing at or before the time that the surgery referral was made.

774.      On May 1, 2015, Yoo performed arthroscopic surgery on P.L.'s left shoulder in New Jersey at Hackensack Surgery, during which the rotator cuff was found intact and no repairs or further procedures were deemed necessary other than generalized debridement and decompression that Yoo purported to perform during the encounter.

775.     Yoo also administered a PRP injection to P.L.'s left shoulder during the May 1, 2015 surgical encounter.

776.     These services were unwarranted and unnecessary because even if P.L.'s left shoulder was injured in the manner represented by Yoo and the other defendants, any such injury was not accident-related.

777.     Moreover, even if P.L.'s left shoulder injury was accident-related (it was not), the immediate surgery and PRP injection were neither necessary nor warranted.

778.     Western Janeda charged Allstate over $70,000.00 in connection with the surgery, PRP injection, and evaluations purportedly performed upon P.L.

779.     Hackensack Surgery submitted facility fee charges to Allstate totaling $27,168.50 in connection with the surgery and PRP injection performed upon P.L.—facility fees that were generated as a direct result of Yoo's unlawful self-referral of P.L. to Hackensack Surgery.

780.     Because the shoulder surgery and PRP injection were both completely unnecessary and unwarranted, Western Janeda's and Hackensack Surgery's charges for the services purportedly provided by Yoo to P.L. are false and fraudulent, and thus are not compensable under New York's No-Fault Laws.

781.     To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services purportedly provided to P.L., Allstate is entitled to recover all payments made to Western Janeda in connection with these services, including, but not limited to, the payments listed in Exhibit 6.

782.     To the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid, Allstate has no further obligation to make payment in

connection with these services because Western Janeda's charges are not compensable under New York's No-Fault laws.

783.     In addition to the services being completely unnecessary and unwarranted, because the surgery and PRP injection were performed by Yoo in New Jersey at Hackensack Surgery as the direct result of a patient referral made in violation of New Jersey law, Hackensack Surgery's charges for the facility fees generated in connection with P.L.'s surgery and PRP injection are not compensable under New York's No-Fault laws.

784.     To the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted by Hackensack Surgery to support the charges for facility services provided in connection with P.L.'s surgery and PRP injection, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

785.     To the extent that any of the charges submitted by Hackensack Surgery in connection with these services remains unpaid, Allstate has no further obligation to make payment in connection with these services because Hackensack Surgery's charges are not compensable under New York's No-Fault laws.

e.     *Patient J.W. (claim no. 0363511964)*

786.     J.W. was supposedly involved in a motor vehicle accident on March 22, 2015.

787.     J.W. did not seek emergency care at the scene of the alleged accident or any time thereafter.

788.     However, on March 23, 2015 (the day after the alleged accident), J.W. began treatment at the Northern Boulevard Clinic with Mah and the other NPTCA providers.

789.     Mah evaluated J.W. and diagnosed neck, back and ankle injuries.

790. Mah also diagnosed a right rotator cuff tear even though his examination of J.W.'s right shoulder showed no sign of any such tear.

791. Notably, J.W. did not complain of any knee pain and Mah did not make any findings of knee pain even though J.W. reported a prior right knee injury, which had resulted in arthroscopic surgery.

792. As with all other NPTCA patients, Mah recommended that J.W. undergo a battery of services and diagnostic tests.

793. Mah also forecasted the need for multiple diagnostic tests and studies if J.W.'s condition did not improve.

794. Further, despite examining J.W. only a day after the alleged accident, Mah predicted a "high probability" that J.W.'s injuries would "develop chronic symptoms and contribute to permanent impairment."

795. J.W. was then referred to a physician at the Northern Boulevard Clinic at the conclusion of Mah's initial examination.

796. J.W. was seen by the Northern Boulevard Clinic physician on March 26, 2015 and was diagnosed with ankle and lower back injuries.

797. Notably, there was no report of any injuries to either of J.W.'s knees or shoulders.

798. Despite no report of knee pain or injury, J.W. was given orders for bilateral knee MRI studies, the results of which purported to show tears, sprains, and other injuries in both of J.W.'s knees.

799. In addition to these MRI studies, because J.W. purportedly showed no improvement, Mah and the other defendants placed J.W. on an extensive treatment protocol, which

included treatments with all NPTCA providers along with additional diagnostic studies, evaluations, and injections from other providers.

800.    On May 14, 2015, J.W. was again evaluated by a physician at the Northern Boulevard Clinic during which J.W. was referred to Yoo "to determine the need for arthroscopic surgery."

801.    On May 23, 2015, Yoo examined J.W. and noted that J.W. presented with bilateral shoulder and bilateral knee pain.

802.    Yoo also reported that J.W. sustained a flexion and extension mechanism of injury during the alleged accident, which is an atypical injury mechanism for both the shoulder and the knee.

803.    Yoo reported that J.W. had a left knee meniscus tear and patellar arthrosis, and then attempted to relate these injuries to the alleged accident even though there was no evidence of any acute complaints.

804.    Yoo also reported that J.W. had right shoulder impingement with a possible rotator cuff tear or labral tear, and then ordered a right shoulder MRI study.

805.    The MRI study of J.W.'s right shoulder showed mild impingement, but no labral tear or significant joint effusion.

806.    J.W. was then subjected to further diagnostic testing by Mah, which was not clinically supported.

807.    Consistent with the means and motives of this scheme, Yoo self-referred to J.W. to Hackensack Surgery for the surgical procedures.

808.    Importantly, upon information and belief, Yoo's ownership interest in Hackensack Surgery was not disclosed to J.W. in writing at or before the time that the surgery referral was made.

809.    On June 19, 2015, J.W. underwent right shoulder arthroscopic surgery in New Jersey at Hackensack Surgery.

810.    During the surgery, Yoo reported debridement of a labral tear, and also reported a repair to the rotator cuff (which had not been shown to be injured) by using just one medial and lateral anchor and just one suture.

811.    Yoo also administered a PRP injection to J.W.'s left shoulder during the June 19, 2015 surgical encounter.

812.    Western Janeda charged Allstate over $88,000.00 in connection with the surgery, PRP injection, and evaluations purportedly performed by Yoo upon J.W.

813.    Hackensack Surgery submitted facility fee charges to Allstate totaling $45,462.50 in connection with the surgery and PRP injection performed upon J.W.—facility fees that were generated as a direct result of Yoo's unlawful self-referral of J.W. to Hackensack Surgery.

814.    Overall, these surgical services were unwarranted and unnecessary because even if J.W.'s right and left shoulders were injured in the manner represented by Yoo and the other defendants, any such injuries were not accident-related.

815.    Because the shoulder surgery and PRP injection were both completely unnecessary and unwarranted, Western Janeda's and Hackensack Surgery's charges for the services purportedly provided by Yoo to J.W. are false and fraudulent, and thus are not compensable under New York's No-Fault Laws.

816. To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services purportedly provided to J.W., Allstate is entitled to recover all payments made to Western Janeda in connection with these services, including, but not limited to, the payments listed in Exhibit 6.

817. To the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Western Janeda's charges are not compensable under New York's No-Fault laws.

818. In addition to the services being completely unnecessary and unwarranted, because the surgery and PRP injection were performed by Yoo in New Jersey at Hackensack Surgery as the direct result of a patient referral made in violation of New Jersey law, Hackensack Surgery's charges for the facility fees generated in connection with J.W.'s surgery and PRP injection are not compensable under New York's No-Fault laws.

819. To the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted by Hackensack Surgery to support the charges for facility services provided in connection with J.W.'s surgery and PRP injection, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

820. To the extent that any of the charges submitted by Hackensack Surgery in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Hackensack Surgery's charges are not compensable under New York's No-Fault laws.

**f.** **_Patient B.L. (claim no. 0451467732)_**

821.    B.L. was supposedly involved in a motor vehicle accident on April 1, 2017.

822.    B.L. did not require care at the scene of the alleged accident, nor did B.L. seek treatment at the hospital thereafter.

823.    B.L. eventually sought care at the Northern Boulevard Clinic on April 10, 2017.

824.    During the first visit to the Northern Boulevard Clinic, B.L. was examined by Mah.

825.    As with all other Northern Boulevard Clinic patients, Mah recommended that B.L. undergo an extensive program of chiropractic care, physical therapy, acupuncture, and other diagnostic procedures.

826.    Mah also referred B.L. to Cho for further evaluation.

827.    On April 10, 2017 (the same day as both B.L.'s first visit to the Northern Boulevard Clinic and Mah's referral), Cho examined B.L. and then ordered several MRI studies even though less than ten (10) days had passed since the alleged accident.

828.    Thereafter, B.L. was subjected to multiple MRI studies while also undergoing a regimen of chiropractic care, physical therapy, and acupuncture services at the Northern Boulevard Clinic.

829.    Then, on June 8, 2017, pursuant to a referral by Cho, B.L. was examined by Yoo for a purported knee injury.

830.    Like all of his other patients, Yoo found that B.L. sustained a "lateral flexion-extension mechanism of injury," which is a highly unusual mechanism of injury description for the knee.

831.    Yoo also examined B.L.'s purported shoulder injury, and then discussed treatment options for the left knee.

832.   In the exam notes, Yoo noted that B.L. wanted "to think long and hard" about the treatment options offered by Yoo.

833.   Then, just days later on June 12, 2017, Yoo authored a note indicating that B.L. had "thought long and hard" about the treatment options and had elected to proceed with left knee surgery.

834.   Consistent with the means and motives of this scheme, Yoo self-referred to B.L. to Hackensack Surgery for the surgical procedures.

835.   Importantly, upon information and belief, Yoo's ownership interest in Hackensack Surgery was not disclosed to B.L. in writing at or before the time that the surgery referral was made.

836.   On June 28, 2017, Yoo performed arthroscopic surgery on B.L.'s left knee in New Jersey at Hackensack Surgery.

837.   Yoo's surgical notes indicate that a lateral meniscus tear was found during the procedure, which is at variance with the findings from B.L.'s pre-surgery MRI study of the left knee.

838.   Yoo also administered a PRP injection to B.L.'s left knee during the June 28, 2017 surgical encounter.

839.   Western Janeda charged Allstate over $25,835.00 in connection with the surgery and PRP injection purportedly administered to B.L.'s left knee.

840.   Hackensack Surgery submitted facility fee charges to Allstate totaling $16,555.50 in connection with the surgery and PRP injection performed upon B.L.—facility fees that were generated as a direct result of Yoo's unlawful self-referral of B.L. to Hackensack Surgery.

841.   B.L.'s treatment with the defendants continued after the June 28, 2017 surgery.

842.     B.L. endured months of additional treatment at the Northern Boulevard Clinic with NPTCA, along with injections and further physician evaluations.

843.     On August 21, 2017, B.L. returned to Yoo for left shoulder arthroscopic surgery.

844.     Yoo proceeded with surgery on B.L.'s left shoulder even though the alleged accident caused nothing more than a sprain or strain of the muscles.

845.     Yoo also administered a PRP injection to B.L.'s left shoulder during the August 21, 2017 surgical encounter.

846.     Western Janeda charged Allstate $69,549.50 in connection with the surgery and PRP injection purportedly administered to B.L.'s left shoulder.

847.     With regard to the August 21, 2017 surgical encounter, Hackensack Surgery submitted facility fee charges to Allstate totaling $16,562.00 in connection with the surgery and PRP injection performed upon B.L.—facility fees that were generated as a direct result of Yoo's unlawful self-referral of B.L. to Hackensack Surgery.

848.     Overall, these surgical services were unwarranted and unnecessary because even if B.L.'s left knee and left shoulder were injured in the manner represented by Yoo and the other defendants, any such injuries were not accident-related.

849.     Moreover, even if B.L.'s left knee and left shoulder injuries were accident-related (they were not), the surgeries and the PRP injections were neither necessary nor warranted.

850.     In total, Western Janeda and Hackensack Surgery charged Allstate over $128,000.00 for surgeries and injections that B.L. simply did not need.

851.     Because the surgeries and PRP injections were completely unnecessary and unwarranted with respect to both the June 28, 2017 and August 21, 2017 surgical encounters,

Western Janeda's and Hackensack Surgery's charges for the services purportedly provided by Yoo to B.L. are false and fraudulent, and thus are not compensable under New York's No-Fault Laws.

852.    To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services purportedly provided to B.L., Allstate is entitled to recover all payments made to Western Janeda in connection with these services, including, but not limited to, the payments listed in Exhibit 6.

853.    To the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Western Janeda's charges are not compensable under New York's No-Fault laws.

854.    In addition to the services being completely unnecessary and unwarranted, because the surgeries and PRP injections were performed by Yoo in New Jersey at Hackensack Surgery during the June 28, 2017 and August 21, 2017 surgical encounters as the direct result of a patient referral made in violation of New Jersey law, Hackensack Surgery's charges for the facility fees generated in connection with B.L.'s surgeries and PRP injections are not compensable under New York's No-Fault laws.

855.    To the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted by Hackensack Surgery to support the charges for facility services provided in connection with B.L.'s surgeries and PRP injections, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

856.    To the extent that any of the charges submitted by Hackensack Surgery in connection with these services remain unpaid, Allstate has no further obligation to make payment

in connection with these services because Hackensack Surgery's charges are not compensable under New York's No-Fault laws.

### g. *Patient N.J. (claim no. 0326078276)*

857.    N.J. was supposedly injured during a motor vehicle accident, but denied care at the scene of the accident and declined to seek care at the emergency room thereafter.

858.    Instead, on the same day as the alleged accident, N.J. visited the Northern Boulevard Clinic and was evaluated by Mah.

859.    Mah recommended that N.J. undergo an extensive program of chiropractic care, physical therapy, acupuncture, and other diagnostic procedures.

860.    Mah also referred N.J. to a physician at the Northern Boulevard Clinic for further evaluation.

861.    After further evaluation by a physician at the Northern Boulevard Clinic, N.J. was referred to Yoo for an orthopedic evaluation of the left shoulder.

862.    Yoo reported that N.J. sustained a flexion and extension mechanism of injury, which is an unusual description of an injury mechanism for the shoulder.

863.    Yoo also made general findings concerning a potential labral tear, and then discussed several treatment options with N.J., who elected to "think about the treatment options further" while continuing with the Mah-imposed treatment regimen.

864.    However, just seven (7) days later, N.J. returned to Yoo for a follow-up visit.

865.     According to Yoo, after "thinking long and hard about various treatment options," N.J. elected to have left shoulder surgery.

866.    Consistent with the means and motives of this scheme, Yoo self-referred N.J. to Hackensack Surgery for the surgical procedures.

867.    Importantly, upon information and belief, Yoo's ownership interest in Hackensack Surgery was not disclosed to N.J. in writing at or before the time that the surgery referral was made.

868.    Yoo performed arthroscopic surgery on N.J.'s left shoulder just a few days later in New Jersey at Hackensack Surgery.

869.    Yoo also administered a PRP injection to N.J.'s left shoulder during the surgical procedure.

870.    Western Janeda charged Allstate over $70,000.00 in connection with the surgery, PRP injection, and evaluations purportedly performed by Yoo upon N.J.

871.    Hackensack Surgery submitted facility fee charges to Allstate totaling $35,243.50 in connection with the surgery and PRP injection performed upon N.J.—facility fees that were generated as a direct result of Yoo's unlawful self-referral of N.J. to Hackensack Surgery.

872.    Overall, the left shoulder surgery and PRP injection were unwarranted and unnecessary because even if N.J.'s shoulder was injured in the manner represented by Yoo and the other defendants, any such injuries were not accident-related.

873.    Moreover, even if N.J.'s shoulder injury was accident-related (it was not), the surgery and the PRP injection were neither necessary nor warranted.

874.    Because the surgery and PRP injection were both completely unnecessary and unwarranted, Western Janeda's and Hackensack Surgery's charges for the services purportedly provided by Yoo to N.J. are false and fraudulent, and thus are not compensable under New York's No-Fault Laws.

875.    To the extent that Allstate paid Western Janeda in reliance on the documents created and submitted in connection with the services purportedly provided to N.J., Allstate is entitled to

recover all payments made to Western Janeda in connection with these services, including, but not limited to, the payments listed in Exhibit 6.

876.    To the extent that any of the charges submitted by Western Janeda in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Western Janeda's charges are not compensable under New York's No-Fault laws.

877.    In addition to the services being completely unnecessary and unwarranted, because the surgery and PRP injection were performed by Yoo in New Jersey at Hackensack Surgery as the direct result of a patient referral made in violation of New Jersey law, Hackensack Surgery's charges for the facility fees generated in connection with N.J.'s surgery and PRP injection are not compensable under New York's No-Fault laws.

878.    To the extent that Allstate paid Hackensack Surgery in reliance on the documents created and submitted by Hackensack Surgery to support the charges for facility services provided in connection with N.J.'s surgery and PRP injection, Allstate is entitled to recover all payments made to Hackensack Surgery in connection with these services, including, but not limited to, the payments listed in Exhibit 7.

879.    To the extent that any of the charges submitted by Hackensack Surgery in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Hackensack Surgery's charges are not compensable under New York's No-Fault laws

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

880.    Throughout the course of this entire scheme, Mah, Choi, Song, Rim, Cho and Yoo created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical

documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing, or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

881.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

882.    Every automobile insurance claim detailed within, involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

### A.    NORTHERN PHYSICAL THERAPY, CHIROPRACTIC AND ACUPUNCTURE, PLLC ("NPTCA") ENTERPRISE

883.    Mah, Choi, Rim, and/or Song either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from NPTCA to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

884.    Mah, Choi, Rim, and/or Song caused NPTCA to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that NPTCA mailed a demand for payment (i.e., invoice) to Allstate.

885.    Mah's, Choi's, Rim's, and Song's provision of excessive and medically unnecessary services to patients of NPTCA rendered NPTCA completely ineligible for No-Fault reimbursement under New York law.

886.    Mah's domination and control over all aspects of NPTCA, including the distribution and receipt of fees and proceeds derived from professional services that Mah was not lawfully authorized to administer, control, or profit from, also rendered NPTCA completely ineligible for No-Fault reimbursement under New York law.

887.    Because NPTCA was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Mah, Choi, Rim, and Song purposely caused NPTCA to make a misrepresentation each and every time that NPTCA mailed a document to Allstate claiming eligibility for reimbursement.

888.    Moreover, because (a) NPTCA was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Mah, Choi, Rim, and/or Song caused NPTCA to seek No-Fault reimbursement from Allstate (even though NPTCA was not entitled to such reimbursement), and (c) NPTCA used the U.S. Mail to seek reimbursement, it is clear that Mah, Choi, Rim, and Song committed mail fraud.

889.    At all relevant times, Mah, Choi, Rim, and Song knew that NPTCA, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by NPTCA.

890.    Allstate estimates that the unlawful operation of the NPTCA enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 8 and incorporated by reference as if set forth in its entirety.

**B.**    **BETHEL INTERVENTIONAL PAIN MANAGEMENT LLC ENTERPRISE**

891.    Cho and/or Mah either personally used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Bethel Interventional to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

892.    Cho and/or Mah caused Bethel Interventional to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Bethel Interventional mailed a demand for payment (i.e., invoice) to Allstate.

893.    Cho's provision of excessive and medically unnecessary services to Bethel Interventional's patients rendered Bethel Interventional completely ineligible for No-Fault reimbursement under New York law.

894.    Cho's purposeful conduct in causing Bethel Interventional to operate in New York even though the company was not authorized to do so also rendered Bethel Interventional completely ineligible for No-Fault reimbursement under New York law.

895.    Additionally, Mah's unlawful control over Cho's delivery of physician services and Bethel Interventional's operation at the Northern Boulevard Clinic also rendered Bethel Interventional completely ineligible for No-Fault reimbursement under New York law.

896.    Because Bethel Interventional was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Cho and Mah purposely caused Bethel Interventional to make a misrepresentation each and every time that Bethel Interventional mailed a document to Allstate claiming eligibility for reimbursement.

897.    Moreover, because (a) Bethel Interventional was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Cho and/or Mah caused Bethel Interventional to seek No-

Fault reimbursement from Allstate (even though Bethel Interventional was not entitled to such reimbursement), and (c) Bethel Interventional used the U.S. Mail to seek reimbursement, it is clear that Cho and Mah committed mail fraud.

898.    At all relevant times, Cho and Mah knew that Bethel Interventional, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Bethel Interventional.

899.    Allstate estimates that the unlawful operation of the Bethel Interventional enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 9 and incorporated by reference as if set forth in its entirety.

### C.    WESTERN JANEDA ENTERPRISE

900.    Yoo either personally used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Western Janeda to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

901.    Yoo caused Western Janeda to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Western Janeda mailed a demand for payment (i.e., invoice) to Allstate.

902.    Yoo's provision of excessive and medically unnecessary services to Western Janeda's patients rendered Western Janeda completely ineligible for No-Fault reimbursement under New York law.

903.     Yoo's purposeful conduct in causing Western Janeda to operate in New York even though the company was not authorized to do so also rendered Western Janeda completely ineligible for No-Fault reimbursement under New York law.

904.     Because Western Janeda was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, **Yoo purposely caused** Western Janeda **to make a misrepresentation each and every time that** Western Janeda **mailed a document** to Allstate claiming eligibility for reimbursement.

905.     Moreover, because (a) Western Janeda was not lawfully eligible to seek or collect No-Fault benefit payments, (b) **Yoo caused** Western Janeda **to** seek No-Fault reimbursement from Allstate (even though Western Janeda was not entitled to such reimbursement), and (c) Western Janeda used the U.S. Mail to seek reimbursement, it is clear that Yoo committed mail fraud.

906.     At all relevant times, Yoo knew that Western Janeda, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Western Janeda.

907.     Allstate estimates that the unlawful operation of the Western Janeda enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 10 and incorporated by reference as if set forth in its entirety.

**D.   HACKENSACK SURGERY CENTER, L.L.C. ENTERPRISE**

908.     Yoo either personally used the U.S. Mail to further this fraudulent scheme by causing medical bills and records from Hackensack Surgery to be mailed to Allstate and/or counsel

for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

909.    Yoo caused Hackensack Surgery to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Hackensack Surgery mailed a demand for payment (i.e., invoice) to Allstate.

910.    Yoo's provision of excessive and medically unnecessary services to Western Janeda's patients at Hackensack Surgery rendered Hackensack Surgery completely ineligible for No-Fault reimbursement under New York law.

911.    Because Hackensack Surgery was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Yoo purposely caused Hackensack Surgery to make a misrepresentation each and every time that Hackensack Surgery mailed a document to Allstate claiming eligibility for reimbursement.

912.    Moreover, because (a) Hackensack Surgery was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Yoo caused Hackensack Surgery to seek No-Fault reimbursement from Allstate (even though Hackensack Surgery was not entitled to such reimbursement), and (c) Hackensack Surgery used the U.S. Mail to seek reimbursement, it is clear that Yoo committed mail fraud.

913.    At all relevant times, Yoo knew that Hackensack Surgery, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Hackensack Surgery.

914.    Allstate estimates that the unlawful operation of the Hackensack Surgery enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in

furtherance of this scheme is annexed at Exhibit 11 and incorporated by reference as if set forth in its entirety.

## VII.   ALLSTATE'S JUSTIFIABLE RELIANCE

915.   Each claim submitted to Allstate by or on behalf of Mah, Choi, Song, Rim, Cho, Yoo, NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery was verified pursuant to Insurance Law § 403.

916.   At all relevant times, Mah, Choi, Song, Rim, Cho, and Yoo, as licensed healthcare providers, were legally and ethically obligated to act with honesty and integrity in connection with their provision of, and billing for, healthcare services.

917.   To induce Allstate to promptly pay Mah, Choi, Song, Rim, Cho, Yoo, NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery's invoices for services rendered to patients, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that Mah, Choi, Song, Rim, Cho, Yoo, NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery were eligible to be reimbursed under New York's No-Fault Laws.

918.   Further, to induce Allstate to promptly pay the non-compensable charges for the professional healthcare services and surgeries purportedly provided to patients of Mah, Choi, Song, Rim, Cho, Yoo, NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery, the defendants hired attorneys and law firms to pursue collection of the fraudulent and/or otherwise non-compensable charges from Allstate.  These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Mah, Choi, Song, Rim, Cho, Yoo, NPTCA, Bethel Interventional, and Western Janeda's invoices are not promptly paid in full.

919.     Allstate is under a statutory and contractual obligation to promptly and fairly process claims within thirty (30) days.  The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

920.     At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Mah, Choi, Song, Rim, Cho, Yoo, NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery's reimbursement eligibility under New York law.

921.     Acting in reasonable reliance on these misrepresentations, Allstate paid money to Mah, Choi, Song, Rim, Cho, Yoo, NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery to its detriment.

922.     Allstate would not have made any of these payments to these entities had the defendants provided true and accurate information about Mah, Choi, Song, Rim, Cho, Yoo, NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery's reimbursement eligibility under New York law, including the operation of the entities and the fact and necessity of the services provided.

923.     As a result of the defendants' conduct, Allstate has been forced to make substantial payments in reasonable reliance on the defendants' false healthcare documentation and false representations regarding the defendants' eligibility for reimbursement under New York's No-Fault Laws.

924.     Because the defendants actively concealed their fraudulent conduct from Allstate, Allstate did not discover, and could not have reasonably discovered, that it had been damaged by the defendants' fraudulent conduct until shortly before it filed this Complaint.

## VIII.  **DAMAGES**

925.   The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made by Allstate to NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery in connection with claims made under New York's No-Fault Laws, the exact amount to be determined at trial, including:

(a) Payments made to Northern Physical Therapy, Chiropractic and Acupuncture, PLLC totaling at least $621,840.00, the exact amount to be determined at trial.  The chart at Exhibit 12 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Northern Physical Therapy, Chiropractic and Acupuncture, PLLC in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(b) Payments made to Bethel Interventional Pain Management LLC totaling at least $151,677.00, the exact amount to be determined at trial.  The chart at Exhibit 13, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Bethel Interventional Pain Management LLC in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(c) Payments made to Western Janeda Orthopedics of New Jersey L.L.C. totaling at least $821,659.00, the exact amount to be determined at trial.  The chart at Exhibit 14, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Western Janeda Orthopedics of New Jersey L.L.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(d) Payments made to Hackensack Surgery Center, L.L.C. totaling at least $622,807.00, the exact amount to be determined at trial.  The chart at Exhibit 15, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Hackensack Surgery Center, L.L.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

## IX.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NORTHERN PHYSICAL THERAPY, CHIROPRACTIC AND ACUPUNCTURE, PLLC ENTERPRISE
### (Against Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and Seung Yeon Song, L.Ac.)

926.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

927.    Northern Physical Therapy, Chiropractic and Acupuncture, PLLC ("NPTCA") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

928.    In connection with the operation and management of the NPTCA enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac. and Seung Yeon Song, L.Ac. (collectively "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of NPTCA's business, or should have reasonably foreseen that the mailing of such false medical documentation by NPTCA would occur, in furtherance of their scheme to defraud.

929.    The Count I Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 8.

132

930.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

931.     Policies of insurance were delivered to insureds through the U.S. Mail.

932.     Payments to NPTCA traveled through the U.S. Mail.

933.     As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at NPTCA, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

934.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to NPTCA for the benefit of the Count I Defendants that would not otherwise have been paid.

935.     The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

936.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

937.     By mailing numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

938.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to NPTCA for the benefit of the Count I Defendants.

939.    The Count I Defendants participated in the conduct of the NPTCA enterprise through a pattern of racketeering activities.

940.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

941.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

942.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

943.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

944.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### NORTHERN PHYSICAL THERAPY, CHIROPRACTIC AND ACUPUNCTURE, PLLC ENTERPRISE
### (Against Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and Seung Yeon Song, L.Ac.)

945.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

946.    Defendants Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac. and Seung Yeon Song, L.Ac. (collectively "Count II Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Northern Physical Therapy, Chiropractic and Acupuncture, PLLC ("NPTCA").

947.     The Count II Defendants each agreed to further, facilitate, support, and operate the NPTCA enterprise.

948.     As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

949.     The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of NPTCA even though NPTCA was not eligible to collect such benefits by virtue of its unlawful conduct.

950.     The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

951.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count II Defendants' unlawful conduct described herein.

952.     By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**BETHEL INTERVENTIONAL PAIN MANAGEMENT LLC ENTERPRISE**
**(Against John S. Cho, M.D. and Sangwoo Mah, D.C.)**

953.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

954.     Bethel Interventional Pain Management LLC ("Bethel Interventional") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

955. In connection with the operation and management of the Bethel Interventional enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants John S. Cho, M.D. and Sangwoo Mah, D.C. (collectively "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Bethel Interventional's business, or should have reasonably foreseen that the mailing of such false medical documentation by Bethel Interventional would occur, in furtherance of their scheme to defraud.

956. The Count III Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 9.

957. Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

958. Policies of insurance were delivered to insureds through the U.S. Mail.

959. Payments to Bethel Interventional traveled through the U.S. Mail.

960. As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Bethel Interventional, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

961. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Bethel Interventional for the benefit of the Count III Defendants that would not otherwise have been paid.

962. The Count III Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

963. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

964. By mailing numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

965. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Bethel Interventional for the benefit of the Count III Defendants.

966. The Count III Defendants participated in the conduct of the Bethel Interventional enterprise through a pattern of racketeering activities.

967. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

968. The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

969. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

970. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

971.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
## BETHEL INTERVENTIONAL PAIN MANAGEMENT LLC ENTERPRISE
### (Against John S. Cho, M.D. and Sangwoo Mah, D.C.)

972.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

973.    Defendants John S. Cho, M.D. and Sangwoo Mah, D.C. (collectively "Count IV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Bethel Interventional Pain Management LLC ("Bethel Interventional").

974.    The Count IV Defendants each agreed to further, facilitate, support, and operate the Bethel Interventional enterprise.

975.    As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

976.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Bethel Interventional even though Bethel Interventional was not eligible to collect such benefits by virtue of its unlawful conduct.

977.    The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

978.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

979.    By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**WESTERN JANEDA ORTHOPEDICS OF NEW JERSEY, L.L.C. ENTERPRISE**
**(Against Daniel J. Yoo, M.D.)**

980.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

981.    Western Janeda Orthopedics of New Jersey, L.L.C. ("Western Janeda") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

982.    In connection with the operation and management of the Western Janeda enterprise and with each of the claims identified in plaintiffs' Complaint, Defendant Daniel J. Yoo, M.D. ("Count V Defendant") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Western Janeda's business, or should have reasonably foreseen that the mailing of such false medical documentation by Western Janeda would occur, in furtherance of their scheme to defraud.

983.     The Count V Defendant employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 10.

984.     Among other things, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

985.     Policies of insurance were delivered to insureds through the U.S. Mail.

986.     Payments to Western Janeda traveled through the U.S. Mail.

987.     As documented above, the Count V Defendant repeatedly and intentionally caused Western Janeda to submit invoices and other medical documentation to Allstate relating to evaluations, surgeries, and injections that were purportedly performed by the Count V Defendant upon Western Janeda patients for the express purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

988.     As alleged above, the evaluations, surgeries, and injections performed by the Count V Defendant upon Western Janeda patients were (a) medically unnecessary, (b) falsely reported, (c) fraudulently billed, (d) not lawfully rendered in accordance with New York law, and (e) performed as the direct result of a patient referral made in violation of New Jersey law; therefore, Western Janeda's claims for payment in connection with these evaluations, surgeries, and injections were not compensable under New York's No-Fault laws.

989.     Nevertheless, the Count V Defendant knowingly caused Western Janeda to submit, through the U.S. Mail, invoices and other documentation to Allstate demanding payment in

connection with these valuations, surgeries, and injections that were purportedly performed by the Count V Defendant upon Western Janeda patients.

990.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Western Janeda for the benefit of the Count V Defendant that would not otherwise have been paid.

991.    The pattern of fraudulent claims that the Count V Defendant purposely caused Western Janeda to make, each appearing legitimate on their face, also prevented Allstate from discovering the Count V Defendant's fraudulent conduct for a long period of time, thus enabling this scheme to continue without being detected.

992.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

993.    By mailing numerous fraudulent claims in an ongoing scheme, the Count V Defendant engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

994.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Western Janeda for the benefit of the Count V Defendant.

995.    The Count V Defendant participated in the conduct of the Western Janeda enterprise through a pattern of racketeering activities.

996.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendant's conduct.

997.    The Count V Defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

998.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

999.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1000.   By virtue of the Count V Defendant's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(c)
## HACKENSACK SURGERY CENTER, L.L.C. ENTERPRISE
### (Against Daniel J. Yoo, M.D.)

1001.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1002.   Hackensack Surgery Center, L.L.C. ("Hackensack Surgery") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1003.   In connection with the operation and management of the Hackensack Surgery enterprise and with each of the claims identified in plaintiffs' Complaint, Defendant Daniel J. Yoo, M.D. ("Count VI Defendant") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Hackensack Surgery's business, or should have reasonably foreseen that the mailing of such false medical documentation by Hackensack Surgery would occur, in furtherance of their scheme to defraud.

1004.   The Count VI Defendant employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 11.

142

1005.   Among other things, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1006.   Policies of insurance were delivered to insureds through the U.S. Mail.

1007.   Payments to Hackensack Surgery traveled through the U.S. Mail.

1008.   As documented above, the Count VI Defendant repeatedly and intentionally caused Hackensack Surgery to submit invoices and other medical documentation to Allstate for facility services relating to surgeries and injections that were purportedly performed by the Count VI Defendant upon Western Janeda patients at Hackensack Surgery in New Jersey for the express purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1009.   As alleged above, the surgeries and injections performed by the Count VI Defendant upon Western Janeda patients at Hackensack Surgery in New Jersey were (a) medically unnecessary, (b) falsely reported, (c) fraudulently billed, and (d) performed as the direct result of a patient referral made in violation of New Jersey law; therefore, Hackensack Surgery's claims for payment in connection with these surgeries and injections were not compensable under New York's No-Fault laws.

1010.   Nevertheless, the Count VI Defendant knowingly caused Hackensack Surgery to submit, through the U.S. Mail, invoices and other documentation to Allstate demanding payment for the facility services that Hackensack Surgery provided in connection with the surgeries and injections that were purportedly performed by the Count VI Defendant upon Western Janeda patients at Hackensack Surgery in New Jersey.

1011.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Hackensack Surgery that would not otherwise have been paid.

1012.   The pattern of fraudulent claims that the Count VI Defendant purposely caused Hackensack Surgery to make, each appearing legitimate on their face, also prevented Allstate from discovering the Count VI Defendant's fraudulent conduct for a long period of time, thus enabling this scheme to continue without being detected.

1013.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1014.   By mailing numerous fraudulent claims in an ongoing scheme, the Count VI Defendant engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1015.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Hackensack Surgery for the benefit of the Count VI Defendant.

1016.   The Count VI Defendant participated in the conduct of the Hackensack Surgery enterprise through a pattern of racketeering activities.

1017.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VI Defendant's conduct.

1018.   The Count VI Defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1019.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1020.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1021.  By virtue of the Count VI Defendant's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT VII**</u>
**COMMON LAW FRAUD**
**(Against Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and Seung Yeon Song, L.Ac.)**

1022.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1023.  Defendants Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac. and Seung Yeon Song, L.Ac. (collectively "Count VII Defendants") conspired to defraud Allstate through their unlawful management and control of Northern Physical Therapy, Chiropractic and Acupuncture, PLLC.

1024.  The Count VII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Northern Physical Therapy, Chiropractic and Acupuncture, PLLC was entitled to receive No-Fault reimbursement under New York law.

1025.  These misrepresentations of fact by the Count VII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count VII Defendants' reports, invoices and collection documentation.

1026.  The Count VII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1027.  These misrepresentations were intentionally made by the Count VII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Northern Physical

Therapy, Chiropractic and Acupuncture, PLLC—an unlawfully operated and controlled professional service limited liability corporation—for payment of No-Fault insurance benefits.

1028.   The Count VII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1029.   Allstate reasonably relied, to its detriment, upon the Count VII Defendants' material misrepresentations concerning Northern Physical Therapy, Chiropractic and Acupuncture, PLLC's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1030.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Northern Physical Therapy, Chiropractic and Acupuncture, PLLC totaling at least $621,840.00, even though Northern Physical Therapy, Chiropractic and Acupuncture, PLLC was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## <u>COUNT VIII</u>
## COMMON LAW FRAUD
### (Against Bethel Interventional Pain Management LLC, Sangwoo Mah, D.C., and John S. Cho, M.D.)

1031.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1032.   Defendants Bethel Interventional Pain Management LLC, Sangwoo Mah, D.C., and John S. Cho, M.D. (collectively "Count VIII Defendants") did conspire to defraud Allstate through their unlawful management and control of Bethel Interventional Pain Management LLC.

1033.   The Count VIII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Bethel Interventional Pain Management LLC was entitled to receive No-Fault reimbursement under New York law.

1034.   These misrepresentations of fact by the Count VIII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count VIII Defendants' reports, invoices and collection documentation.

1035.   The Count VIII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1036.   These misrepresentations were intentionally made by the Count VIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Bethel Interventional Pain Management LLC—an unlawfully operated and controlled limited liability corporation—for payment of No-Fault insurance benefits.

1037.   The Count VIII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1038.   Allstate reasonably relied, to its detriment, upon the Count VIII Defendants' material misrepresentations concerning Bethel Interventional Pain Management LLC's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1039.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Bethel Interventional Pain Management LLC totaling at least $151,677.00, even though Bethel Interventional Pain Management LLC was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT IX
## COMMON LAW FRAUD
**(Against Western Janeda Orthopedics of New Jersey L.L.C. and Daniel J. Yoo, M.D.)**

1040.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1041.   Defendants Western Janeda Orthopedics of New Jersey L.L.C. and Daniel J. Yoo, M.D. (collectively "Count IX Defendants") did conspire to defraud Allstate through their unlawful operation of Western Janeda Orthopedics of New Jersey L.L.C.

1042.   The defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Western Janeda Orthopedics of New Jersey L.L.C. was entitled to receive No-Fault reimbursement under New York law.

1043.   These misrepresentations of fact by the Count IX Defendants included, but were not limited to, the material misrepresentations of fact made in the Count IX Defendants' reports, invoices and collection documentation.

1044.   The Count IX Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1045.   These misrepresentations were intentionally made by the Count IX Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Western Janeda Orthopedics of New Jersey L.L.C. for payment of No-Fault insurance benefits.

1046.   The Count IX Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1047.   Allstate reasonably relied, to its detriment, upon the Count IX Defendants' material misrepresentations concerning Western Janeda Orthopedics of New Jersey L.L.C.'s eligibility to

148

receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1048.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Western Janeda Orthopedics of New Jersey L.L.C. totaling at least $821,659.00, even though Western Janeda Orthopedics of New Jersey L.L.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

### COUNT X
### COMMON LAW FRAUD
### (Against Hackensack Surgery Center, L.L.C. and Daniel J. Yoo, M.D.)

1049.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1050.   Defendants Hackensack Surgery Center, L.L.C. and Daniel J. Yoo, M.D. (collectively "Count X Defendants") did conspire to defraud Allstate through their unlawful operation of Hackensack Surgery Center, L.L.C.

1051.   The defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Hackensack Surgery Center, L.L.C. was entitled to receive No-Fault reimbursement under New York law.

1052.   These misrepresentations of fact by the Count X Defendants included, but were not limited to, the material misrepresentations of fact made in the Count X Defendants' reports, invoices and collection documentation.

1053.   The Count X Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1054.   These misrepresentations were intentionally made by the Count X Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Hackensack Surgery Center, L.L.C. for payment of No-Fault insurance benefits.

1055.   The Count X Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1056.   Allstate reasonably relied, to its detriment, upon the Count X Defendants' material misrepresentations concerning Hackensack Surgery Center, L.L.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1057.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Hackensack Surgery Center, L.L.C. totaling at least $622,807.00, even though Hackensack Surgery Center, L.L.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XI
## COMMON LAW FRAUD
**(Against Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., Seung Yeon Song, L.Ac., John S. Cho, M.D., Daniel J, Yoo, M.D., Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, Bethel Interventional Pain Management LLC, Western Janeda Orthopedics of New Jersey, L.L.C., and Hackensack Surgery Center, L.L.C.)**

1058.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1059.   Defendants Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., Seung Yeon Song, L.Ac., John S. Cho, M.D., Daniel J, Yoo, M.D., Northern Physical Therapy, Chiropractic and Acupuncture, PLLC ("NPTCA"), Bethel Interventional Pain Management LLC

("Bethel Interventional"), Western Janeda Orthopedics of New Jersey, L.L.C. ("Western Janeda"), and Hackensack Surgery Center, L.L.C. ("Hackensack Surgery") (collectively "Count XI Defendants") conspired to defraud Allstate by (a) providing unnecessary and unwarranted healthcare services, (b) charging for these services at unlawfully excessive rates, (c) referring patients among NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery to generate support for the provision of unnecessary and unwarranted healthcare services, (d) operating NPTCA, Bethel Interventional, and Western Janeda in violation of New York law, (e) providing surgeries and injections to patients of Western Janeda and Hackensack Surgery pursuant to patient referrals made in violation of New Jersey law, (f) purposely unbundling certain charges submitted to Allstate, (g) misrepresenting the nature and extent of the services actually provided to patient, and (h) in certain cases, billing for services not actually rendered in the manner represented.

1060.   The Count XI Defendants' conspiracy and scheme to defraud involves the healthcare services provided to the Allstate claimants listed in the chart attached as Exhibit 16.

1061.   Both Allstate and the Allstate claimants listed in Exhibit 16 were victimized by the Count XI Defendants' concerted efforts to provide and then bill for as many tests and treatments as possible.

1062.   The Allstate claimants listed in Exhibit 16 were brought into this scheme through NPTCA where they were evaluated and treated by Mah and the Sham Members, and then referred by Mah to Cho and Bethel Interventional.  Mah purposely referred his NPTCA patients to Cho and Bethel Interventional to obtain the physician referral for physical therapy that was required under New York law.  Mah's referral of these claimants also gave Cho the opportunity to conduct evaluations and make recommendations and referrals for additional testing and treatments.

1063.   The claimants listed in Exhibit 16 followed Mah's referral and were evaluated by Cho through Bethel Interventional.  Cho's evaluations of these patients routinely resulted in (a) recommendations for injections and other pain management services, (b) referrals to Yoo and Western Janeda for orthopedic evaluations and surgical consultations, (c) positive findings of injury to support the provision of further tests and treatments, and (d) referrals of patients back to NPTCA for extensive regimens of physical therapy services.

1064.   The claimants listed in Exhibit 16 followed Cho's recommendations and were taken to New Jersey for the purpose of undergoing injections administered by Cho through Bethel Interventional at an ambulatory care facility.  Bethel Interventional then submitted unlawfully excessive charges to Allstate when demanding payment under New York's No-Fault laws.

1065.   The claimants listed in Exhibit 16 also accepted Cho's physician referrals for physical therapy, and then returned to NPTCA to undergo a further battery of unwarranted physical therapy services.

1066.   The claimants listed in Exhibit 16 also followed Cho's referrals and were evaluated by Yoo through Western Janeda.  These evaluations served the purposes of generating billing for Western Janeda, and providing Yoo with an opportunity to recommend surgery to Western Janeda patients and then self-refer those surgical candidates to Hackensack Surgery in New Jersey for the surgeries.

1067.   A substantial number of the claimants listed in Exhibit 16 elected to follow Yoo's recommendations for surgery.  Yoo self-referred these Western Janeda patients to Hackensack Surgery in New Jersey for the procedures.  Yoo—often with the help of an assistant surgeon—performed arthroscopic surgeries and PRP injections upon the claimants, and then caused Western Janeda to submit unlawfully excessive charges to Allstate seeking payment for the services.

1068.   As one of Hackensack Surgery's partial owners, Yoo (or persons working at Yoo's direction) also caused Hackensack Surgery to submit unlawfully excessive charges to Allstate when seeking payment for surgical facility services purportedly provided in connection with the surgeries purportedly performed by Yoo (and sometimes others) upon Western Janeda patients.

1069.   Following the surgeries, the claimants listed in Exhibit 16 returned to NPTCA for further (and unnecessary) acupuncture, chiropractic, and physical therapy services.  In many cases, these claimants also returned to Cho and Bethel Interventional for follow-up examinations and additional injections.  These claimants likewise returned to Yoo and Western Janeda for follow-up examinations wherein Yoo referred the claimants for further testing and treatment at NPTCA, and, in certain cases, recommended that the claimants undergo additional surgical procedures.

1070.   The Count XI Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact.  These misrepresentations include, but are not limited to, (a) false and misleading statements about the claimants' conditions and injuries, (b) false and misleading statements about the results of diagnostic tests administered to the claimants, (c) false and misleading statement about the clinical need and justification for additional testing, treatments, injections, and surgeries, (d) false and misleading statements concerning the nature and extent of the tests and treatments actually provided, (e) false and misleading statements that NPTCA, Bethel Interventional, and Western Janeda were operated in compliance with New York law, (f) false and misleading statements concerning Yoo's, Western Janeda's, and Hackensack Surgery's compliance with New Jersey law with respect to Yoo's self-referrals of claimants for surgery, and (g) false and misleading statements that NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery were entitled to receive No-Fault reimbursement under New York law.

1071.   These misrepresentations of fact made by the Count XI Defendants in furtherance of this scheme included, but were not limited to, the representations and statements contained in the Count XI Defendants' reports, invoices and collection documentation.

1072.   The Count XI Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1073.   These misrepresentations were intentionally made by the Count XI Defendants in furtherance of their scheme to defraud Allstate by submitting claims from NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery seeking payment under New York's No-Fault laws.

1074.   The Count XI Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1075.   Allstate reasonably relied, to its detriment, upon the Count XI Defendants' material misrepresentations concerning NPTCA's, Bethel Interventional's, Western Janeda's, and Hackensack Surgery's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1076.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to NPTCA, Bethel Interventional, Western Janeda, and Hackensack Surgery in connection with claims submitted to Allstate in connection with the claimants listed in Exhibit 16.

## COUNT XII
## UNJUST ENRICHMENT
### (Against Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and Seung Yeon Song, L.Ac.)

1077.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1078.   As alleged herein, Defendants Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and Seung Yeon Song, L.Ac. (collectively "Count XII Defendants") conspired to induce Allstate to make numerous and substantial payments to Northern Physical Therapy, Chiropractic and Acupuncture, PLLC pursuant to New York's No-Fault Laws.

1079.   As alleged herein, Northern Physical Therapy, Chiropractic and Acupuncture, PLLC was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Northern Physical Therapy, Chiropractic and Acupuncture, PLLC was unlawfully operated by and controlled by Sangwoo Mah, D.C., who is not qualified or licensed in New York to practice physical therapy or acupuncture.

1080.   When Allstate paid Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XII Defendants, or those persons working under their control, made concerning Northern Physical, Chiropractic and Acupuncture, PLLC's reimbursement eligibility under New York's No-Fault Laws.   Included in these misrepresentations were the representations that Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and/or Seung Yeon Song, L.Ac. were, at all relevant times, members of Northern Physical Therapy, Chiropractic and Acupuncture, PLLC and thus, able to both provide and bill for physical

therapy and acupuncture services through Northern Physical Therapy, Chiropractic and Acupuncture, PLLC.

1081.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Northern Physical Therapy, Chiropractic and Acupuncture, PLLC during the course of the scheme constitutes a benefit that the Count XII Defendants aggressively caused Northern Physical Therapy, Chiropractic and Acupuncture, PLLC to seek and voluntarily accept.

1082.   Throughout the course of their scheme, the Count XII Defendants caused Northern Physical Therapy, Chiropractic and Acupuncture, PLLC to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $621,840.00 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1083.   Under New York law, Sangwoo Mah, D.C.—as a person lacking legal authorization to (a) provide, dictate, or receive payment for physical therapy services or (b) provide, dictate, or receive payment for acupuncture services—never had any legal right to control Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, including its account receivables and/or the receipt and disbursement of any professional physical therapy and/or acupuncture fees and profits obtained by Northern Physical Therapy, Chiropractic and Acupuncture, PLLC or to participate in the operation and management of Northern Physical Therapy, Chiropractic and Acupuncture, PLLC.

1084.   As a direct and proximate result of Sangwoo Mah, D.C.'s unlawful control over Northern Physical Therapy, Chiropractic and Acupuncture, PLLC and/or participation in the operation and management of Northern Physical Therapy, Chiropractic, and Acupuncture, PLLC, at no point was Northern Physical Therapy, Chiropractic and Acupuncture, PLLC ever eligible for reimbursement under New York's No-Fault Laws.

1085.   Throughout the duration of this scheme, the Count XII Defendants obtained substantial monetary benefits totaling at least $621,840.00 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Northern Physical Therapy, Chiropractic and Acupuncture, PLLC.

1086.   Retention of those benefits by the Count XII Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT XIII**
**UNJUST ENRICHMENT**
**(Against Bethel Interventional Pain Management LLC, Sangwoo Mah, D.C., and John S. Cho, M.D.)**

1087.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1088.   As alleged herein, Defendants Bethel Interventional Pain Management LLC, Sangwoo Mah, D.C., and John S. Cho, M.D. (collectively "Count XIII Defendants") conspired to induce Allstate to make numerous and substantial payments to Bethel Interventional Pain Management LLC pursuant to New York's No-Fault Laws.

1089.   As alleged herein, Bethel Interventional Pain Management LLC was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, (a) Bethel Interventional Pain Management LLC was not authorized to conduct business in the State of New York as a foreign professional service entity, and (b) Bethel Interventional Pain Management LLC was unlawfully operated by and controlled by Sangwoo Mah, D.C., who is not qualified or licensed in New York to provide physician services.

1090.   When Allstate paid Bethel Interventional Pain Management LLC, Allstate reasonably believed that it was legally obligated to make such payments based upon the

misrepresentations and omissions that the Count XIII Defendants, or those persons working under their control, made concerning Bethel Interventional Pain Management LLC's reimbursement eligibility under New York's No-Fault Laws.  Included in these misrepresentations were the representation that (a) Bethel Interventional Pain Management LLC was lawfully authorized to operate in the State of New York as a foreign professional service entity, and (b) John S. Cho, M.D. was, at all relevant times, the only person who participated in the operation, management, and control of Bethel Interventional Pain Management LLC.

1091.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Bethel Interventional Pain Management LLC during the course of the scheme constitutes a benefit that the Count XIII Defendants aggressively caused Bethel Interventional Pain Management LLC to seek and voluntarily accept.

1092.   Throughout the course of their scheme, the Count XIII Defendants caused Bethel Interventional Pain Management LLC to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $151,677.00 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1093.   Under New York law, Sangwoo Mah, D.C., as a person lacking legal authorization to provide, dictate, or receive payment for physician services, never had any legal right to control Bethel Interventional Pain Management LLC, including its account receivables and/or the receipt and disbursement of any professional physician fees and profits obtained by Bethel Interventional Pain Management LLC or to participate in the operation and management of Bethel Interventional Pain Management LLC.

1094.   As a direct and proximate result of Sangwoo Mah, D.C.'s unlawful control over Bethel Interventional Pain Management LLC and/or participation in the operation and

management of Bethel Interventional Pain Management LLC, at no point was Bethel Interventional Pain Management LLC ever eligible for reimbursement under New York's No-Fault Laws.

1095. Throughout the duration of this scheme, the Count XIII Defendants obtained substantial monetary benefits totaling at least $151,677.00 as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Bethel Interventional Pain Management LLC.

1096. Retention of those benefits by the Count XIII Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT XIV
## UNJUST ENRICHMENT
**(Against Western Janeda Orthopedics of New Jersey L.L.C.  and Daniel J. Yoo, M.D.)**

1097. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1098. As alleged herein, Defendants Western Janeda Orthopedics of New Jersey L.L.C. and Daniel J. Yoo, M.D. (collectively "Count XIV Defendants") conspired to induce Allstate to make numerous and substantial payments to Western Janeda Orthopedics of New Jersey L.L.C. pursuant to New York's No-Fault Laws.

1099. As alleged herein, Western Janeda Orthopedics of New Jersey L.L.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Western Janeda Orthopedics of New Jersey L.L.C. was, among other things, not authorized to conduct business in the State of New York as a foreign professional service entity.

1100. When Allstate paid Western Janeda Orthopedics of New Jersey L.L.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the

misrepresentations and omissions that the Count XIV Defendants, or those persons working under their control, made concerning Western Janeda Orthopedics of New Jersey L.L.C.'s reimbursement eligibility under New York's No-Fault Laws.

1101.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Western Janeda Orthopedics of New Jersey L.L.C. during the course of the scheme constitutes a benefit that the Count XIV Defendants aggressively caused Western Janeda Orthopedics of New Jersey L.L.C. to seek and voluntarily accept.

1102.   Throughout the course of their scheme, the Count XIV Defendants caused Western Janeda Orthopedics of New Jersey L.L.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $821,659.00 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1103.   Throughout the duration of this scheme, the Count XIV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Western Janeda Orthopedics of New Jersey L.L.C.

1104.   Retention of those benefits by the Count XIV Defendants would violate fundamental principles of justice, equity and good conscience.

### COUNT XV
### UNJUST ENRICHMENT
**(Against Hackensack Surgery Center, L.L.C. and Daniel J. Yoo, M.D.)**

1105.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1106.   As alleged herein, Defendants Hackensack Surgery Center, L.L.C. and Daniel J. Yoo, M.D. (collectively "Count XV Defendants") conspired to induce Allstate to make numerous

and substantial payments to Hackensack Surgery Center, L.L.C. pursuant to New York's No-Fault Laws.

1107.   As alleged herein, Hackensack Surgery Center, L.L.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, the facility services provided and billed for in connection with surgeries performed by Daniel J. Yoo, M.D. upon patients of Western Janeda Orthopedics of New Jersey L.L.C. at Hackensack Surgery Center, L.L.C. were the direct product of patient referrals made in violation of New Jersey law.

1108.   Because Hackensack Surgery Center, L.L.C.'s facility services failed to comply with all relevant New Jersey state licensing requirements applicable to ambulatory care facilities, Hackensack Surgery Center, L.L.C.'s claims for reimbursement in connection with such services were not eligible for compensation under New York's No-Fault laws.

1109.   When Allstate paid Hackensack Surgery Center, L.L.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XV Defendants, or those persons working under their control, made concerning Hackensack Surgery Center, L.L.C.'s compliance with all applicable New Jersey licensing requirements and its reimbursement eligibility under New York's No-Fault Laws.

1110.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Hackensack Surgery Center, L.L.C. during the course of the scheme constitutes a benefit that the Count IV Defendants aggressively caused Hackensack Surgery Center, L.L.C. to seek and voluntarily accept.

1111.   Throughout the course of their scheme, the Count XV Defendants caused Hackensack Surgery Center, L.L.C. to wrongfully obtain from Allstate No-Fault benefit payments

totaling at least $622,807.00 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1112.   Throughout the duration of this scheme, the Count XV Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Hackensack Surgery Center, L.L.C.

1113.   Retention of those benefits by the Count XV Defendants would violate fundamental principles of justice, equity and good conscience.

<u>**COUNT XVI**</u>
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Northern Physical Therapy, Chiropractic and Acupuncture, PLLC)**

1114.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1115.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1116.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physical therapist (i.e., Sangwoo Mah, D.C.), (c) unlawful control by one or more non-acupuncturist (i.e., Sangwoo Mah, D.C.), (d) unlawful sharing of professional physical therapy fees with one or more non-physical therapist (i.e., Sangwoo Mah, D.C.), (e) unlawful sharing of professional acupuncture fees with one or more non-acupuncturist (i.e., Sangwoo Mah, D.C.), and (f) billing for excessive and medically unnecessary healthcare services, Northern Physical Therapy, Chiropractic and Acupuncture, PLLC has, at all relevant times, been operating in violation of one or more New York state or local licensing requirements necessary to provide

professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (among other statutory provisions)), and thus has no standing to submit or receive assigned benefits under New York No-Fault Law.

1117.   Northern Physical Therapy, Chiropractic and Acupuncture, PLLC continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1118.   Northern Physical Therapy, Chiropractic and Acupuncture, PLLC continues to challenge Allstate's prior claim denials.

1119.   Northern Physical Therapy, Chiropractic and Acupuncture, PLLC continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1120.   A justifiable controversy exists between Allstate and Northern Physical Therapy, Chiropractic and Acupuncture, PLLC because Northern Physical Therapy, Chiropractic and Acupuncture, PLLC rejects Allstate's ability to deny such claims.

1121.   Allstate has no adequate remedy at law.

1122.   Northern Physical Therapy, Chiropractic and Acupuncture, PLLC will also continue to bill Allstate for No-Fault benefits payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Northern Physical Therapy, Chiropractic and Acupuncture, PLLC.

1123.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 22 U.S.C. §§ 2201 and 2202, declaring that Northern Physical Therapy, Chiropractic and

Acupuncture, PLLC, at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physical therapist, (c) unlawfully owned, operated, managed, and/or controlled by one or more non-acupuncturist, (d) engaged in the unlawful sharing of fees derived from the provision of professional physical therapist services, (e) engaged in the unlawful sharing of fees derived from the provision of professional acupuncturist services, (f) engaged in billing for healthcare services not rendered as represented, and (g) engaged in billing for medically unnecessary treatments and tests and thus has no standing to submit or receive assigned No-Fault benefits under New York No-Fault Law.

<u>COUNT XVII</u>
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Bethel Interventional Pain Management LLC)**

1124.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1125.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1126.   In view of its (a) unauthorized and unlawful operation in New York, (b) unlawful sharing of professional physician fees with one or more non-physician (i.e., Sangwoo Mah, D.C.), and (c) billing for excessive and medically unnecessary healthcare services, Bethel Interventional Pain Management LLC has, at all relevant times, been operating in violation of one or more New York state or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (among other statutory provisions)), and thus has no standing to submit or receive assigned benefits under New York No-Fault Law.

1127. Bethel Interventional Pain Management LLC continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1128. Bethel Interventional Pain Management LLC continues to challenge Allstate's prior claim denials.

1129. Bethel Interventional Pain Management LLC continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1130. A justifiable controversy exists between Allstate and Bethel Interventional Pain Management LLC because Bethel Interventional Pain Management LLC rejects Allstate's ability to deny such claims.

1131. Allstate has no adequate remedy at law.

1132. Bethel Interventional Pain Management LLC will also continue to bill Allstate for No-Fault benefits payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Bethel Interventional Pain Management LLC.

1133. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 22 U.S.C. §§ 2201 and 2202, declaring that Bethel Interventional Pain Management LLC, at all relevant times, was (a) not authorized to conduct business in New York, (b) not authorized to provide and bill for physician services provided in New York and billed for under New York's No-Fault Laws, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) engaged in billing for healthcare services not rendered as represented, and (e) engaged in billing for medically unnecessary treatments and tests and thus has no standing to submit or receive assigned No-Fault benefits under New York No-Fault Law.

## COUNT XVIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Western Janeda Orthopedics of New Jersey L.L.C.)

1134.  Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1135.  To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1136.  In view of its unauthorized and unlawful operation in New York, and its billing for excessive and medically unnecessary healthcare services, Western Janeda Orthopedics of New Jersey L.L.C. has, at all relevant times, been operating in violation of one or more New York state or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (among other statutory provisions)), and thus has no standing to submit or receive assigned benefits under New York No-Fault Law.

1137.  Western Janeda Orthopedics of New Jersey L.L.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1138.  Western Janeda Orthopedics of New Jersey L.L.C. continues to challenge Allstate's prior claim denials.

1139.  Western Janeda Orthopedics of New Jersey L.L.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1140.   A justifiable controversy exists between Allstate and Western Janeda Orthopedics of New Jersey L.L.C. because Western Janeda Orthopedics of New Jersey L.L.C. rejects Allstate's ability to deny such claims.

1141.   Allstate has no adequate remedy at law.

1142.   Western Janeda Orthopedics of New Jersey L.L.C. will also continue to bill Allstate for No-Fault benefits payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future no-Fault claims submitted by Western Janeda Orthopedics of New Jersey L.L.C.

1143.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 22 U.S.C. §§ 2201 and 2202, declaring that Western Janeda Orthopedics of New Jersey L.L.C., at all relevant times, was (a) not authorized to conduct business in New York, (b) not authorized to provide and bill for physician services provided in New York and billed for under New York's No-Fault Laws, (c) engaged in billing for healthcare services not rendered as represented, and (d) engaged in billing for medically unnecessary treatments and tests and thus has no standing to submit or receive assigned No-Fault benefits under New York No-Fault Law.

## COUNT XIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against Hackensack Surgery Center, L.L.C.)**

1144.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-925 as if set forth fully herein.

1145.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1146.   Additionally, under New York law, a provider of healthcare services is not eligible for No-Fault reimbursement if the provider fails to meet any licensing requirement necessary to perform the service in the state in which the service was performed (e.g., New Jersey).

1147.   In view of its failure to comply with all relevant New Jersey state licensing requirements applicable to ambulatory care facilities, including its billing for facility services provided in connection with surgeries performed by Daniel J. Yoo, M.D. upon patients of Western Janeda Orthopedics, L.L.C. at Hackensack Surgery Center, L.L.C. that were the direct product of patient referrals made in violation of New Jersey law, and its billing for excessive and medically unnecessary healthcare services, Hackensack Surgery Center, L.L.C. has, at all relevant times, been operating in violation of one or more New York and New Jersey state or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law and the New Jersey Codey Law (among other statutory provisions)), and thus has no standing to submit or receive assigned benefits under New York No-Fault Law.

1148.   Hackensack Surgery Center, L.L.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1149.   Hackensack Surgery Center, L.L.C. continues to challenge Allstate's prior claim denials.

1150.   Hackensack Surgery Center, L.L.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1151.   A justifiable controversy exists between Allstate and Hackensack Surgery Center, L.L.C. because Hackensack Surgery Center, L.L.C. rejects Allstate's ability to deny such claims.

1152.   Allstate has no adequate remedy at law.

1153.   Hackensack Surgery Center, L.L.C. will also continue to bill Allstate for No-Fault benefits payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Hackensack Surgery Center, L.L.C.

1154.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 22 U.S.C. §§ 2201 and 2202, declaring that Hackensack Surgery Center, L.L.C., at all relevant times, was (a) engaged in providing and billing for facility services that were the direct product of patient referrals made in violation of New Jersey law applicable to ambulatory care facilities, and (b) engaged in billing for medically unnecessary treatments and tests and thus has no standing to submit or receive assigned No-Fault benefits under New York No-Fault Law.

## VII.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" or "plaintiffs"), respectfully pray that judgment enter in their favor, as follows:

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NORTHERN PHYSICAL THERAPY, CHIROPRACTIC AND ACUPUNCTURE, PLLC ENTERPRISE
### (Against Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and Seung Yeon Song, L.Ac.)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT II
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**NORTHERN PHYSICAL THERAPY, CHIROPRACTIC AND ACUPUNCTURE, PLLC**
**ENTERPRISE**
**(Against Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and Seung**
**Yeon Song, L.Ac.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and

attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT III
**VIOLATION OF 18 U.S.C. § 1962(c)**
**BETHEL INTERVENTIONAL PAIN MANAGEMENT LLC ENTERPRISE**
**(Against John S. Cho, M.D. and Sangwoo Mah, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and

attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT IV
**VIOLATION OF 18 U.S.C. § 1962(d)**
**BETHEL INTERVENTIONAL PAIN MANAGEMENT LLC ENTERPRISE**
**(Against John S. Cho, M.D. and Sangwoo Mah, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### WESTERN JANEDA ORTHOPEDICS OF NEW JERSEY, L.L.C. ENTERPRISE
### (Against Daniel J. Yoo, M.D.)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(c)
### HACKENSACK SURGERY CENTER, L.L.C. ENTERPRISE
### (Against Daniel J. Yoo, M.D.)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in this Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VII
## COMMON LAW FRAUD
**(Against Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and Seung Yeon Song, L.Ac.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT VIII
## COMMON LAW FRAUD
**(Against Bethel Interventional Pain Management LLC, Sangwoo Mah, D.C., and John S. Cho, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT IX
## COMMON LAW FRAUD
**(Against Western Janeda Orthopedics of New Jersey L.L.C. and Daniel J. Yoo, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants

   seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT X
## COMMON LAW FRAUD
**(Against Hackensack Surgery Center, L.L.C. and Daniel J. Yoo, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

   the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants

   seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XI
## COMMON LAW FRAUD
**(Against Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., Seung Yeon Song, L.Ac., John S. Cho, M.D., Daniel J, Yoo, M.D., Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, Bethel Interventional Pain Management LLC, Western Janeda Orthopedics of New Jersey, L.L.C., and Hackensack Surgery Center, L.L.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

   the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants

   seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just

## COUNT XII
### UNJUST ENRICHMENT
**(Against Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, Sangwoo Mah, D.C., Seung Hyuk Choi, P.T., Ho Rheem Rim, L.Ac., and Seung Yeon Song, L.Ac.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XIII
### UNJUST ENRICHMENT
**(Against Bethel Interventional Pain Management LLC, Sangwoo Mah, D.C., and John S. Cho, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XIV
### UNJUST ENRICHMENT
**(Against Western Janeda Orthopedics of New Jersey L.L.C. and Daniel J. Yoo, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XV
### UNJUST ENRICHMENT
**(Against Hackensack Surgery Center, L.L.C. and Daniel J. Yoo, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XVI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against Northern Physical Therapy, Chiropractic and Acupuncture, PLLC)**

(a) DECLARE that Northern Physical Therapy, Chiropractic and Acupuncture, PLLC, at

all relevant times, has been unlawfully organized, controlled, and/or operated by at

least one non-physical therapist and non-acupuncturist, and otherwise operated in

violation of at least one New York state and/or local licensing requirement necessary to provide professional physical therapy and acupuncture services in New York;

(b) DECLARE that Northern Physical Therapy, Chiropractic and Acupuncture, PLLC's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Northern Physical Therapy, Chiropractic and Acupuncture, PLLC; and

(d) GRANT all other relief this Court deems just.

## COUNT XVII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Bethel Interventional Pain Management LLC)

(a) DECLARE that Bethel Interventional Pain Management LLC, at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Bethel Interventional Pain Management LLC's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Bethel Interventional Pain Management LLC; and

(d) GRANT all other relief this Court deems just.

## COUNT XVIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Western Janeda Orthopedics of New Jersey L.L.C.)

(a) DECLARE that Western Janeda Orthopedics of New Jersey L.L.C., at all relevant times, has been operated in violation of at least one New York state and/or local

licensing requirement necessary to provide and bill for professional physician services in New York;

(b) DECLARE that Western Janeda Orthopedics of New Jersey L.L.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Western Janeda Orthopedics of New Jersey L.L.C.; and

(d) GRANT all other relief this Court deems just.

### COUNT XIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Hackensack Surgery Center, L.L.C.)

(a) DECLARE that Hackensack Surgery Center, L.L.C., at all relevant times, has been operated in violation of at least one New Jersey state and/or local licensing requirements necessary to provide services as an ambulatory care facility in New Jersey and in violation of at least one New York state and/or local licensing requirement necessary to bill for such facility services in New York;

(b) DECLARE that Hackensack Surgery Center, L.L.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Hackensack Surgery Center, L.L.C.; and

(d) GRANT all other relief this Court deems just.

### JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____

Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Michael W. Whitcher (MW 7455)
mwhitcher@smithbrink.com
1325 Franklin Ave, Suite 320
Garden City, NY 11530
Ph: (347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Fire & Casualty Insurance Company, and*
*Allstate Property & Casualty Insurance Company*

Dated: May 15, 2019